## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **James D. Moses**<br>  **For himself and**<br>  **All others similarly situated**<br><br>  **Plaintiffs**<br><br>        **v.**<br><br>**DAVID M. WALKER**<br>**Comptroller General of the United States,**<br>**Government Accountability Office (GAO)**<br>  **and**<br>**Michael Doheny, Chair**<br>**The Personnel Appeals Board of the GAO,**<br>  **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    )<br>)<br>)<br>)<br>)<br>)<br>)    **Case No.  1:06 CV 01712  (JGP)** |

### PLAINTIFF'S SUR-REPLY MEMORANDUM
### IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

**I.    The Evidentiary Standard at This Stage of this Litigation:**

In considering a motion to dismiss under Rule 12(b)(6), the court must assume that

all facts alleged in the plaintiff's complaint are true, and must liberally construe those

allegations. *Conley v. Gibson*, 355 U.S. 41-46, 78 S. Ct. 99, 101-02, 2 Law Ed. 2d 80

(1957)[1].

As will be detailed below, that evidence demonstrates that Mr. Moses's statutorily

required notices were complete and timely.  In addition, his complaint is well pled and describes

---

[1]  The court further concluded:

"A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the
plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S.
at 45-46, 78 S.Ct. at 101-02. Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a
complaint's factual allegations.*Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 1832, 104 L.Ed.2d
338 (1989).Thus, it is only in the "unusual case" where the complaint on its face reveals some insuperable bar
to relief that a dismissal under Rule 12(b)(6) is warranted. *Fusco v. Xerox Corp.*, 676 F.2d 332, 334 (8th
Cir.1982).

a policy, pattern and practice of age discrimination, both the continuing discriminatory events, and as part of an overall long-standing pattern of discrimination against older workers based upon age.

II.    **Plaintiff's August 9th, 2006 Notice of Intent to Sue Was Timely**:

Plaintiffs notice of intent to sue, filed on August 9th, 2006, was timely filed.  The incorrect "start" date for plaintiffs 180 day period of time was used by counsel for the defendant, apparently based upon an error of omission in the department recording those dates.  If the correct effective start date for the date of the final decision on Mr. Moses's (Moses) adverse actions is used, February 16th, 2006, Moses's filing on August 9th, was timely, even if the date is when received by the GAO, August 14th, 2006.

A. The Date of Moses's Final Placement Decision Was Misstated:

Defendant misstates the applicable effective start date of both of the discriminatory events as applicable to this Plaintiff.  Defendant attempts to use as the start date the date the initial written reconsideration determination (as to Moses) was delivered to Moses by the Comptroller General.(Def. Reply, pg. 2, ¶ 1).

To accomplish that end, Counsel mislabels the initial notice to Moses as "final".  But after that first notice, on February 16, 2006 Moses and the Comptroller General had a 45 minute telephone conference on the subject of reconsideration of Moses's placement.  Therefore, the earlier notice, dated February 2, and received February 7th, could not have been "final" in the sense of being notice of the Comptroller General's final decision.  Defendant's Reply Memorandum states, erroneously:

[the]"***final*** decision [on Moses placement] was February 7, 2006, the date Plaintiff

received the CG's ***final*** reconsideration decision" (emphasis added).

The word "final" does not appear in the CG's letter of February 2, 2006. And that is not what happened, and in fact the preceding sentence omits a material fact. The Comptroller General further reconsidered the placement, at the CG's suggestion which was subject to a 45 minute conference on the subject of reconsideration. No other subject was discussed. (Moses Declaration, Exhibit 1, pg. 3[2], ¶ 7, pg. 5 ¶¶ 12[3], 13[4]).

The evidence of record clearly establishes that the 45 minute telephone conference occurred on February 16th, 2006 and occurred exactly in the manner described by Moses, and only on the subject of placement reconsideration. Using that date as the starting date, Moses Notice of Intent to Sue was timely filed on either August 9th, 2006, when mailed, or on August 14th, 2006 when received. Even using the later date, it was filed timely with one day to spare. The defendant is therefore incorrect in his factual assertions as to timeliness.

**B. The First "Notice" Received by Moses on February 7th, was not a "Final" Reconsideration Action:**

First, the word "final" does not appear anywhere in the CG's February 2, 2006, letter notice to Moses (See Exhibit 5). Thus, the label "final" is not supported by any written evidence of record, under later happenings in Moss's case, and is an erroneous conclusion of the Defendant's counsel.

Second, the letter of the Comptroller General himself refutes that interpretation. That CG's letter states (See-Exhibit 5, pg 2, final line):

---

[2] "... my telephone meeting with the CG was substantial and consisted only of discussions about reconsideration of my own placement in Band IIA."

[3] "...the conference was on only one subject–reconsideration."

[4] "...The only substantial purpose for the meeting, as evidenced by the substance of what was said by me and the responses by the Comptroller General, was my attempt to get the CG to reconsider and place me in Band IIB."

"Please contact Beth Miller, Confidential Assistant, on 512-5500 if your would like to set up an appointment with me *regarding my reconsideration decision*."  (Emphasis Added).

The above quoted phrase of the Comptroller General's letter of February 2, 2006 (Attachment 5) to Mr. Moses indicates that the reconsideration process was not final until the CG said it was.    This conclusion is driven simply because the CG had the authority to reconsider his preliminary decision at any time he wanted and said he would do that in the above cited letter.  The GAO has recently advertised the fact that a number of Band IIA designees were favorably reconsidered and placed in Band IIB.

The CG later confirmed that Moses's interpretation of his intent was true by actually holding the meeting with Mr. Moses.  In addition the subject of that meeting was *only* reasons for further reconsideration of the CG's decision.(Exhibit 1, pg 3, ¶ 7, pg. 4 ¶ 12., 13).  These words and acts of the CG contained in the 45 minute meeting were of such unmistakable clarity that Moses relied upon that further reconsideration in not filing his notice until he did, on August 9th, 2006 which was within the statutory180 day period for notice to the employer.


**C.  Details of Moses's Meeting with the CG Demonstrate that Reconsideration was Ongoing Until February 16th, 2006:**

Mr. Moses averred (Exhibit 1, with specific references below) that the conversation on February 16th, 2006 included many details indicating reconsideration was ongoing.  Among those were:

"6....During that conference [on February 16th, 2006] after a full presentation by me of the facts, it became evident to me that Mr. Walker was not going to change his mind from the position expressed in the earlier February 2nd , 2006 letter.  In other words he was not going to place me in Band IIB, and he didn't. He made his final decision not to grant my request for placement in Band IIB"(Exhibit 1, pg. 2, 3 ¶ 6).

4

"10....I discussed my 40 years of experience with GAO and how only considering the last three years of experience was unfair and it favored younger less experienced staff. I discussed the fact that I had been a GS-14, had been responsible for up to ten people and multiple jobs and that placing me in Band IIA was a demotion. The CG disagreed, saying that legally I was not demoted because I did not lose any money. I told him that I did lose money because I was denied the COLA for now and in the future because I was placed in Band IIA. I also told the CG that money was not the only reason for me wanting to be placed in Band IIB because my current salary puts me close to the top of the market based pay for a Band IIB. The CG then acknowledged that there could be psychological reasons. I told him that I was embarrassed, humiliated and would lose respect and status by being placed in Band IIA." (Exhibit 1, pg 4, ¶ 10).

"11....  I told him that one area of the rating system that African Americans and older people were falling short was in receiving "role model" marks. This is very significant because those receiving "role model" marks in the placement decision got 5 points whereas, the next highest rating mark only allowed 3 points. The CG told me that OOI had not evaluated the "role model" marks from a racial or age standpoint. He told me that he would check into both of the issues that I had brought to his attention—the rating system in general and the "role model" rating mark in particular. It is important to note that the CG acknowledged to all of the GAO staff in a "CG Chat" that the performance evaluation system showed lower average ratings for blacks as compared to whites. The CG announced that a study would be made by a private firm to determine why blacks are rated lower."  (Exhibit 1, pg 4,5, ¶ 11).

12.     "In that 45 minute meeting my unswerving objective was to get the CG to reconsider the decision, and to place me in Band IIB where I should have been all alone. Never in that entire conversation was there any statement from the CG that "I have made my final decision on your request for reconsideration and will not change my mind" or anything like that statement. The inescapable conclusion is that the conference was on only one subject -- reconsideration." (Exhibit 1, pg 5, ¶ 12).

13.     "Contrary to what the attorneys for the Defendant are claiming, this final meeting was not merely to ask questions about the restructuring process. I was quite familiar with that process. That subject was never brought up and never discussed. The only substantial purpose for the meeting, as evidenced by the substance of what was said by me and the responses by the Comptroller General, was my attempt to get the CG to reconsider and place me in Band IIB. The CG had the clear power to do this. However, upon the conclusion of the meeting, the CG had made it clear to me that he would not change his mind. I filed my complaint with the OOI the next day." (Exhibit 1, pg 5, ¶ 13).

19." ....this final meeting was not merely to ask questions about the restructuring process. I was quite familiar with the process and that subject was never discussed. The only substantial purpose for the meeting, as evidenced by the substance of what was said by me and the responses by the Comptroller General, was to get the CG to place me in

Band IIB.  The CG had the power to do this." (Exhibit 1, pg. 6 ¶ 19).

**D.      In Sum, These Events and Conversations Describe and Demonstrate a Continuation of the Reconsideration Process:**

The above quotes describe a reconsideration process, with presentation of facts, and discussion of why the decision was wrong, with responses by the CG.  In the context of what was happening, with reconsideration ongoing, it is clearly error to not classify that meeting as a part of the approved process of reconsideration.  No other purpose for the meeting makes sense, and the conversation was described before it happened as "reconsideration", not by Moses, but by the Comptroller General himself.

Under these circumstances, the Court should hold that the final decision occurred on February 16th, 2006, the final day of the reconsideration process.  The fact that the GAO failed to properly record the happenings of that day is not the responsibility of Moses, and he should not be held accountable for the paperwork error of the agency, howsoever it occurred.

**II.  Defendant Misstates the Facts on Mr. Moses Filings of Administrative Complaint and Failure of the GAO to Process Moses Complaints in 2002 and Mid 2006**:

Defendant misstates the number and effectiveness of Mr. Moses's earlier filed notices of intent to sue.  If those earlier complaints are viewed as the continuation of one pattern, and that pattern is the same as the instant acts, a continuing policy, pattern and practice of discrimination, will have been established.  That is what Moses also alleges, and none of his allegations have as yet been ruled upon by this Court.  If those allegations are taken as true, as they must be under I above, then none of Defendants arguments of untimeliness apply.  This is true even if the agency was correct in its assertions of untimeliness, which it is not.  See ***National Railroad Passenger Corporation, v. Morgan***, 536 U.S. 101 (2002).  A policy, pattern and practice that results in

discrimination is not subject to the same limitations as individual discrete events under the principle of **Morgan**.

Applying the principle of **Morgan, supra**, no part of Defendant's untimeliness argument would be applicable to Moses hostile work environment or pattern and practice claims. Plaintiff alleges, and it is currently undecided on the record of this case, that all of the recent activities are nothing more than a carry-on of the same ongoing continuing policy of discrimination that Moses has been complaining about for many years. That is the reason that all of these related cases have requested consolidation by the Court. The issue of liability is therefore identical throughout all of these related cases.

The only difference is the length of time and period of time the policy was actually applicable to each of the plaintiffs and each person in the class or classes they seek to represent.

It is well known, and finally defined in **Stephens v. Department of the Treasury**, 500 U.S. 1 (1991) that the Age Discrimination in Employment Act of 1967, 81 Stat. 602, 29 U.S.C. § 633a, et seq, as amended, (ADEA) does not contain a specific independent statute of limitations. Here, Moses filed a multiplicity of "Notices of Intent to Sue", and multiple administrative complaints. Any one of those prior notices, if the complaint is about a continuing policy, pattern and practice, may furnish the required notice, if the principles of **Morgan**, supra apply here. Those principles do apply, because Moses, as well as all plaintiffs in related cases, have alleged a hidden policy, implemented as a pattern and practice of barring older age protected professional employees from advancements, as well as other discriminatory practices.

Additionally, in an age discrimination case, all that must be done to fulfill the statutory administrative requirements is to file a notice of intent to sue within 180 days of the happening of the adverse event. Here, Moses has done that timely as to the discrete events he claims are

7

based upon the continuing age discrimination claimed.  In addition, however, he has fulfilled the factual requirements of alleging a policy of discrimination against employees 50[5] years of age and older.

Here, Mr. Moses has alleged two individual discrete claims, the adverse placement and the related COLA denial, and also a series of events, a policy, pattern and practice which is alleged to be the same continuation of discrimination for more then 20 years.  Thus, under either theory, Moses met all administrative exhaustion requirements and has well pled his case.

A similar policy, pattern and practice is as also alleged in the related cases, primarily ***Chennareddy, et al v. Walker***, Case No. 87-3538 (JGP) into which Moses began to attempt to intervene in 1999.  During the interim, he has filed no less than four Notices of Intent to Sue.  One was filed in 1999, another in 2000, another in 2005, and another in 2006[6].  All of those Notices are summarized into Moses Notice of August 9th, 2006 (Exhibit 2).

### III.  Defendant Also Misstates the Facts as to Filing of Administrative Complaints by Moses:

Defendant's brief also misstates the facts applicable to the timeliness of Plaintiffs filing of his administrative complaints.  That argument is irrelevant to the issue of Notice, in that none of Moses complaints since 2002 were completed as to administrative processing by the GAO.  It appears from the record in this case that the GAO "Office of Inclusiveness" is simply unable to timely process all of its complaints within the reasonable period set out by standard federal

---

[5]  The pattern as it appears from all of the data presently available begins a pattern of age discrimination in about 1985 with a ceiling on age amounting to a bar at about age 43, over the years of Moses employment that age bar has risen to about age 50.

[6]  See Exhibit 2, Notice and Re-Notice of Intent to Sue, Dated August 9th, 2006 listing previous filings of Notices in detail.

regulations and practice.  That period of time is 180 days.  That matter is irrelevant here, for the limited purposes of this opposition to a motion to dismiss.  That is because Moses filed his Notices of Intent to sue for both of the discrete events in accordance with the statute as interpreted by ***Stevens v. Department of the Treasury, supra***.

Finally, Defendant incorrectly states that Plaintiff has somehow argued and therefore relies upon an argument that "the filing of a Notice of Intent to Sue or exhaustion of administrative remedies was not necessary" (Def. Reply, pg 1).  This appears to be a red herring since Plaintiff did not miss his deadline, and did not argue that it was unnecessary for him to file a notice.  To the contrary, Plaintiff did in fact timely actually file a "Notice and Re-Notice of Intent to Sue" (Exhibit 2) as to each the several latest discriminatory personnel actions.  And one of those about which he complained was specifically and separately named as the COLA denial in the August 9th, 2006 notice (See, Exhibit 2, pg 1, ¶ 1, and pg. 2, ¶ 2-5)[7].

Since both of the major discriminatory actions detrimental to Moses were, contrary to the representations of the Defendant, mentioned prominently in the August 9th, Notice of Intent to Sue, the argument of the Defendant appears to be simply an error in failing to read plaintiff's allegations and evidence.

Finally, the "Notice of Intent to Sue" filed by the Plaintiff on August 9th, 2006 (Exhibit 2) clearly references both of Plaintiff's complaints, (1) the demotion to Band II A, and (2) the COLA denial.  Therefore, his complaints were timely brought to the attention of the GAO Office of Inclusiveness (OOI).  That notice was received by the GAO OOI on August 14th, 2006 (See United States Post Office Tracking Certificate, Exhibit 4, Attached).

---

[7]  Paragraph 1 of Moses Notice of Intent to Sue dated August 9th, 2006 states in part:

"...Those new matters result from the "Band II Restructuring" and cost of living adjustment (COLA) denials which became effective in his paycheck on February 16[th], 2006."

**IV.  The Correct Calculation of Timeliness**
**Refutes Defendants Erroneous Representations:**

No decision was ever made, and still has not been made on Moses' administrative

complaints (as of March 2, 2007).  Once the 180 days had passed, from the initial date of Moses

administrative complaint on this subject, (February 2, 2006) Moses was free to file his lawsuit

pursuant to his notice of intent to sue.

In calculating the timeliness of Moses' Notice of Intent to Sue, and whether or not Moses

filed his notice of intent to sue within 180 days of the final decision, therefore, the following

facts are determinative.

1.  The date of the final decision, as per the above evidence of record, including the CG's

final decision on the denial of Moses request for reconsideration was February 16th, 2006.  The

correct "Start Date" for the statutory calculation therefore is February 16th, 2006.

2.  The date of the Notice of Intent to Sue, when Mailed, August 9th, 2006 (Exhibit 3-4).

Elapsed days from effective date of the final decision date, = 174 days.

3.  The date the Notice of Intent to Sue was received, August 14, 2006.

Elapsed day from effective date of the final decision date, = 179 days.

4.  The lawsuit was actually filed on October 4, 2006 (Docket page 1).  Therefore, 30

days had expired from the date of the 30 day notice of intent to sue to the date this lawsuit was

filed..

Therefore, in all respects Moses's administrative procedures were timely and in

accordance with the applicable GAO regulations and/or ***Stevens, supra***.  Administrative

procedures, including the timely notice of intent to sue were fully and correctly performed.

Therefore Mr. Moses met the statutory requirements in all respects.

For these reasons, the Court should find that the grounds stated in Defendants Motion to Dismiss are faulty. The Motion to Dismiss should be denied.

**V.  Defendant's Statistical Representations (Def. Ex. # 1) are Just More of the Same, Bad Faith Misrepresentations to this Honorable Court; In a Word-Outrageous; That Exhibit, Which is Not Probative Evidence, Should be Stricken from the Record of Evidence in this Case:**

Defendant has submitted Exhibit 1 to this Court, purportedly as some sort of probative evidence of non-discrimination. First of all, in a motion to dismiss, Evidence can not be submitted or considered by the Court. To do that clearly violates Federal Rule 12(b)(6) and converts this Motion to one for summary judgment. If that is the intent of this submission, then of the motion to dismiss must be denied and summary judgment denied as not adequately establishing undisputed facts entitling Defendant to summary judgment.

Secondly, there is no foundation as to the accuracy of the data used to generate that document, and the statistical theory of what, if anything, it purports to show. But that Exhibit does demonstrate one important fact; GAO indeed has the statistical system that it has under oath denied to exist for over 20 years. That is where this Exhibit obviously came from.

Thirdly, to deal with the absurdities and misrepresentations of the statistics, Plaintiff has elicited the help of fellow complainant Dr. Venkareddy Chennareddy, to perform an analysis, not to submit some subjective opinion, but merely to point out to the Court the arithmetic and logical absurdities of the position GAO adopts as its own.

How GAO can say to the Court on one hand that it has no statistical system, or personnel data base, and on the other that the data base (which does not exist) shows non-discrimination, is a question of integrity that needs to be asked by this Court.

Dr. Chennareddy's analysis of the purported facts, in the light of the lack of any evidentiary foundation of data by GAO, and the failure of GAO to either object or refute the data relied upon in Dr. Chennareddy's initial analysis is submitted herewith as Exhibit 7.

The conclusion of that document, which is neither esoteric nor complex, is that GAO's data is both meaningless and false.

Counsel's Comments on GAO's Submission Follow.

## VI.  Detailed Comments Refuting GAO's Exhibit 1 to the Opposition to GAO's Motion to Dismiss :

Since a data base containing definitive evidence exists, despite GAO's previous denials of the existence of this evidence, why does not GAO simply use the entire database for all the staff members in Band II category and analyze it objectively and authentically by estimating an established model for deriving a statistical inference related to age-biased discrimination. The answer to this question is that GAO does not want to do that.  Such an objective procedure and analysis would force GAO to admit that it has been misleading the Court for more than 20 years.

**GAO's Argument is Fundamentally Flawed:**

The GAO argument, based on the chart, and numbers is crude and practically meaningless and not objective at all.  The GAO has failed to provide any objective criterion for selection to Band II-B from Band II at all, and again refuses to address the evidence of age-bias, which also highlights the false and pretextual nature of GAO's alleged reasons for the non-selection of age-protected persons.

GAO gave only numbers for two age groups, less than 40 years and 40 and above 40 years. According to the ADEA standard theory and case law, staff members who are 60 years old can claim discrimination against them in favor of those 55 years old and staff members, who are 50 years old can claim discrimination against them in favor of those 45 years old. That methodology as used in Chennareddy's opinion derived from the data in this case is the actual correct model of what an appropriate model must measure, not merely over 40 and under 40.

ADEA cases have consistently held that bias between ages at least 5 years apart could claim discrimination against those older persons in favor of those with lower ages even within the protected age group, 40 and above 40 years old.

GAO did not either address this issue or provide any objective , impartial, and mathematical  explanation for its wrong statistical inferential  statement that there was no age-biased discrimination in the Band II-B selection process in GAO. The evidence for a true age-biased discrimination hidden in the entire database cannot be revealed by mere chart and numbers provided by GAO in support of its argument. Chennareddy has previously provided a statistical evidence for age-biased discrimination in the case of GAO staff members belonging to the age group 49-69 years, basically the age group  addressed in the complaint.

In the absence of GAO-provided data, Chennareddy, the plaintiff statistical expert,  used the data provided by the counsel alleged to be extracted verbatim from GAO files of all of the persons 49 years of age and older who would be the class as defined in the putative class action case.

Chennareddy estimated a best and an appropriate statistical model for the data related to these prospective GAO staff members, who are 49 years old and older.  That model, which has not been refuted, was used to estimate the probability of selection to Band II-B based on the age

of a staff member within the age group 49-69 years. Based on the results of the model, there is

an unrefutable evidence for statistical inference that there is age-biased discrimination within

that age group.

This result was developed based upon years of experience in similar statistical and

mathematical work and numerous publications by Plaintiffs expert. An article in Jurimetrics was

given as a reference for the estimated model. Dr. Chennareddy justified his model and the

objectivity of his estimation procedure in his statistical opinion affidavit.

However, neither set of data should be considered by this court in deciding upon the

Defendant's Motion to Dismiss.

Respectfully submitted,

Signed, *charltonw2428*

Walter T. Charlton, Attorney for Plaintiffs
D.C. Bar # 186940
Walter T. Charlton & Associates
1156 15th, Street N.W. LL 10
Washington D.C., 20005-1704
Phone 410 571 8764, Fax 410 897 0471
charltonwt@comcast.net

Counsel for Plaintiff and the Putative Class

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
James D. Moses                                  )
For himself and                                 )
All others similarly situated                   )
                                                )
Plaintiffs                                      )
        V.                                      )
                                                ) Case No.    1:06 CV 01712  (JGP)
                                                )
DAVID M. WALKER                                 )
Comptroller General of the United States,       )
Government Accountability Office (GAO)          )
and                                             )
Michael Doheny, Chair                           )
The Personnel Appeals Board of the GAO,         )
Defendants.                                     )
_____)

REBUTTAL DECLARATION OF MR. JAMES D. MOSES, PLAINTIFF

(Note: this Declaration Is Plaintiff Moses's Second Declaration of Facts Rebutting
Defendant's Counsel's Incorrect Timing Calculation and
Incorrect Representation That Moses's
Notice of Intent to Sue Was Untimely)

I hereby declare under the penalties of perjury that the following determinative facts on

timeliness, are true and correct.

1.      My Notice of Intent to Sue dated August 9, 2006 (Exhibit 2), was mailed and received

timely, based upon the Post Office's Official Tracking certified mailing receipts (Exhibit 3).

The receipt signed by GAO employee, "Elaine B. Wise" is Exhibit 4.  Exhibit 3 specifies the

tracking number used in Exhibit 2, the Tracking Receipt.

2.      Even if the date the notice of intent to sue was received by GAO's Office of

Inclusiveness (August 14th, 2006) is used as the delivery date (rather than the date mailed), that

1

notice was received on the 179th, day from the date of the determination of the Comptroller

General's (CG) final decision demoting me.

3.      That final decision was made by the CG himself while I was on the telephone with him in

a telephone conference on February 16th, 2006.   The delivery was therefore within the 180 day

limit of the Comptroller General's final decision on my Band II placement (with one day to

spare).

4.      My Notice of intent to sue was actually mailed on August 9th, 2006, 173 days after the

date of the Comptroller General's personal and final decision on my Band II placement and

coincidently on the same date as the cost of living denial appeared in my paycheck of February

16th, 2006.

5.      My calculation that the notice was timely is  based on two key facts:

        (1) The effective operative date of the agency's decision on my placement was February

        16, 2006, the date of my first pay check that reflected my placement in Band IIA and

        which also included the COLA denial, and;

        (2) By coincidence, that same date, February 16th, 2006, was the date the Comptroller

        General personally made the final decision finally denying my request for

        reconsideration of my placement in Band IIA (a demotion)(See ¶ 3 above, and ¶¶ 6-14

        following).

6.      That decision I know of my own knowledge was made that day because it was made

while Mr. Walker and I were engaged  in a formal telephone conference agreed to by the CG to

be pursuant to my formal request for reconsideration of my placement in Band II A.  During that

conference after a full presentation by me of the facts, it became evident to me that Mr. Walker

was not going to change his mind from the position expressed in the earlier February 2nd, 2006

letter.  In other words he was not going to place me in Band IIB, and he didn't.  My placement in

Band II B, and COLA denial was reflected in my check received that very day.  I contacted a

counselor in OOI on 2/17/06 about filing  a discrimination , one day after the telephone meeting

with the CG.  In fact, I was waiting until the final meeting on my reconsideration before

invoking my right to file a complaint with OOI.

7.      **The Content of the 45 Minute Meeting On February 16th, 2006, Was**
        **Reconsideration of My Placement in Band IIA**

      The content of my telephone meeting with the CG was substantial and consisted only of

discussions about reconsideration of my own placement in Band IIA.

      As the Defendants correctly state, the CG's initial reply to my request for reconsideration

was dated February 2, 2006 and was received by me on February 7, 2006.  In that letter (Exhibit

5), the CG denied my request to be placed in Band IIB *but* offered the opportunity to me to

discuss that decision.

8.      The notice I received from the GAO of my reconsideration decision did not state that it

was a "final" decision.  In fact the CG's letter (Exhibit 5 hereto) did not contain any statement

that it was a "final" determination at all.  The word "final" does not appear anywhere in that

letter.  In fact, in the last paragraph reads to the contrary.  That last sentence invites further

reconsideration.  It says:

> "... Please contact Beth Miller, Confidential Assistant, on 512-5500 if you would like to
> set up an **appointment with me regarding my reconsideration decision**." [Exhibit 5,
> page 2]. (emphasis added).

9.       I took that opportunity and asked the CG for a personal meeting but instead was granted

a telephone meeting.  That meeting occurred on February 16, 2006.

10.     In that telephone meeting  I continued my push for placement in Band IIB.  I discussed

my 40 years of experience with GAO and how only considering the last three years of

experience was unfair and it favored younger less experienced staff.  I discussed the fact that I

had been a GS-14, had been responsible for up to ten people and multiple jobs and that placing

me in Band IIA was a demotion..  The CG disagreed, saying that legally I was not demoted

because I did not lose any money.  I told him that I did lose money because I was denied the

COLA for now and in the future because I was placed in Band IIA.  I also told the CG that

money was not the only reason for me wanting to be placed in Band IIB because my current

salary puts me close to the top of the market based pay for a Band IIB.  The CG then

acknowledged that there could be psychological reasons.  I told him that I was embarrassed,

humiliated and would lose respect and status by being placed in Band IIA.

11.     I talked about my accomplishments and some of the significant things that I had done

including supervising other staff.  I talked about the performance evaluation system and how it

was biased against Blacks and older people (Over 50).  In his letter dated February 2, 2006, the

CG acknowledged that the only area the he looked at in making his reconsideration decision was

my performance evaluations for the last three years.

        I told the CG that the performance evaluation system put in place just three years ago and

used to place people in Band IIB or IIA had not been validated as fair and equitable, and that

African American and older people in general were not being fairly rated.  I told him that one

area of the rating system that African Americans and older people were falling short was in

receiving "role model" marks.  This is very significant because those receiving "role model"

marks in the placement decision got 5 points whereas, the next highest rating mark only allowed

3 points.  The CG told me that OOI had not evaluated the "role model" marks from a racial or age standpoint.  He told me that he would check into both of the issues that I had brought to his attention—the rating system in general and the "role model" rating mark in particular.  It is important to note that the CG acknowledged to all of the GAO staff in a "CG Chat" that the performance evaluation system showed lower average ratings for blacks as compared to whites. The CG announced that a study would be made by a private firm to determine why blacks are rated lower.

12.      In that 45 minute meeting my unswerving objective was to get the CG to reconsider the decision, and to place me in Band IIB where I should have been all alone.  Never in that entire conversation was there any statement from the CG that "I have made my final decision on your request for reconsideration and will not change my mind" or anything like that statement.  The inescapable conclusion is that the conference was on only one subject -- reconsideration.

13.      Contrary to what the attorneys for the Defendant are claiming, this final  meeting was not merely to ask questions about the restructuring process.  I was quite familiar with that process. That subject was never brought up and never discussed.  The only substantial purpose for the meeting, as evidenced by the substance of what was said by me and the responses by the Comptroller General, was my attempt to get the CG to reconsider and place me in Band IIB. The CG had the clear power to do this.  However, upon the conclusion of the meeting, the CG had made it clear to me that he would not change his mind.  I filed my complaint with the OOI that very same day.

14.      For Defendant to attempt to classify this meeting as merely to answer questions about the restructuring process is just wrong and a transparent attempt to change the actual date for the

final agency decision and evade the actual facts of the situation.   The final agency decision to

not place me in Band IIB was on February 16, 2006, the date the CG indicated that he had made

his final decision.  Other than that oral notification, I never was so notified in writing of a final

decision as required by the rules contained in Order # 2900.3.

15.    **GAO Regulations (Order # 2900.3) Authorize Reconsideration by the CG:**

My right to a reconsideration meeting with the Comptroller General was pursuant to

GAO Order # 2900.3 Ch. 2 paragraph 13b.  I relied upon that regulation, in detrimental reliance

as to the effective date, which I believed to be AFTER completion of the reconsideration

process, not half-way through.  That Order, in pertinent part (pages 1 and 8 and 9) is attached

(See Exhibit 6).  That Order, requires the "final placement decision" to be notified in writing,

presumably *after* the reconsideration process was complete.  I never received any "final

placement decision" in writing after the CG's final meeting with me on that subject

(reconsideration).

16.    That particular part of the Order reads as follows:

**GAO Order # 2900.3, November 4, 2005**

 **Chapter 2, # 13, pages 8,9,**

**Feedback and Placement Reconsideration.**

"Employees who are not selected for placement in the band IIB pay range may requests a

reconsideration of the placement decision from the Comptroller General (CG) or his

designee(s)....Employees will be **notified in writing of the *final* placement decision**

resulting from the placement decision resulting from the placement reconsideration."

(Emphasis Added).

6

17.    The determination which the CG indicated to me would remain unchanged (on February 16th, 2006), was, as a matter of timing, the final word on the subject of my placement.  It is a well known matter of authority and power, that the CG can do exactly what he wants, including change decisions like the one affecting me.

18.  Again, I was never "notified in writing of the final placement decision resulting from the placement reconsideration" (Exhibit 6, pg 9, ¶ 1) which occurred in that meeting with the CG.  But he made it crystal clear that there would be no change in his previous determination.

19.    During my contact with OOI on February 167th, 2006 while filing my complaint, I was not notified of my duty to file within 180 days of the letter of February 2, 2006 or any other date.  I therefore relied upon my own knowledge of the facts and used the date of February 16th, 2006 as the final decision date in my later filings.  Also, I was never informed by OOI or any other part of GAO that the original letter was to be binding upon me as he date of the "final" determination for reconsideration by the CG.

20.  OOI has a duty to protect the rights of employees on such matters, I therefore believe that I was detrimentally deprived of my right to full notice on the due date for my complaint as calculated by GAO.  This was simply never done.

21.    It also appeared to me that the intent of the regulation under which I invoked that privilege to carry out my telephone meeting with Mr. Walker was not to shorten the time allowed by the federal code for filing notices.  However, that appears to be the position GAO is taking in its motion to dismiss.  I then believed, and still believe the CG also intended that the telephone conference was to be an integral part of the reconsideration process.  Under those

circumstances, it would appear to me that the time for filing should also be extended, as would

be normal procedure for reconsideration matters.

22.     Since I am, and have been for many years, a civil rights counselor, I am fully familiar

with the fact that I had only 180 days to file my notice of intent to sue in this case.  I carefully

calculated that time based upon the fact of the reconsideration regulation, and detrimentally

relied upon the regulation and the statements of the Comptroller General in that telephone

conference that he was reconsidering carefully, my demotion.  I have therefore used the

representations made to me by the Comptroller General, Mr. Walker as to his good faith

reconsideration in calculating the timing of my duty to timely file my notice of intent to sue

within 180 days of that decision.

23.     It should be noted that the comptroller general has never, to my knowledge, personally

disputed my claim that he made his final determination on the 16th, of February, after our final

conference.  My counsel informs me that no evidence received directly from the CG has been

submitted to date refuting any of the facts presented in this declaration.  Therefore, the contrary

conclusion appears to be a decision made by his attorney, without bothering to verify the date

directly with the CG or investigating my claims of the content of the February 16th, 2006

reconsideration conference.


24.     <u>Plaintiff's 2006 Notice of Intent to Sue Was Timely and Correctly Made:</u>

Defendant's argument contained in his Reply on page 1 incorrectly describes my

arguments and the content of my notice of intent to sue.  I took great care to correctly follow the

instructions for the objection and reconsideration process because it was vitally important to me

and others who were similarly situated.  The Band II restructuring, followed by the COLA denial

was a major change in GAO that has significant impact on those who were downgraded by being placed in Band IIA, like me.   After being placed in Band IIA, I asked the CG for reconsideration per the applicable regulation.

**25.  Defendant incorrectly alleges that Plaintiff failed to either Exhaust His Administrative Remedies or File a Notice of Intent to Sue regarding his Cost of Living Adjustment claims.**

The effective date of the COLA denial for me was February 16, 2006, when it first appeared in my pay check.  This is the first date that the COLA denial impacted me.  By coincidence it is the same date as my reconsideration telephone conference with the CG on my reconsideration request.

26.    In my Notice of Intent to Sue dated August 9, 2006, I did not fail to mention the COLA denial or "argue ...that the...filing of a Notice of Intent to Sue ... was not necessary".  In fact my notice of intent to sue clearly describes the COLA matter as a separate matter from the downgrading, whether in fact legally it is or not.  I stated that:

> "Those new matters result from the "Band II Restructuring" ***and*** cost of living adjustment (COLA) denials which became effective in his paycheck on February 16th, 2006." (Exhibit 2, page 1, ¶ 1).  (Emphasis added).

That document speaks for itself and is attached (Exhibit 2) should further questions arise.

27.    The above establishes timely filing on both the COLA and the Band II restructuring matters.

28.    The dates in that notice of intent to sue were never challenged as incorrect by the receiving department, which had a duty to timely notify me of any deficiencies.  I therefore conclude that this faulty procedure in GAO's Office of Inclusiveness, is just more of the same,

intentional misleading the employee (me) rather than helping as is the duty of that department under the law.

29.  I did not file a complaint with OOI questioning the COLA denial with the OOI department because at that time I considered that, and it was true, if I prevailed upon my complaint as to the demotion, I automatically would receive my COLA.  The two actions were linked so that result (the receiving of the COLA) would automatically follow.

30.    However, after consulting with my counsel, we determined to mention each of those actions separately, along with some others in the notice of intent to sue I filed on August 9th, 2006.  Therefore, it should be noted from Exhibit 2, hereto, as stated in the opening paragraph of this Declaration, that my notice of intent to sue was timely as to both of these claims, and not omitted as appears to be the misinformation presented by Defendant on page 1 of their Reply Memorandum when they state "Plaintiff argues that .. [the COLA denial] notice was not necessary".  That representation is simply wrong.

I declare under the penalties of perjury that the above statements are true and correct.

James D. Moses                                    February 28th, 2007
                                                            Date

8

EXHIBIT 2

# WALTER T. CHARLTON & ASSOCIATES
### Attorneys At Law, Washington, D.C.
--------
### 202 296 2975, 410 571 8764 (Phone)
### Mailing Address: 410 897 0471 (Fax)
### 230 Kirkley Road
### Annapolis, Maryland 21401

### August 9th, 2006

United States General Accounting Office (GAO)      **BY CERTIFIED MAIL**
Office of Opportunity and Inclusiveness              **RETURN RECEIPT REQUESTED**
451 G. Street, N.W.
Washington, D.C. 20548

*Re: Class Action(s) , Age Discrimination in Employment*
*Notice and Re-Notice of Intent to Sue 300 COLA Denials*
*(Pursuant to GAO Order # 2713.2, December 2, 1997)*

Ladies and Gentlemen:

This Notice is a New Notice of Intent to Sue by James D. Moses, presently a Band II A

analyst for GAO. He give this notice for himself and all others similarly situated pursuant to

GAO Order number 2713.2, Chapter 3, 9, page 12 (Age Discrimination in Employment

Act)(ADEA), Chapter 3, 10 (Equal Pay Act, Section 16(b) of the Fair Labor Standards Act) and

Chapter 4, (Class Complaints). This notice incorporates by this reference two previous notices of

intent to sue for the same pattern and practice of across-the-board age discrimination, and, in the

interest of caution, adds several recent discrete events which Mr. Moses alleges continue the

same pattern and practice. Those new matters result from the "Band II Restructuring" and cost of

living adjustment (COLA) denials which became effective in his paycheck on February 16th,

2006. Mr. Moses alleges that all of his complaints are timely, and the latest Notice is Timely

under Statute of Limitations contained in the Fair Labor Standards Act, as applicable to Federal

Employees, 29 U.S.C. § 631(a); 633(a) et seq, as amended. Mr. Moses alleges that GAO's Order

1

violates the existing statute of limitations of two years from the event, and three years if the

violation is intentional (as here). But in any event this Notice is timely for all matters contained

therein.

Mr. Moses notices his intent to sue as a class complaint for himself and about 300 other

similarly situated employees affected adversely by the "Band II Restructuring", or "Band II Split"

and denials of Cost of Living Increases (COLAs) which became effective with the pay check of

February 16, 2006. Mr. Moses has previously complained of these actions and received

counseling by GAO's Office of Inclusiveness, but no resolution has occurred.

Although Mr. Moses for years has been a regular counselor for employees, neither he nor

any employee he is aware of has received timely written or other notice of deadlines for

notification or filing applicable to age discrimination cases. Under federal civil rights law

principles, notice to employees of their rights in employment disputes is an important duty of the

GAO Office of Opportunity and Inclusiveness. That has simply not happened here.

Mr. Moses and his counsel recently became aware of the existence of GAO Order

Number 2713.2, effective December 2, 1997, through their own research. Chapters 3 and 4, of

that Order, if interpreted literally, mean that he must complain within 180 days of the occurrence

of the discrete events about which he complains. It is fortuitous that this fact became known

before the unnoticed deadline expired. However, as foregoing noted, Mr. Moses argues that all

of these events are part and parcel of the same discriminatory pattern and practice.

This letter is that notice, purportedly required by GAO Order # 2713.2 in the event the

"Band II Split" is found to be a discrete event and not a part, as Mr. Moses claims, of the overall

pattern of age discrimination at the GAO.

2

Mr. Moses alleges that the first payday that this occurrence became effective was on February 16, 2006, and that the harm is repeated effective on each payday thereafter, each one a separate violation of law. He alleges that about 300 persons are similarly situated in that they are over 40 years of age and have been effectively demoted in rank and denied COLAs while performing satisfactorily in their jobs.

As per this Notice, Mr. Moses intends to file an amendment to his existing class action lawsuit, or if it becomes necessary to file a new class action in the event the Court determines that the "Band II Split" and resulting actions by GAO are discrete events and not a part of the on-going overall pattern and practice of illegal age discrimination which he, and others have alleged previously in United States District Court Case numbers 87-3538 and 06 1002. Both of those cases allege essentially the same pattern and practice of across-the-board discrimination. Those cases are now "live" before the Honorable Judge John G. Penn, Senior Judge of the United States District Court for the District of Columbia.

Although unnecessary to file a separate notice under existing law, Mr. Moses also alleges that GAO's actions violate the Equal Pay Act. To the extent that act affords relief, no separate notification of the GAO is necessary under the existing GAO Order, 2713.2, chapter 2, # 10.

This Notice also memorializes Mr. Moses's actions in previously complaining to the Civil Rights Office, or as newly named the Office of Opportunity and Inclusiveness, for himself and all others similarly situated, in complaining about the discriminatory effect of the "Band II Split" events, occurrences and related decision to deny COLAs for himself and all others similarly situated.

In no way is this new notice to be construed as an admission of any failure to previously

3

complain, since in fact Mr. Moses has consistently been timely in accordance with all GAO regulations of which he is and had been made aware. You will please note that Mr. Moses served as a counselor, and therefore purportedly at least, received all instructions appropriate from GAO to perform in that capacity including regulations and GAO Orders which have been brought to his attention by the Office of Opportunity and Inclusiveness or in conversations with the Officials of the GAO with whom he has spoken and been counseled.

This Notice also incorporates by this reference his previous notices which Mr. Moses alleges are part of the on-going pattern and practices of discrimination about which he complains. Those are:

By letter of June 10, 1999 a Notice of Intent to Sue was given by letter, a copy of which was directed to the Comptroller General, Mr. David M. Walker. A copy of that letter is incorporated by this reference. That letter noticed and re-noticed intent to sue for a class action for age discrimination for 15 employees specifically named persons and 151 unnamed persons all of whom were then employees or former employees of the GAO. All of the specifically named persons had previously given the required notice of intent to sue as a part of the on-going case of V. Chennareddy et al v. David Walker, Case No. 87-3538 JGP.

By letter of April 6 , 2005 Mr. Moses again gave notice of intent to sue alleging continuing violations of (ADEA) alleging the same pattern and practice. When the intervention by Messrs. Moses, Davis and Gilbert was denied by the United States District Court, they filed a lawsuit to preserve their remedies. That lawsuit, Case No 06 1002 (JGP) resulted.

Both of the foregoing cases, and the claims of all of the present persons who seek to become class representatives in this case are presently pending before the Honorable Senior

United States District Judge, John G. Penn of the United States District Court for the District of Columbia.

No part of this new Notice of Intent to Sue is to be considered an admission that any previous notice of continuing violations is either abandoned or ineffective as to the new violations herein alleged, nor does this new notice constitute any waiver of or admission to any rights contained in the previous notices of intent to sue by Mr. Moses or any other party now before the United States District Court.

The undersigned firm represents all of those individuals named in the previous lawsuits as well as Mr. Moses for purposes of the contemplated lawsuit(s) and/or in any of the on-going cases as prospective intervenors.

Counsel for Mr. Moses hereby requests that any notification of actions required by Mr. Moses pursuant to GAO regulations or orders, including any counseling required for individual or class complaints, interviews or investigations, be Noticed to this office, and in addition to Mr. Moses.

All correspondence should be directed to this office at:

Walter T. Charlton, D.C. Bar # 186940
230 Kirkley Road,
Annapolis, Maryland 21401
Phone 410 571 8764
email, charltonwt@comcast.net

APPROVED:

_____/s/_____
JAMES D. MOSES

5

Sincerely,

/s/ charltonw 2428
Walter T. Charlton
Counsel for Mr. Moses and the
class or classes he seeks to represent

CC:
Jimmie Gilbert
7251 S. Vernon Ave.
Chicago,
ILL. 60619

James David Moses
1662 Cyrene Drive
Carson, CA 90746

Arthur Davis
194 Carnival Court
Vallejo, CA 94589

The Honorable David M. Walker
Comptroller General of the United States
of America
451 G. Street, N.W.
Washington, DC 20548



**UNITED STATES
POSTAL SERVICE**

### Track/Confirm - Intranet Item Inquiry
### Item Number: 7005 3110 0001 4015 5920

**The item(s) you queried are summarized below. If you would like to request a delivery record check the box in the "Select" column to the right of the item (if available). Learn more about Restore.**

| Detail | Item | Origin | Destination | Firm | Recipient | Event/Image Info | Date | Time | Sele |
|--------|------|--------|-------------|------|-----------|------------------|------|------|------|
| Archived | 70053110000140155920 | | 20548 | | | DELIVERED | 08/14/2006 | 10:59 | ☐ |

Request Delivery Record for Selected Items

**Enter Request Type and Item Number:**

**Quick Search** ◉        **Extensive Search** ○

Explanation of Quick and Extensive Searches

Submit

*Version 1.0*

Inquire on multiple items.

Go to the Product Tracking System Home Page.

EXHIBIT 3

**SENDER:**
■ Complete items 1 and/or 2 for additional services.
■ Complete items 3, 4a, and 4b.
■ Print your name and address on the reverse of this form so that we can return this card to you.
■ Attach this form to the front of the mailpiece, or on the back if space does not permit.
■ Write "Return Receipt Requested" on the mailpiece below the article number.
■ The Return Receipt will show to whom the article was delivered and the date delivered.

Is your **RETURN ADDRESS** completed on the reverse side?

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:

UNITED STATES OF AMERICA
ACCOUNTABILITY OFFICE
OFFICE OF INFORMATION &
INCLUSIVENESS
441 G STREET, N.W.
WASHINGTON, DC 30548

| 4a. Article Number |
| --- |
| 7005 3110 0001 4015 5920 |

4b. Service Type
☐ Registered      ☒ Certified
☐ Express Mail    ☐ Insured
☐ Return Receipt for Merchandise  ☐ COD

7. Date of Delivery

5. Received By: (Print Name)
Elaine B Wise

8. Addressee's Address (Only if requested and fee is paid)

6. Signature: (Addressee or Agent)
X Elaine B. Wise

PS Form **3811**, December 1994                Domestic Return Receipt

Thank you for using Return Receipt Service.

EXHIBIT
4



**G A O**
Accountability • Integrity • Reliability

**Comptroller General**
**of the United States**

United States Government Accountability Office
Washington, DC 20548

February 2, 2006

James Moses
Senior Analyst
FMA
Los Angeles Field Office

Dear Mr. Moses:

This is in response to your request for reconsideration of the decision to place you in Band IIA instead of Band IIB. I personally gave serious consideration to your reconsideration request. Unfortunately, after detailed review of the statement you provided and pertinent data, I am unable to grant your request for placement into Band IIB. While you are a valued member of GAO and your team, you did not meet the requirements for strong relative past performance through September 30, 2005. If you asked for reconsideration of any of the other assessment factors, I did not consider those because I determined you did not meet the past performance factor.

As I have stated previously, no one in the Band IIA pay range will have his or her pay reduced as a result of this placement decision. As a result, you will retain your current salary and will, at a minimum, be able to earn annual performance based adjustments up to the maximum Band II rate that was in effect in 2005 (e.g. $118,700 in Washington, D.C.).

GAO will hold another Band IIB placement process in the near future. This will give you another opportunity to be considered for possible placement effective as of the end of June 2006. In the initial placement process, employees had to meet a high bar for placement into Band IIB. In addition to fulfilling the relative performance criteria, employees needed to have demonstrated that they actually performed the required roles and responsibilities of a Band IIB to a significant degree and on a recurring basis through September 30, 2005. In contrast, future cycles will be competitive and similar to our current promotion procedures. The competitive pool will differ from the pool that was recently considered for Band IIB placement, and an employee's chances for movement into Band IIB should increase. In addition, over the coming months, you should gain further relevant experience which should help improve your opportunity for Band IIB placement.

EXHIBIT
5

The Band IIB placement process was one of the most difficult issues that GAO has undertaken. The decisions relating to it were not easy, but they were necessary. I realize that you still may have questions about the process and I am willing to meet with you personally if you would like to discuss this matter. Please contact Beth Miller, Confidential Assistant, on 512-5500 if you would like to set up an appointment with me regarding my reconsideration decision.

Thank you for your service to GAO, the Congress and our country.

Sincerely yours,

David M. Walker
Comptroller General
of the United States

Page 2

EXHIBIT 6

**United States
Government
Accountability Office
Operations Manual**

# Order

| 2900.3 |
| --- |

---

# BAND II RESTRUCTURING

## NOVEMBER 4, 2005

---

**Distribution:**   GAO Intranet                    **Initiated by:**   **Human Capital
Office**

(ii) employees who receive a "no" preliminary recommendation from each Managing Director shall be placed in a "no"category; and

(iii) all other employees shall be placed in an "unsure" category.

b. Step 2 – Centralized Specialist Panel: A panel will be convened with the COO and the CAO serving as chair and vice-chair, respectively. The role of the chair and vice-chair includes such things as organizing, leading, and facilitating panel discussions, but the COO and CAO will not serve as panel members. Using the categories of employees produced under para. 12a.2., panel members shall meet and discuss whether the preliminary categorizations of employees are appropriate. Panel members may change their individual preliminary recommendations based on this discussion, and any changes shall be forwarded to a designated official for re-categorization as appropriate at the conclusion of the Centralized Analyst Panel process. Any "yes" preliminary recommendation must be based on an assessment that an employee meets all three assessment factors under para. 6. Panel members should make every effort to reach agreement as to whether an employee should be placed in pay range IIB. To the extent the panel members cannot reach agreement, the employee shall remain in the "unsure" category..

c. Step 3 – COO and CAO Preliminary Determinations: After receiving recommendations from the Centralized Specialist Panel, the COO and CAO shall jointly determine whether an employee should be placed in pay range IIB. The COO and CAO should make this determination based upon the information and recommendations provided through the Centralized Panel Process, but shall not be bound by the recommendations of the panels. To the extent the COO and CAO's decision differs from the recommendation of the panels, their decision shall be based on a determination of whether the employee information provided under para. 9 and input from the panel members demonstrates that the employee meets all the assessment factors of para. 8. Any decision to place an employee in pay range IIB must be based on an assessment that an employee meets all three assessment factors under para. 8.

d. Step 4 – GAO-wide Review: HCO and O&I shall review the preliminary determinations of the COO and CAO and provide input to the COO and CAO concerning their review prior to any final determinations.

e. Final Determinations: The COO and CAO may consider any input provided to them as a result of the GAO-wide Review process and shall make final determinations regarding which band II analyst staff will be placed in the band IIB pay range. Any decision to place an employee in pay range IIB must be based on an assessment that an employee meets all three assessment factors under para. 8.

f. Notification. Staff will be notified of final placement determinations.

13.    **FEEDBACK AND PLACEMENT RECONSIDERATION.**

a. Unit Feedback. After notification of placement decisions, employees may request relevant feedback from their team MDs/office heads. In providing feedback, MDs/Office Heads or their SES level designees will inform employees of which assessment factor(s) they did not meet.

b. Reconsideration Process. Employees who are not selected for placement in the band IIB pay range may request a reconsideration of the placement decision from the Comptroller General (CG) or his designee(s). Before requesting placement reconsideration, employees must first request and receive feedback from their MD or unit head. To request placement reconsideration, an employee must submit a written explanation by email of the reasons why he/she believes the decision was incorrect. HCO will issue instructions and deadlines for submitting such requests. The CG or designee, with support from the General

November 4, 2005                                                                                  2900.3

Counsel, will review each request and the original employee information considered by the panel.  At his discretion, the CG or his designee(s) may consult with the relevant MD/Office Heads.  Employees will be notified in writing of the final placement decision resulting from the placement reconsideration.

14. **APPEALS.**

   a.  An employee alleging discrimination on the basis of race, color, religion, sex, national origin, age, disability, or sexual orientation or retaliation for activities protected by the anti-discrimination statutes must contact a counselor in the Office of Opportunity and Inclusiveness within 45 days of the effective date of the action.

   b. An employee who believes that an action taken against him/her under this order is a prohibited personnel practice has the right to file a charge with the General Counsel of the PAB.  To exercise such a right, the employee must contact the Office of the General Counsel of the PAB within 30 days of the effective date of the action.

Exhibit 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **James D. Moses** )<br>    **For himself and** )<br>    **All others similarly situated** )<br> )<br>    **Plaintiffs** )<br> )<br>        **v.** )<br> )<br>**DAVID M. WALKER** )<br>**Comptroller General of the United States,** )<br>**Government Accountability Office (GAO)** )<br>    **and** )<br>**Michael Doheny, Chair** )<br>**The Personnel Appeals Board of the GAO,** )<br>    **Defendants.** )<br>)  | **Case No.  1:06 CV 01712  (JGP)** |

## REBUTTAL DECLARATION  DR.. VENKAREDDY CHENNAREDDY
### (Fact Witness, Related Case Plaintiff, and Statistical Expert)

### Verification and Foundation of Opinion Evidence:

I declare under the penalties of perjury that the following statements of fact are true and correct to the best of my present knowledge, information and belief.  Opinions contained herein are accurate and true based upon the data furnished to me, and all other data and information of which I have had access to over the past 20 years from my former employer, the GAO, and as made available to myself and my counsel through discovery in related cases to this case.  That data includes data, information and conclusions gathered in my cases, 87-3538 (JGP) et cetera, and an independent study conducted by the GAO Personnel Appeals Board entitled "Promotions of Banded Employees 1991-1995".  I also know of my own knowledge the large number of employees (about 150) who have supported my own case, and the results of my own statistical

1

estimate on the data recently purportedly extracted for the employees affected by what is known

as the "Band II Split".  That data purports to be 100 % of those employees over 49 years of age.

No data was furnished to me for employees affected by the Band II Split under the age of 49.

I am also aware of and have considered the sworn testimony of Mr. William (Bob)

Mowbray, to the effect that a 100% inclusive data base does now exist, and has existed since

1986.  That data base contains according to Mr. Mowbray's testimony, all relevant data elements

for all GAO professional evaluator (currently, analyst) and evaluator- related employees

(currently, analyst-related specialist).  That database  was not made available to me.  I believe that

if it were furnished in proper computerized form[1], which appears to be entirely feasible, the

opinions as stated herein would have to be either: (1) verified as certain, or (2) utterly refuted, or

(3) indeterminate.  That latter event, the inability to decide, would be completely surprising to me

since no information at all is now available to me which would indicate that result in view of the

size of the sample (100% for 20 years).

---

[1]  Proper computerized form, as an example, not meant to be restrictive, would be in a data base or other appropriate computerized manipulable file:

Column 1–Social Security Number

Column 2- Selection to Band II-B with a code of 1, if selected and 0, if not selected

Column 3- Total number of years of service at Band II in GAO and equivalent level outside GAO.

Column 4- Average performance ratings in the current year (year of selection to Band II-B) and in the past 2 years.

Column 5- Years of education of a staff member

Column 6- Age of a staff member in years including fraction

Column 7- Staff member belonging to the Analyst category coded as 1 if it is an Analyst category, 0 if it is analyst-related specialist category

Column 8-Staff member belonging to Headquarter coded as 1 if the location is Headquarters and 0 if it is regional office

Therefore, based upon the above facts, the opinions as stated herein, I believe to be true and correct within all reasonable deviations accepted as standards in the statistical analysis profession.

## OPINION

### GAO's Statistical Statements Appearing in Exhibit 1, are not Based upon Objective Data; and <u>are Flawed and Meaningless</u>:

I have examined the chart and data presented by GAO counsel appearing in this case entitled "Demographic Data on Band IIB Selection Rate: Band II Applicants as Compared with Band IIB Placements, by Age." My overall opinion of this data is that the statements purported to be gleaned from that information is flawed, meaningless, and incorrect.

My initial reaction is that this chart (Defendant's Exhibit 1) appears to be a report print out derived and/or extracted from the database system that GAO has claimed for 20 years that it did not exist, in my own case, now before this Court, Civil Action # 87-3538.

This is a striking revelation in the light of the 20 years of sworn denials by GAO counsel.

<u>Analysis:</u>

(1) GAO's Statistical Statements are based on aggregate data in the case of two age groups in support of its wrong conclusions and are, therefore, misleading in the following respects:

(2) GAO furnishes insufficient, aggregated, misleading data, and chart, Exhibit I to the Reply. (Docket, Document 13, Filed 2/21/07, pg 1 of 1).

(3) A detailed professional personnel database is known to have existed for the entire GAO staff, for over 20 years, via the testimony of William (Bob) Mowbray in a related case before this

3

Court.  However, GAO has not furnished that database and  has not used it for its own rebuttal.

GAO has not otherwise identified its data used as the source for this automatically generated chart.

It is, particularly under the above circumstances, rendered suspect for this omission.  Certainly it

may not properly be considered validated evidence of what it purports to show, the absence  of age

discrimination in the underlying decision.

(4) Ideally, any final decision of the Court should be based, not upon a partial set of data,

but upon  the entire validated database.  The evidence of the existence of a full database has now

conclusively established by Mr. Mowbray's testimony in a related case, and validated by the

submission of an automatically generated chart in this case.

(5) Only a part of that full database was used by the plaintiffs for all aspects of my opinion.

Plaintiff's proffer of expected results from analysis of GAO's professional employee database by

counsel in this case accompanies this opinion.  I have not participated in that data or opinion

expressed.

(6) Based upon my knowledge of the partial database information gathered to date, I

believe that the existing but withheld data contained in that database will consistently support, in

all important respects, my conclusions that have been derived from the several partial, but

extensive samples of GAO professional personnel data previously available to plaintiffs.

(7) However, based upon my limited knowledge, the proffer of results to be expected is

entirely reasonable under the circumstances of all these related cases.

(8) Plaintiffs' data, used as the basis for this opinion, has not been seriously questioned or

rebutted by furnishing contradictory data, or objection to filing with the Court.

(9) Therefore, it appears that for purposes of this discussion, the database used has been

4

accepted as true and correct by GAO representatives, the United States Department of Justice, and must be assumed to be true, until refuted by some other valid evidence, which is not believed to exist, true and correct.

(10) The over 40 and under 40 age distinction as depicted in Defendant's Exhibit 1 to its rebuttal is utterly meaningless and even misleading in the context of plaintiffs' allegations supported by evidence contained in prior and current statistics.

(11) The statistics used by the plaintiffs relate to the staff members in Band II in GAO in the age group 49 years and above and their selections or non-selections to Band II-B.  That data showed a clear, validated, objectively derived, and unquestionable age-biased discrimination for those in that age group. The plaintiff herein, Mr. Moses, and virtually all of the persons he seeks to represent are likewise members of that same age group analyzed. That makes that data highly relevant to the main issue of this case, alleged bias in ratings, retention and promotions.

(12) To the contrary, the data set used by the GAO is not the correct data set and is not relevant to the issue of this case.  The most glaring error is that plaintiffs have never alleged, in any case of which I am aware, a bias between over 40 and under 40 in age.  Rather, the bias at the present time, is between persons under about 50 and under 50, and the older you are the more the bias is effective.  That is the pattern that emerged from my analysis.  Thus, GAO in its chart measured the wrong data set.

**CONCLUSION :**

GAO's position is incorrect, based upon false factual premises and intentionally designed misleading, improperly combined, data, with under 40 and over 40 totals when the actual

discrimination bar begins not at 40, but at about 50.  The chart derived therefrom therefore appears to be designed to mislead the viewer to an incorrect fact, that no age bias exists in the band II split process.  A proper objective, and  sophisticated statistical analysis of the entire database for statistical inference related to the age-biased discrimination in the Band II-B selection process in GAO is absolutely  necessary to achieve accurate assessment of the differing positions of the plaintiffs and defendants.

## Verification:

I declare under the penalties of perjury that the above facts and opinion are true and correct to the best of my present knowledge, information and belief.

V. Chennareddy    March 4, 2007

Venkareddy Chennareddy, Phd.                    Date
Plaintiff, as Fact Witness, and Statistician

Note: Dr. Venkareddy Chennareddy's credentials and curriculum vitae are attached. (Attachment 1)

Attachment 1

## DR. VANKAREDDY CHENNAREDDY
## CREDENTIALS AND CURRICULUM VITAE

### I. PERSONAL INFORMATION, ACADEMIC QUALIFICATIONS, WORK AND PROFESSIONAL WRITING EXPERIENCE OF VENKAREDDY CHENNAREDDY

#### A.  Personal Information

My name is Venkareddy Chennareddy. I am a former employee of GAO in the age protected group, 40 years and older. I am an Asian American male.  I was hired by GAO on August 14, 1978 and retired on January 3rd, 2006.  My federal government service date was May 1, 1976, which meant my services in the other federal government agencies were included in my total service in U.S. federal government.  My highest position in GAO was Senior Economist-Band-II in the Applied Research Methods (ARM) in the U.S. Government Accountability Office (GAO) at Washington, D.C.   I am currently residing at 8830 Bloomsbury CT, Colorado Springs, CO. 80920. My telephone number is (719) 598-2051.  My fax number is (719) 598-2051.  My E.Mail address is Chennareddy1934@Yahoo.com.

#### B.  Academic Qualifications

I have M.A. Economics (High Second Class) from Andhra University, M.Sc. Statistics (First Class and First rank) from Andhra University, and a PhD with completed  comprehensive examinations in Economic  theory (administered  by  the Department of Economics), Mathematical Statistics (administered by the Department of Statistics), and Agricultural economics—general, production, and price analysis—administered by the Department of Agricultural Economics, from Michigan State University, East Lansing, Michigan, U.S.A.

8

### C. Professional Writing Experience

I have more than 135 publications and professional write-ups to my credit which include

staff papers and  staff reports in Andhra University, Michigan State University (PhD thesis),

Tennessee Valley Authority, Southern Research Institute, the Budget Division of the Conservation

and Stabilization Service of the U.S. Department of Agriculture, GAO, and the District of

Columbia Government, presentations at the domestic (U.S.A) and international conferences related

to economics,  business, and public administration areas, publications in the conference

proceedings issues, publications in the journals, chapters in books, and contributions to  GAO

reports.

### D. Awards

I obtained 6 conference best research paper awards decided by committees after reviews, 1

in November, 1996 from the Association For Global Business, 1 in January 2006 from the

International Academy For Business and Public Administration Disciplines, 2 in April 2006 from

the International Academy For Business and Public Administration Disciplines, and 2 in January

2007 from the International Academy For Business and Public Administration Disciplines. Also, I

obtained some GAO awards: 1. Certificate of Merit with cash award 2. Certificate of Appreciation

with cash award 3. Spot award for numerical accuracy in the office of Chief Economist  4.  Salary

bonus awards in the distant past in GAO, when they were in existence. 5. I obtained and held

Graduate Research Assistantship for a 4-year period at Michigan State University, East Lansing,

Michigan, U.S.A.

### E. Experience outside GAO

I have extensive teaching and research experience in various teaching and research

institutions.  I have about 10 years of teaching experience in the United States in

colleges—Talladega college— and Universities—Saginaw Valley State University in Michigan

and University of Wisconsin at Platteville. I was promoted to Senior Research Officer from

Research Officer in a 4-year research project in the Department of Economics, Andhra University,

from Assistant Professor of Economics to Associate Professor of Economics in the Department of

Economics, College of Business and Economics, University of Wisconsin at Platteville, from a

Research Economist to Senior Economist at Southern Research Institute, Birmingham, Alabama. I

was detailed as a consultant by GAO to the Government of the District of Columbia for about 8

months.   I worked as a Faculty Fellow during three summers; two summers in the Budget Division

of the Conservation and Stabilization Service of the U.S. Department of Agriculture and one

summer at the Economic Research Service of the U.S. Department of Agriculture.

### F. Other Professional Activities

I presented a number of papers, chaired a number of sessions, discussed a number of others'

papers in various professional economics and business and public administration conferences, and

reviewed some papers for academic associations for their decisions regarding the submissions for

conference presentations and for publication in journals.

### G.  Reference Letter from a GAO Past Supervisor

One of my supervisors in GAO gave me a reference letter on September 18, 1985

after his retirement, which was addressed to "To whom it may concern" and wrote

"Dr. Venkareddy Chennareddy was assigned to work on several projects for which I
was Project Director at the U.S. General Accounting Office from mid 1979 to mid
1983.  Dr. Chennareddy served as a senior analyst and he developed several
econometric models for measuring the impact of important federal programs. He
was… [conscientious] …and technically extremely well qualified not only in the
field of economics but also statistics and operations research.  Some of the projects

10

for which he provided very valuable analyses were:
> The impact of farm parity programs on food prices.
> The impact of trucking deregulation on unemployment among truckers.
> The efficiency of the department of Energy's uranium enrichment program.
> An evaluation of the Federal Emergency Management Agency's criteria for awarding disaster assistance
> The impact of the energy crisis on attendance at National Parks.

He made a real contribution to these projects."

## H.  Letter From the Comptroller General, GAO

Honorable David M. Walker, Comptroller General, GAO, wrote to me

> "I am pleased to take this opportunity to thank you for your contributions to the work of the Government Accountability Office and for your dedicated service to the American public…. I want to commend you for the excellent application of your technical expertise, your willingness to work long hours when required, and the attention to detail you have applied to so much work which has helped to assure consistency with GAO's quality standards.  These characteristics were especially noted in work on: regulatory reform;…. As the primary referencer…, your familiarity with technical evaluation issues facilitated the reviews and contributed thoughtful suggestions, particularly in reports on…..as treatments."

## I.    Expertise in Statistical Analysis

Therefore, I believe that, on the basis of my academic qualifications and professional writing experience in advanced statistical analyses in various fields, I would qualify as a statistical expert in analyzing data related to employment discrimination cases and in offering expert opinions based on statistical evidence hidden  in the data.

Venkareddy Chennareddy, Phd, February 28th, 2007

11