IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **James D. Moses**<br>    **For himself and**<br>    **All others similarly situated**<br><br>    **Plaintiffs**<br><br>            v.<br><br>**DAVID M. WALKER**<br>**Comptroller General of the United States,**<br>**Government Accountability Office (GAO)**<br>    **and**<br>**Michael Doheny, Chair**<br>**The Personnel Appeals Board of the GAO,**<br>    **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No.  1:06 CV 01712  (JGP) |

**FILED AS "NOTICE OF SUMMPLEMENTAL AUTHORITY" PER CLERK**
**(Plaintiff's Surreply Memorandum**
<u>**In Opposition to Defendant's Motion to Dismiss the Complaint**</u>**)**

**I.     The Evidentiary Standard at This Stage of this Litigation:**

In considering a motion to dismiss under Rule 12(b)(6), the court must assume that all facts alleged in the plaintiff's complaint are true, and must liberally construe those allegations. *Conley v. Gibson*, 355 U.S. 41-46, 78 S. Ct. 99, 101-02, 2 Law Ed. 2d 80 (1957)[1].

As will be detailed below, that evidence demonstrates that Mr. Moses's statutorily

---

[1]  The court further concluded:

"A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45-46, 78 S.Ct. at 101-02. Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations.*Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989).Thus, it is only in the "unusual case" where the complaint on its face reveals some insuperable bar to relief that a dismissal under Rule 12(b)(6) is warranted. *Fusco v. Xerox Corp.,* 676 F.2d 332, 334 (8th Cir.1982).

required notices were complete and timely.  In addition, his complaint is well pled and describes a policy, pattern and practice of age discrimination, both the continuing discriminatory events, and as part of an overall long-standing pattern of discrimination against older workers based upon age.

II.     **Plaintiff's August 9<u>th</u>, 2006 Notice of Intent to Sue Was Timely**:

Plaintiffs notice of intent to sue, filed on August 9th, 2006, was timely filed.  The incorrect "start" date for plaintiffs 180 day period of time was used by counsel for the defendant, apparently based upon an error of omission in the department recording those dates.  If the correct effective start date for the date of the final decision on Mr. Moses's (Moses) adverse actions is used, February 16th, 2006, Moses's filing on August 9th, was timely, even if the date is when received by the GAO, August 14th, 2006.

**A. The Date of Moses's Final Placement Decision Was Misstated:**

Defendant misstates the applicable effective start date of both of the discriminatory events as applicable to this Plaintiff.  Defendant attempts to use as the start date the date the initial written reconsideration determination (as to Moses) was delivered to Moses by the Comptroller General.(Def. Reply, pg. 2, ¶ 1).

To accomplish that end, Counsel mislabels the initial notice to Moses as "final".  But after that first notice, on February 16, 2006 Moses and the Comptroller General had a 45 minute telephone conference on the subject of reconsideration of Moses's placement.  Therefore, the earlier notice, dated February 2, and received February 7th, could not have been "final" in the sense of being notice of the Comptroller General's final decision.  Defendant's Reply Memorandum states, erroneously:

[the]"*final* decision [on Moses placement] was February 7, 2006, the date Plaintiff received the CG's *final* reconsideration decision" (emphasis added).

The word "final" does not appear in the CG's letter of February 2, 2006. And that is not what happened, and in fact the preceding sentence omits a material fact. The Comptroller General further reconsidered the placement, at the CG's suggestion which was subject to a 45 minute conference on the subject of reconsideration. No other subject was discussed. (Moses Declaration, Exhibit 1, pg. 3[2], ¶ 7, pg. 5 ¶¶ 12[3], 13[4]).

The evidence of record clearly establishes that the 45 minute telephone conference occurred on February 16th, 2006 and occurred exactly in the manner described by Moses, and only on the subject of placement reconsideration. Using that date as the starting date, Moses Notice of Intent to Sue was timely filed on either August 9th, 2006, when mailed, or on August 14th, 2006 when received. Even using the later date, it was filed timely with one day to spare. The defendant is therefore incorrect in his factual assertions as to timeliness.

**B. The First "Notice" Received by Moses on February 7th, was not a "Final" Reconsideration Action:**

First, the word "final" does not appear anywhere in the CG's February 2, 2006, letter notice to Moses (See Exhibit 5). Thus, the label "final" is not supported by any written evidence of record, under later happenings in Moss's case, and is an erroneous conclusion of the Defendant's counsel.

Second, the letter of the Comptroller General himself refutes that interpretation. That

---

[2] "... my telephone meeting with the CG was substantial and consisted only of discussions about reconsideration of my own placement in Band IIA."

[3] "...the conference was on only one subject–reconsideration."

[4] "...The only substantial purpose for the meeting, as evidenced by the substance of what was said by me and the responses by the Comptroller General, was my attempt to get the CG to reconsider and place me in Band IIB."

3

CG's letter states (See-Exhibit 5, pg 2, final line):

> "Please contact Beth Miller, Confidential Assistant, on 512-5500 if your would like to set up an appointment with me *regarding my reconsideration decision*." (Emphasis Added).

The above quoted phrase of the Comptroller General's letter of February 2, 2006 (Attachment 5) to Mr. Moses indicates that the reconsideration process was not final until the CG said it was.   This conclusion is driven simply because the CG had the authority to reconsider his preliminary decision at any time he wanted and said he would do that in the above cited letter.  The GAO has recently advertised the fact that a number of Band IIA designees were favorably reconsidered and placed in Band IIB.

The CG later confirmed that Moses's interpretation of his intent was true by actually holding the meeting with Mr. Moses.  In addition the subject of that meeting was *only* reasons for further reconsideration of the CG's decision.(Exhibit 1, pg 3, ¶ 7, pg. 4 ¶ 12., 13).  These words and acts of the CG contained in the 45 minute meeting were of such unmistakable clarity that Moses relied upon that further reconsideration in not filing his notice until he did, on August 9th, 2006 which was within the statutory180 day period for notice to the employer.


**C. Details of Moses's Meeting with the CG Demonstrate
 that Reconsideration was Ongoing Until February 16th, 2006:**

Mr. Moses averred (Exhibit 1, with specific references below) that the conversation on February 16th, 2006 included many details indicating reconsideration was ongoing.  Among those were:

> "6....During that conference [on February 16th, 2006] after a full presentation by me of the facts, it became evident to me that Mr. Walker was not going to change his mind from the position expressed in the earlier February 2nd, 2006 letter.  In other words he was not going to place me in Band IIB, and he didn't. He made his final decision not to

grant my request for placement in Band IIB"(Exhibit 1, pg. 2, 3 ¶ 6).

"10....I discussed my 40 years of experience with GAO and how only considering the last three years of experience was unfair and it favored younger less experienced staff. I discussed the fact that I had been a GS-14, had been responsible for up to ten people and multiple jobs and that placing me in Band IIA was a demotion. The CG disagreed, saying that legally I was not demoted because I did not lose any money. I told him that I did lose money because I was denied the COLA for now and in the future because I was placed in Band IIA. I also told the CG that money was not the only reason for me wanting to be placed in Band IIB because my current salary puts me close to the top of the market based pay for a Band IIB. The CG then acknowledged that there could be psychological reasons. I told him that I was embarrassed, humiliated and would lose respect and status by being placed in Band IIA." (Exhibit 1, pg 4, ¶ 10).

"11....  I told him that one area of the rating system that African Americans and older people were falling short was in receiving "role model" marks. This is very significant because those receiving "role model" marks in the placement decision got 5 points whereas, the next highest rating mark only allowed 3 points. The CG told me that OOI had not evaluated the "role model" marks from a racial or age standpoint. He told me that he would check into both of the issues that I had brought to his attention—the rating system in general and the "role model" rating mark in particular. It is important to note that the CG acknowledged to all of the GAO staff in a "CG Chat" that the performance evaluation system showed lower average ratings for blacks as compared to whites. The CG announced that a study would be made by a private firm to determine why blacks are rated lower."  (Exhibit 1, pg 4,5, ¶ 11).

12.     "In that 45 minute meeting my unswerving objective was to get the CG to reconsider the decision, and to place me in Band IIB where I should have been all alone. Never in that entire conversation was there any statement from the CG that "I have made my final decision on your request for reconsideration and will not change my mind" or anything like that statement. The inescapable conclusion is that the conference was on only one subject -- reconsideration." (Exhibit 1, pg 5, ¶ 12).

13.     "Contrary to what the attorneys for the Defendant are claiming, this final meeting was not merely to ask questions about the restructuring process. I was quite familiar with that process. That subject was never brought up and never discussed. The only substantial purpose for the meeting, as evidenced by the substance of what was said by me and the responses by the Comptroller General, was my attempt to get the CG to reconsider and place me in Band IIB. The CG had the clear power to do this. However, upon the conclusion of the meeting, the CG had made it clear to me that he would not change his mind. I filed my complaint with the OOI the next day." (Exhibit 1, pg 5, ¶ 13).

19." ....this final meeting was not merely to ask questions about the restructuring process. I was quite familiar with the process and that subject was never discussed. The

5

only substantial purpose for the meeting, as evidenced by the substance of what was said by me and the responses by the Comptroller General, was to get the CG to place me in Band IIB.  The CG had the power to do this." (Exhibit 1, pg. 6 ¶ 19).

**D.     In Sum, These Events and Conversations Describe and Demonstrate a Continuation of the Reconsideration Process:**

The above quotes describe a reconsideration process, with presentation of facts, and discussion of why the decision was wrong, with responses by the CG.  In the context of what was happening, with reconsideration ongoing, it is clearly error to not classify that meeting as a part of the approved process of reconsideration.  No other purpose for the meeting makes sense, and the conversation was described before it happened as "reconsideration", not by Moses, but by the Comptroller General himself.

Under these circumstances, the Court should hold that the final decision occurred on February 16th, 2006, the final day of the reconsideration process.  The fact that the GAO failed to properly record the happenings of that day is not the responsibility of Moses, and he should not be held accountable for the paperwork error of the agency, howsoever it occurred.

**II. Defendant Misstates the Facts on Mr. Moses Filings of Administrative Complaint and Failure of the GAO to Process Moses Complaints in 2002 and Mid 2006**:

Defendant misstates the number and effectiveness of Mr. Moses's earlier filed notices of intent to sue.  If those earlier complaints are viewed as the continuation of one pattern, and that pattern is the same as the instant acts, a continuing policy, pattern and practice of discrimination, will have been established.  That is what Moses also alleges, and none of his allegations have as yet been ruled upon by this Court.  If those allegations are taken as true, as they must be under I above, then none of Defendants arguments of untimeliness apply.  This is true even if the agency was correct in its assertions of untimeliness, which it is not.  See ***National Railroad Passenger***

*Corporation, v. Morgan*, 536 U.S. 101 (2002). A policy, pattern and practice that results in discrimination is not subject to the same limitations as individual discrete events under the principle of *Morgan*.

Applying the principle of *Morgan, supra*, no part of Defendant's untimeliness argument would be applicable to Moses hostile work environment or pattern and practice claims. Plaintiff alleges, and it is currently undecided on the record of this case, that all of the recent activities are nothing more than a carry-on of the same ongoing continuing policy of discrimination that Moses has been complaining about for many years. That is the reason that all of these related cases have requested consolidation by the Court. The issue of liability is therefore identical throughout all of these related cases.

The only difference is the length of time and period of time the policy was actually applicable to each of the plaintiffs and each person in the class or classes they seek to represent.

It is well known, and finally defined in **Stephens v. Department of the Treasury**, 500 U.S. 1 (1991) that the Age Discrimination in Employment Act of 1967, 81 Stat. 602, 29 U.S.C. § 633a, et seq, as amended, (ADEA) does not contain a specific independent statute of limitations. Here, Moses filed a multiplicity of "Notices of Intent to Sue", and multiple administrative complaints. Any one of those prior notices, if the complaint is about a continuing policy, pattern and practice, may furnish the required notice, if the principles of *Morgan*, supra apply here. Those principles do apply, because Moses, as well as all plaintiffs in related cases, have alleged a hidden policy, implemented as a pattern and practice of barring older age protected professional employees from advancements, as well as other discriminatory practices.

Additionally, in an age discrimination case, all that must be done to fulfill the statutory administrative requirements is to file a notice of intent to sue within 180 days of the happening

of the adverse event. Here, Moses has done that timely as to the discrete events he claims are based upon the continuing age discrimination claimed. In addition, however, he has fulfilled the factual requirements of alleging a policy of discrimination against employees 50[5] years of age and older.

Here, Mr. Moses has alleged two individual discrete claims, the adverse placement and the related COLA denial, and also a series of events, a policy, pattern and practice which is alleged to be the same continuation of discrimination for more then 20 years. Thus, under either theory, Moses met all administrative exhaustion requirements and has well pled his case.

A similar policy, pattern and practice is as also alleged in the related cases, primarily ***Chennareddy, et al v. Walker***, Case No. 87-3538 (JGP) into which Moses began to attempt to intervene in 1999. During the interim, he has filed no less than four Notices of Intent to Sue. One was filed in 1999, another in 2000, another in 2005, and another in 2006[6]. All of those Notices are summarized into Moses Notice of August 9th, 2006 (Exhibit 2).

### III. Defendant Also Misstates the Facts as to Filing of Administrative Complaints by Moses:

Defendant's brief also misstates the facts applicable to the timeliness of Plaintiffs filing of his administrative complaints. That argument is irrelevant to the issue of Notice, in that none of Moses complaints since 2002 were completed as to administrative processing by the GAO. It appears from the record in this case that the GAO "Office of Inclusiveness" is simply unable to

---

[5] The pattern as it appears from all of the data presently available begins a pattern of age discrimination in about 1985 with a ceiling on age amounting to a bar at about age 43, over the years of Moses employment that age bar has risen to about age 50.

[6] See Exhibit 2, Notice and Re-Notice of Intent to Sue, Dated August 9th, 2006 listing previous filings of Notices in detail.

timely process all of its complaints within the reasonable period set out by standard federal regulations and practice. That period of time is 180 days. That matter is irrelevant here, for the limited purposes of this opposition to a motion to dismiss. That is because Moses filed his Notices of Intent to sue for both of the discrete events in accordance with the statute as interpreted by ***Stevens v. Department of the Treasury, supra***.

Finally, Defendant incorrectly states that Plaintiff has somehow argued and therefore relies upon an argument that "the filing of a Notice of Intent to Sue or exhaustion of administrative remedies was not necessary" (Def. Reply, pg 1). This appears to be a red herring since Plaintiff did not miss his deadline, and did not argue that it was unnecessary for him to file a notice. To the contrary, Plaintiff did in fact timely actually file a "Notice and Re-Notice of Intent to Sue" (Exhibit 2) as to each the several latest discriminatory personnel actions. And one of those about which he complained was specifically and separately named as the COLA denial in the August 9th, 2006 notice (See, Exhibit 2, pg 1, ¶ 1, and pg. 2, ¶ 2-5)[7].

Since both of the major discriminatory actions detrimental to Moses were, contrary to the representations of the Defendant, mentioned prominently in the August 9th, Notice of Intent to Sue, the argument of the Defendant appears to be simply an error in failing to read plaintiff's allegations and evidence.

Finally, the "Notice of Intent to Sue" filed by the Plaintiff on August 9th, 2006 (Exhibit 2) clearly references both of Plaintiff's complaints, (1) the demotion to Band II A, and (2) the COLA denial. Therefore, his complaints were timely brought to the attention of the GAO Office of Inclusiveness (OOI). That notice was received by the GAO OOI on August 14th, 2006 (See

---

[7] Paragraph 1 of Moses Notice of Intent to Sue dated August 9th, 2006 states in part:

> "...Those new matters result from the "Band II Restructuring" and cost of living adjustment (COLA) denials which became effective in his paycheck on February 16th, 2006."

United States Post Office Tracking Certificate, Exhibit 4, Attached).

**IV. The Correct Calculation of Timeliness**
**Refutes Defendants Erroneous Representations:**

No decision was ever made, and still has not been made on Moses' administrative complaints (as of March 2, 2007). Once the 180 days had passed, from the initial date of Moses administrative complaint on this subject, (February 2, 2006) Moses was free to file his lawsuit pursuant to his notice of intent to sue.

In calculating the timeliness of Moses' Notice of Intent to Sue, and whether or not Moses filed his notice of intent to sue within 180 days of the final decision, therefore, the following facts are determinative.

1. The date of the final decision, as per the above evidence of record, including the CG's final decision on the denial of Moses request for reconsideration was February 16th, 2006. The correct "Start Date" for the statutory calculation therefore is February 16th, 2006.

2. The date of the Notice of Intent to Sue, when Mailed, August 9th, 2006 (Exhibit 3-4). Elapsed days from effective date of the final decision date, = 174 days.

3. The date the Notice of Intent to Sue was received, August 14, 2006. Elapsed day from effective date of the final decision date, = 179 days.

4. The lawsuit was actually filed on October 4, 2006 (Docket page 1). Therefore, 30 days had expired from the date of the 30 day notice of intent to sue to the date this lawsuit was filed..

Therefore, in all respects Moses's administrative procedures were timely and in accordance with the applicable GAO regulations and/or *Stevens, supra*. Administrative

procedures, including the timely notice of intent to sue were fully and correctly performed. Therefore Mr. Moses met the statutory requirements in all respects.

For these reasons, the Court should find that the grounds stated in Defendants Motion to Dismiss are faulty.  The Motion to Dismiss should be denied.

**V.  Defendant's Statistical Representations (Def. Ex. # 1) are Just More of the Same, Bad Faith Misrepresentations to this Honorable Court; In a Word-Outrageous; That Exhibit, Which is Not Probative Evidence, Should be Stricken from the Record of Evidence in this Case:**

Defendant has submitted Exhibit 1 to this Court, purportedly as some sort of probative evidence of non-discrimination.  First of all, in a motion to dismiss, Evidence can not be submitted or considered by the Court.  To do that clearly violates Federal Rule 12(b)(6) and converts this Motion to one for summary judgment.  If that is the intent of this submission, then the motion to dismiss must be denied and summary judgment denied as not adequately establishing undisputed facts entitling Defendant to summary judgment.

Secondly, there is no foundation as to the accuracy of the data used to generate that document, and the statistical theory of what, if anything, it purports to show.  But that Exhibit does demonstrate one important fact; GAO indeed has the statistical system that it has under oath denied to exist for over 20 years.  That is where this Exhibit obviously came from.

Thirdly, to deal with the absurdities and misrepresentations of the statistics, Plaintiff has elicited the help of fellow complainant Dr. Venkareddy Chennareddy, to perform an analysis, not to submit some subjective opinion, but merely to point out to the Court the arithmetic and logical absurdities of the position GAO adopts as its own.

How GAO can say to the Court on one hand that it has no statistical system, or personnel data base, and on the other that the data base (which does not exist) shows non-discrimination, is

a question of integrity that needs to be asked by this Court.

Dr. Chennareddy's analysis of the purported facts, in the light of the lack of any evidentiary foundation of data by GAO, and the failure of GAO to either object or refute the data relied upon in Dr. Chennareddy's initial analysis is submitted herewith as Exhibit 7.

The conclusion of that document, which is neither esoteric nor complex, is that GAO's data is both meaningless and false.

Counsel's Comments on GAO's Submission Follow.

## VI. Detailed Comments Refuting GAO's Exhibit 1 to the Opposition to GAO's Motion to Dismiss :

Since a data base containing definitive evidence exists, despite GAO's previous denials of the existence of this evidence, why does not GAO simply use the entire database for all the staff members in Band II category and analyze it objectively and authentically by estimating an established model for deriving a statistical inference related to age-biased discrimination. The answer to this question is that GAO does not want to do that. Such an objective procedure and analysis would force GAO to admit that it has been misleading the Court for more than 20 years.

**GAO's Argument is Fundamentally Flawed:**

The GAO argument, based on the chart, and numbers is crude and practically meaningless and not objective at all. The GAO has failed to provide any objective criterion for selection to Band II-B from Band II at all, and again refuses to address the evidence of age-bias, which also highlights the false and pretextual nature of GAO's alleged reasons for the non-selection of age-protected persons.

GAO gave only numbers for two age groups, less than 40 years and 40 and above 40 years. According to the ADEA standard theory and case law, staff members who are 60 years old can claim discrimination against them in favor of those 55 years old and staff members, who are 50 years old can claim discrimination against them in favor of those 45 years old. That methodology as used in Chennareddy's opinion derived from the data in this case is the actual correct model of what an appropriate model must measure, not merely over 40 and under 40.

ADEA cases have consistently held that bias between ages at least 5 years apart could claim discrimination against those older persons in favor of those with lower ages even within the protected age group, 40 and above 40 years old.

GAO did not either address this issue or provide any objective , impartial, and mathematical  explanation for its wrong statistical inferential  statement that there was no age-biased discrimination in the Band II-B selection process in GAO. The evidence for a true age-biased discrimination hidden in the entire database cannot be revealed by mere chart and numbers provided by GAO in support of its argument. Chennareddy has previously provided a statistical evidence for age-biased discrimination in the case of GAO staff members belonging to the age group 49-69 years, basically the age group  addressed in the complaint.

In the absence of GAO-provided data, Chennareddy, the plaintiff statistical expert,  used the data provided by the counsel alleged to be extracted verbatim from GAO files of all of the persons 49 years of age and older who would be the class as defined in the putative class action case.

Chennareddy estimated a best and an appropriate statistical model for the data related to these prospective GAO staff members, who are 49 years old and older.  That model, which has not been refuted, was used to estimate the probability of selection to Band II-B based on the age

of a staff member within the age group 49-69 years. Based on the results of the model, there is unrefutable evidence for statistical inference that there is age-biased discrimination within that age group.

This result was developed based upon years of experience in similar statistical and mathematical work and numerous publications by Plaintiffs expert. An article in Jurimetrics was given as a reference for the estimated model. Dr. Chennareddy justified his model and the objectivity of his estimation procedure in his statistical opinion affidavit.

However, neither set of data should be considered by this court in deciding upon the Defendant's Motion to Dismiss.

Respectfully submitted,

Signed, *charltonw2428*

Walter T. Charlton, Attorney for Plaintiffs
D.C. Bar # 186940
Walter T. Charlton & Associates
1156 15th, Street N.W. LL 10
Washington D.C., 20005-1704
Phone 410 571 8764, Fax 410 897 0471
charltonwt@comcast.net

Counsel for Plaintiff and the Putative Class