## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **James D. Moses**<br>    **For himself and**<br>    **All others similarly situated**<br><br>    **Plaintiffs**<br>       **v.**<br><br>**DAVID M. WALKER**<br>**Comptroller General of the United States,**<br>**Government Accountability Office (GAO)**<br>    **and**<br>**Michael Doheny, Chair**<br>**The Personnel Appeals Board of the GAO,**<br>    **Defendants.** | )<br>)<br>)<br>)<br>)<br>)   **Case No.   1:06 CV 01712  (JGP)**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## REPLY TO DEFENDANT'S OPPOSITION
## TO IMMEDIATE CERTIFICATION OF THE CLASS AND INJUNCTIVE RELIEF

**INTRODUCTION:**

Plaintiff James D. Moses, for himself and all other similarly situated hereby files this Reply to defendant's afore-captioned opposition.

This opposition continues to follow GAO's consistent policy of misleading the Court as to the most basic facts, with apparent concurrence of the United States Department of Justice counsel.  The facts are sufficiently torqued that the argument which follow need not be addressed, except within the context of the correct facts.

Defendant incorrectly alleges that time and effort would be saved by delay of class certification, and injunctive relief.  In fact the reverse is true.  The first reason for the motion is the immediacy of the need to prevent harm to each member of the putative class by informing them of their rights as class members, and stopping  misinformation flowing from the GAO, and

1

its satellite, the PAB. That misinformation concerns the right of each class member to be represented as if he/she had filed when Mr. Moses did, making the filing for the entire class timely.

Second, there is no likelihood that the motion to dismiss will succeed. The defendant's motion violates F.R. Civ. P 12 (b)(6) by relying upon affidavits. Moreover, the factual content of those affidavits has been refuted by facts disclosed, not by GAO but by defendant's affidavit, in evidence presented and not refuted by the GAO. Therefore, GAO's argument is simply a red herring, merely a ploy to delay resolution of the case.

Thus, immediate certification and injunctive relief will speed resolution and avoid undue and interminable delay. That objective, it appears is GAO's true objective in this objection.

In addition, recent testimony before the Congress, by the PAB General Counsel, Anne M. Wagner, Esq., (Exhibit 1 attached) states additional defects in GAO's timeliness defense, the only defense presented in its Motion to Dismiss. The Court's attention is respectfully directed to Exhibit 1, page 20, ¶ 3,

> "... GAO did not accord petitioners [Moses or the class] the requisite 30 day notice and meaningful opportunity to respond to GAO's decision to demote them. Specifically, GAO notified employees of their Band IIB eligibility status on November 7, 2005. Employees who wanted to avoid placement into Band IIA had only until November 21, 2005 to make their case though written application. Having been informed on December 16th, 2005 of their demotions, they were given only until January 13, 2006 to seek feedback from their Managing Directors, who were not the decision-makers and did not have the authority to alter the decision. Petitioners were given an opportunity to seek reconsideration from Mr. Walker. However, they were not notified as to the standards and additional evidence that Mr. Walker would rely upon in making his decision...."

Moses filed his complaint just one day after Mr. Walker rejected his request for reconsideration.

2

**STATEMENT OF CORRECTED AND UPDATED RELEVANT FACTS IN SUPPORT OF PLAINTIFF'S MOTION, AND REFUTING DEFENDANT'S OPPOSITION:**

1. Mr. Moses, in his affidavit demonstrates that his own complaint was filed just one day after the final decision by Mr. Walker on his request for reconsideration. Given the foregoing statement by Ms. Wagner, there is no likelihood of granting the Defendant's Motion to Dismiss on grounds of untimeliness (the only grounds stated) of any part of plaintiff's filings. This erroneous and misleading statement is contained as a factual predicate throughout the Defendant's Opposition, beginning on page 1, and specifically contained in page 2, ¶ 2 ..."the claims in the complain are likely to be dismissed"...

Reply:

a. As to the likelihood of this case being dismissed for untimeliness:

Moses was not untimely in his filings. Moses' affidavit, giving the date of the decision-making telephone conference with the Comptroller General, in accordance with GAO rules on this subject, *if false*, could be easily rebutted by GAO telephone records or a conflicting affidavit from the Comptroller General. None such was filed simply because Moses affidavit is true. Therefore, GAO has conceded that Moses, who filed one day after the CG's final decision, met his deadlines. No other deadlines are stated as applicable or were missed. This defense is quite simply a bad faith defense.

b. The motion of the defendant does not even qualify as a motion to dismiss. An affidavit was submitted by defendant GAO, in support of its position employee purporting to prove untimeliness. Where affidavits of parties are filed in conjunction with a Motion to Dismiss, the Motion is converted by operation of law, into a motion for summary judgment.

3

c.  That motion, for summary judgment, will also fail since many facts are disputed.    Plaintiff responded with un-rebutted evidence from Moses stating unequivocally that the Comptroller General's (CG) decision was only one day before he (timely) filed his complaint.  No part of Moses factual basis has been rebutted by any evidence whatever, much less conclusive.  The only person who could conceivably refute Moses contention of the date of the Comptroller General's final decision (after the reconsideration conference) is the CG himself.

No affidavit was submitted by the CG.  Therefore the question of untimeliness has been conceded by GAO.  That makes impossible a correctly founded granting of the dismissal under the undisputed facts of record.

d.  Thus, there are no grounds to dismiss any part of the claims on grounds of untimeliness. And no other grounds have been stated.

e.  It follows that there is no likelihood of success on the Motion to Dismiss being found to be untimely, and no other grounds were stated is statistically, the inexorable zero.  In sum, the motion to dismiss is a specious attempt to delay processing in Order that GAO may take other action to evade the application of the law to its discriminatory actions.


2.  The facts of this case support class certification, now to avoid confusion by each class member as to his respective rights and options.  In the Sworn testimony before the Congress in an extraordinary session held on May 22, 2007, the General Counsel of the GAO Personnel Appeals Board, Anne M. Wagner testified as if this case, covering all 330 employees, was appropriate for class treatment.  She testified, inter alia, that GAO's notification process as to these demotions

4

and denials of cost of living increases were defective[1]. (Exhibit 1, page 20 ¶ 4-page 21 ¶ 1, incorporated *en toto* by this reference).

3.    Totally aside from the fact that Moses himself was timely in filing all aspects of his complaint, where an agency violates strict guidelines for notification of time deadlines, it cannot hold an employee to the strict timing of the regulations it itself did not follow.  Thus, where, as here, GAO's timing of the entire procedure was faulty, there cannot be any proper application of the strict rules argued by GAO's counsel (which were in fact met by Moses regardless of GAO's failures) any valid argument of untimeliness by the employee.

a.    This is particularly true here, where in fact Moses, the class representative, met all guidelines.

b.    GAO's argument, in the light of Wagner's testimony and further facts, applicable equally to Mr. Moses and all of the other members of the class, is not worthy of credibility or reliance by the Court.  In fact it is disingenuous on its face.

4.    It is imperative that permanent and irreparable harm be prevented by timely action by the Court as to class certification and class notices of their rights.  GAO in its actions, which are being now participated in by the PAB General Counsel, have taken adverse actions, demotions and cost of living denials (COLAS), affecting about 330 senior employees.  All of these employees are believed to be employees protected by ADEA, some also Title VII, some

---

[1]  Moses situation as to his alleged demotion and cost of living denial is identically factually situated as to the 12 administrative complainants represented by Ms. Wagner.  That is the requirements for timing of filings are identical.  The only difference is that Moses claims the foundation was based upon age discrimination, the administrative complaints omitted that claim and proceeded on the basis of other technical regulation violations termed, generally  "prohibited employment practices".  In either set of violations alleged, the timing requirements to exhaust administrative remedies are identical, except that in a age case, as a matter of statute, no administrative exhaustion is required.  All that is required is a 30 day notice of intent to sue.  Moses timely gave that notice.

Veterans, and Some Disabled Veterans.

Of the total putative class membership, 330 persons, information now available to plaintiffs is to the effect that age and race were determinative factors in virtually 100% of the demotions and cola denials. As one result of the demotions and cola denials, pressure from this case, from Congress, from the settlement of the 12 cases processed by the PAB have resulted in reversals of about 100 of the demotions. About another 100 persons are believed to have resigned or taken early retirement. That leaves about another 100 persons who are, or may be affected by the actions taken or not taken by the PAB which is now considering the petition filed by the uninformed persons. Those persons have no knowledge of the effects upon their position of this lawsuit.

5. Moreover, the widely disseminated misinformation, (Def's Opposition, Exhibit 1) authored by the PAB General Counsel, is entirely incorrect in its application to the putative class members under the existing circumstances. The way the "two bites of the apple, prohibited" rule works, if any employee follows that advice given by the PAB General Counsel may result in a total loss of that employees' rights to any recovery.

If a putative class member files with the PAB, and is rejected for whatever reason, that employee runs a substantial risk, amounting to a prohibition, of getting a second bite of the apple as a class member in the Moses lawsuit in this Court. The advice of the General Counsel, widely disseminated, is therefor incorrect and misleading in its application by the unknowledgeable employees signing the petition for relief to the PAB General Counsel.

6. It is interesting as a matter of omission, that nowhere in the PAB General Counsel's Statement to Congress is any mention made of "age discrimination", or Bob Mowbray's full

statistical system, or this lawsuit. It appears that both GAO and the PAB General Counsel have failed to disclose the operative effect of this lawsuit to the Congress. This Court should take judicial notice of those omissions.

7.    The Comptroller General has already stated that each of those about 100-200 persons who have petitioned the PAB, in reliance upon the incorrect advice of the PAB General Counsel-- in ignoring the "two bites of the apple-prohibited" principle-- would be untimely in their filing with the PAB at this time under the GAO regulations as way too late.

Whether this theory of defense by GAO is correct or incorrect at this time is irrelevant. Each class member has the right to be fully informed of their statutory rights and the informed right to make an election as to how to proceed. The present course of action argued by GAO's AUSA counsel would substantially interfere with meaningful exercise of those rights.

Wherefore, the only correct course of action is an immediate certification of the class, with full notice to each of the 330 employees of their options (as requested as relief by plaintiff on behalf of the class) and with each employee's actions to date deemed voidable for failure of the PAB General Counsel to inform them of the existence of this class, and the claims and facts related to this 100% viable age discrimination case.

**CONCLUSION:**

For those reasons, the Motion to Dismiss should be denied, and, in order to prevent immediate and irreparable harm, the Motion to Certify should be granted, with forthwith full disclosure of the existence of this case, the rights of each employee fully stated, and the PAB Ordered to cease and desist in failing to fully inform each class member of his/her rights. In

addition, each employee who is a member of the class should be allowed to have voidable any and all decisions previously made which do, or may affect his/her full knowledge of options available under the Rules of this Court including F.R. Civ. P. 23, as well as the GAO Orders and rules affecting their individual rights and status.

## REQUEST FOR A HEARING ON THIS MOTION

Plaintiff hereby requests a hearing on this motion at the Court's earliest convenience.

Respectfully submitted,

Signed, *charltonw2428*

Walter T. Charlton, Attorney for Plaintiffs
D.C. Bar # 186940
Walter T. Charlton & Associates
1156 15th, Street N.W. LL 10
Washington D.C., 20005-1704
Phone 410 571 8764, Fax 410 897 0471
charltonwt@comcast.net
Counsel for Plaintiff and the Putative Class

CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that I filed on July 16th, 2007 in the ECF system for the United States District Court, this Reply to Defendant's Opposition to Plaintiffs Motion for Immediate Certification of the Class and for Injunctive Relief, with the expectation that a copy of this Motion would be sent to Andrea McBarnette, AUSA, counsel for the defendants, in the normal course of business.

CharltonW 2428

**Before the**
**Senate Subcommittee on Oversight of Government Management, the Federal Workforce,**
**and the District of Columbia**
**and the**
**House Subcommittee on the Federal Workforce, Postal Service, and the District of**
**Columbia**


Statement of Anne M. Wagner
General Counsel
Personnel Appeals Board, GAO


May 22, 2007


Good morning, Chairman Akaka, Chairman Davis, and members of the subcommittees.

At your request, I am here today to address questions you may have regarding the efforts by the

Government Accountability Office (GAO) to restructure its mid-level analyst corps, commonly

known as Band II.   As a preliminary matter, however, I would appreciate the opportunity to

address my role and that of the Personnel Appeals Board with regard to this matter.

In 1980, Congress enacted the Government Accountability Office Personnel Act (GAOPA), and

in doing so, established the Personnel Appeals Board with jurisdiction to adjudicate adverse

actions, discrimination complaints and prohibited personnel practices, among other things.  Final

PAB decisions are appealable to the United States Court of Appeals for the Federal Circuit.  To

date, the Board has issued over a hundred decisions, only a small number of which have been

appealed to the Circuit.  And, in twenty-seven years, the PAB has been reversed fewer than a

handful of times.

The GAOPA and the Board's implementing regulations define the role of the Board's

Office of General Counsel.  Specifically, the Office investigates charges filed by GAO

employees or applicants alleging a violation of their employment rights.  Where reasonable

Testimony of Anne M. Wagner, May 22, 2007

grounds exist to believe that such a violation has occurred, the General Counsel offers to represent the individual in adjudicating the claim before the PAB.  The employee may accept the offer, or decline and proceed to the Board *pro se* or with a representative of his or her choosing. If reasonable grounds do not exist and the General Counsel does not offer to represent, the individual may still proceed to the Board with his/her claims.

The Personnel Appeals Board Office of General Counsel (PAB/OGC) has no role in the creation or implementation of policy at GAO other than to comment on proposed Agency orders. More importantly, PAB/OGC does not adjudicate claims and thus does not make findings as such.  Rather, the purpose of the investigations conducted by the General Counsel is solely to determine whether to offer representation to the charging party based on a relatively low threshold of whether there are reasonable grounds to believe that a violation has occurred, rather than on the much higher test applied by the Board when ruling upon the claim.

In February 2006, fifteen GAO employees who had been in the Band II analyst and specialist force timely filed individual charges with the PAB General Counsel's Office challenging their alleged recent demotions as a result of GAO's recent restructuring of the single Band II into Band IIA and Band IIB.   Three of these individuals thereafter decided to pursue discrimination claims with the GAO's Office of Opportunity and Inclusiveness and thus the PAB/OGC investigation into their charges was held in abeyance.  Upon investigating the remaining twelve charges, I determined that reasonable grounds existed to believe that the individuals' employment rights had been violated and, therefore, offered to represent them before the Personnel Appeals Board.

Testimony of Anne M. Wagner, May 22, 2007

Thus, the PAB/OGC filed petitions on behalf of the twelve Band IIA individuals challenged the legality of several aspects of the GAO restructuring process and the specific placement decisions.  After filing these petitions, my Office moved to consolidate the cases for processing before the Board.

The Subcommittees have asked me to provide a written statement regarding the Band II cases that were scheduled for hearing before the Personnel Appeals in April 2007.   The following describes in detail the factual and legal assertions made by the PAB/OGC on behalf of the petitioners.  However, as stated above, the PAB General Counsel does not make "findings" insofar as that term implies a determination of fact based upon adjudication of relevant evidence. While I firmly believe that the evidence and law supporting the claims set forth in the petitions would have carried the day if the cases went to a hearing, their settlement prior to trial meant that the Board did not have the opportunity to make findings of fact and conclusions of law with regard to the matters at issue.  With that said, I can summarize for you what I believe the record would have shown with regard to GAO's restructuring of the Band II analyst and specialist workforce.

The PAB/OGC was prepared to show that GAO improperly demoted the twelve petitioners.  As a threshold matter, we would have demonstrated that the alleged "reassignments" were adverse actions triggering the substantive or procedural due process protections set forth in 5 U.S.C. §7513, made applicable to GAO through 31 U.S.C. §731.[1]   Under GAO Order 2752.1, ch. 3(1)(d), such adverse actions include reductions in band and pay.  A reduction in band is defined as an "involuntary change of an employee…to a lower pay band," and a reduction in pay means  "the involuntary reduction of an employee's pay."  GAO Order 2752.1, ch.1(4).  Pay is

---

[1]  Alternatively, we were prepared to argue that the "reassignments" were constructive demotions.

Testimony of Anne M. Wagner, May 22, 2007

defined as "the basic pay rate set by the Comptroller General for a position before any deductions and additional compensation, such as overtime."  The petitioners' placement from Band II to Band IIA constituted both a reduction in band and pay.

Specifically, the Band II, formed in 1989, merged the former GS-13 and GS-14 analysts and specialists.  The restructuring effectively reinstituted the two grade/pay classifications with the Band IIB being the GS-14 and the Band IIA being the GS-13.  Thus, for analysts, such as one of the petitioners, who were, in fact, at the GS-14 grade level prior to the formation of the Band in 1989, placement into the Band IIA effected a demotion to the GS-13 equivalent Band IIA position.  Similarly, other petitioners with considerable years of service at GAO and at the top of the Band II or GS-14 equivalent, reassignment to the Band IIA or GS-13 equivalent likewise constituted a demotion. A further indication that the placement from Band II to Band IIA was a demotion is that the competencies and duties previously encompassed within the Band II were ultimately assigned to Band IIB,[2] effectively making the Band IIA a lower band level than the Band II.

Furthermore, the PAB/OGC was prepared to argue that placement into Band IIA also meant a reduction in pay because it resulted in petitioners being denied the annual adjustment to their basic salary to which they were otherwise entitled.  While acknowledging cases holding that pay and grade retention preclude finding that an action constitutes a demotion, we were

---

[2] The "Developing People" and "Investing Resources" competencies had previously been validated for the Band II analyst position by Personnel Decisions Research Incorporated (PDRI) under a contract with GAO.  GAO chose not to apply them to the Band II, however, due to the so-called "bimodal" response to these competencies in the PDRI job survey.  *See* "Talking Points for Band IIA/B Restructuring Analysts Community Town Hall Meeting." (Aug. 5, 2005)

Testimony of Anne M. Wagner, May 22, 2007

prepared to argue that these cases are distinguishable on the grounds that pay retention, without

an annual cost of living adjustment, results in a real reduction in the basic rate of pay.

Because these reductions in band level and pay constituted adverse actions, had these

cases gone to trial, GAO would have been required to prove by a preponderance of the evidence

that they were taken for such cause as promotes the efficiency of the service. The term "cause"

in the context of federal personnel law is normally defined as misconduct or poor performance.

Here, there was no allegation that the petitioners engaged in misconduct. Nor can it be said that

they demonstrated unacceptable performance given that their ratings for the relevant time period

were all at "meets expectations" and above.

Rather, in May, 2005, GAO issued a Project Plan (Plan) for restructuring the Band II

Analysts/Specialists into two pay bands designated Band IIA and Band IIB. The stated purpose

of the proposed restructuring was to move GAO to a more market-based and performance

oriented classification and compensation system that would result in "equal pay for work of

equal value over time."

The record in this case would show that the decision to restructure the Band II was made by the

Comptroller General (CG), David Walker. The GAO Executive Committee (members at the

time included David Walker, Gene Dodaro, Chief Operating Officer (COO), Tony Gamboa

(then-General Counsel), and Sallyanne Harper, Chief Administrative Office (CAO)) was

responsible for providing guidance throughout the Band II restructuring project development and

for making final policy decisions.

Prior to the proposed restructuring, GAO operated under a performance-based

compensation system that provided for pay distinctions based on performance. Despite the

PAB/OGC's repeated requests during the investigation and discovery for documented evidence

Testimony of Anne M. Wagner, May 22, 2007

that the existing Band II structure deprived employees of equal pay for work of equal value over time, GAO failed to produce any such evidence.  Additionally, most of the Managing Directors interviewed during the course of the investigation stated that they had not perceived any inadequacies with the existing system and had not conveyed any dissatisfaction with it to Mr. Walker or the Executive Committee prior to the restructuring.

In their depositions, members of the GAO Executive Committee and other GAO officials involved with the Band II restructuring alternately attributed the basis for the restructuring decision to a 2000 study by Personnel Decisions Research Inc. (PDRI) and the Watson Wyatt compensation study in 2004.  However, upon examination, neither study demonstrated the need to split Band II.

In 2000, GAO contracted with PDRI to develop a competency-based performance, appraisal, pay and promotion system.  GAO's statement of work contemplated that this objective would be carried out in three phases:  (1) develop competencies that reflect the knowledge, attributes and skill that GAO staff should possess to succeed in fulfilling GAO's mission; (2) develop a validated "world-class performance appraisal system; and (3) develop validated promotion and pay systems that "should allow for a significant role for management judgment in making both promotion and pay decisions."  *See* GAO Purchase Order 200073.

In an effort to validate the competencies that it had devised as part of its contract, PDRI surveyed employees to determine the relevance of the related work activities to effective performance.  Of those who responded, 22.6% of Band IIs indicated that the "developing people" competency was not relevant, while 21.7% of them indicated that the "investing resources" competency was not relevant to their performance.  GAO officials referred to these

Testimony of Anne M. Wagner, May 22, 2007

survey results as the "bimodal" response, which they repeatedly cited as the evidence which lead

them to conclude that there were two distinct positions within Band II warranting the split.

 Consequently, according to a subsequent PDRI report, at the time of the survey, "it was

hypothesized that the differences may be explained be [sic] examining the data separately for

those who functioned as individual contributors versus those who functioned as engagement

leaders or Analysts in Charge." *See U.S. Government Accountability Office: Impact of GAO*

*Initiatives on the Content Validity of the Analyst and Specialist Competency Model and*

*Performance Management System,* Technical Report No. 538 (May 2006) at 2.  However, "at

the time of the original analyses, …data had not been collected that would enable determination

of membership in these two groups, making it impossible to test this hypothesis." *Id.*  There is

no evidence that,  at that time, GAO undertook or contracted for a more thorough analysis of the

survey to determine the cause for the allegedly bimodal result as to the two aforementioned

competencies.  It is clear, therefore, that the 2000 PDRI study did not compel GAO to the

conclusion that the Band II analyst level in fact comprised two separate and distinct positions.

 In February, 2004, GAO entered into another contract with PDRI to obtain "continuous

improvement of GAO's competency-based performance management system for Analysts/

Specialists." *See* GAO Purchase Order 2004201 at 7 (*Statement of Work*).  Two years later, GAO

modified the contract to request PDRI's " assistance in reanalyzing the job analysis data used to

validate the Analysts and Specialists Competency Model to verify that the Developing People

and Investing Resources competencies are relevant to the Band IIBs." *See Statement of Work*

supporting Modification No. 4 of GAO Purchase Order 2004201.  In so doing, GAO stated its

belief that the so-called bimodal response to the earlier survey "was *further* indication that there

were two types of Band IIs-those who primarily functioned as engagement leaders and those who

Testimony of Anne M. Wagner, May 22, 2007

primarily functioned as individual contributors" and noted its assumption "that those indicating that these two competencies were relevant to their work were primarily the engagement leaders." *Id.* (emphasis added).  However, GAO failed to identify or produce any documented evidence, either pre- or post- the PDRI survey, that there were in fact "two types of Band IIs."

Although information regarding employee "membership in these two groups" was not available at the time of the original survey, PDRI stated that, in the interim, "GAO collected data as to whether or not respondents had served as engagement leaders or individual contributors." *See* PDRI's Technical Report No. 538 at 2.  PDRI did not indicate how GAO collected this information.  Nevertheless, its Report states that of 1208 Band II respondents to the 2000 survey, 767 were Analysts-in-Charge[3]   and 441 were not AICs.

The fact that 63% of the original survey respondents were Analysts-in-Charge (AICs) substantially undercuts GAO's assumption that the "bimodal" response demonstrated the presence of two distinct positions within the Band II.   In addition, however, upon reanalysis, the percentage of AICs who responded that the eleven enumerated work activities under the Developing People and Investing Resources competencies were not relevant was also considerable, in no case lower that 10% and in some instances reaching as high as 30% and 37%. In fact, in subsequently validating these competencies for the Band IIB, PDRI concluded that only eight of the eleven work activities identified in the survey would be appropriate.

The GAO Executive Committee has likewise cited the work performed by Watson Wyatt relating to GAO's compensation system as a compelling factor in the decision to split the Band II Analyst/Specialist force.   Specifically, they stated in depositions that the Watson Wyatt study confirmed that there were two distinct positions within the Band II.   However, this claim is at

---

[3]  At GAO, an analyst-in-charge (AIC) is responsible for leading the engagement.

Testimony of Anne M. Wagner, May 22, 2007

odds with Watson Wyatt's own characterization of its study set forth in a briefing provided by

Watson Wyatt to the Executive Committee on October 29, 2004.  *See Government*

*Accountability Office, Executive Committee Briefing: Compensation Design Options* (Oct. 29,

2004).  Among the design characteristics that Watson Wyatt identified as originating with the

Executive Committee was that "[t]he difference between Band 2 'leaders' and 'individual

contributors' should be recognized." *Id.* at 5.  The evidence thus indicates that Watson Wyatt

designed its study presuming the existence of two separate positions at the Band II level pursuant

to the Executive Committee's direction, rather than independently discerning such a bifurcation

in the Band after examination of the GAO workforce.

In sum, absent any documented evidence demonstrating that the structure of the Band II

Analyst/Specialist in fact deprived employees of "equal pay for work of equal value over time,"

GAO would not be able to show that the petitioners' demotions were for such cause as promotes

the efficiency of the service.  Absent such a showing, the demotions would not have been

sustained.

In addition, the PAB/OGC was prepared to show that the restructuring process deprived

petitioners of the procedural due process mandated by 5 U.S.C. §7513.  In support of that claim,

we would have presented evidence that in May, 2005, GAO issued its Project Plan (Plan) for

Restructuring the Band II Analysts/Specialists.  The Plan contemplated two phases with the

following goals: (I) develop and provide proposals to the Executive Committee regarding the

roles, responsibilities and competencies of the Band IIA and IIB positions and (II) identify the

criteria and devise the process for making the initial placements into Band IIB.

Testimony of Anne M. Wagner, May 22, 2007

The two phases of the Plan were to be carried out sequentially by task teams, consisting primarily of GAO Directors.  Although members of the Employee Advisory Council[4] were also assigned to the teams, Band II analysts and specialists were not otherwise invited to be part of the task teams.  GAO employees were subsequently told that the task teams developed a proposal outlining the roles, responsibilities and competencies applicable to Band IIA and B.  *See* "Talking Points for Band IIA/B Restructuring Analysts Community Town Hall Meeting" (August 5, 2005),  In fact, however,  Susan Kladiva, the Project leader working under the close direction of the Executive Committee, provided the teams with prepared drafts of proposals that defined the roles, responsibilities and competencies of the Band IIA and IIB positions, as well as the criteria and process for the restructuring.[5]

The task teams conducted numerous focus groups allegedly consisting of randomly selected employees from throughout GAO.  Participants were not given copies of the straw proposals in advance or even at the meetings.

---

[4] GAO's Employee Advisory Council (EAC) was established by the Comptroller General to serve as an advisory body to him and other senior executives.

[5] Writing to the Executive Committee regarding these so-called "straw" proposals, Ms. Kladiva stated that "[f]or the analysts and specialists, we stayed close to what we can related to the validated competencies and performance standards for Developing People and Investing Resources. I think these additional competencies-with their related work activities and standards-give us a clear basis for defining what a "2b" does in a way that is distinguished from a "2a." *See*  Email from Susan Kladiva to Executive Committee (May 26, 2005).  Yet, later, in dismissing employee concerns that these competencies were inherently Band III functions, GAO stated that "[b]ecause both competencies were validated for Band II, we believe they apply to the Band IIB pay range."  *See Talking Points for Band IIA/B Restructuring Analysts Community Town Hall Meeting.* (Aug. 5, 2005)

Testimony of Anne M. Wagner, May 22, 2007

Phase I concluded in mid-July 2005 with the posting of the proposals relating to roles, responsibilities and competencies of the Band IIB and a "town hall meeting" led by the Executive Committee.  Phase II concluded in September with the posting of the restructuring criteria and process proposals and a town hall meeting in September 2005.

On September 27, 2005, GAO posted a document on its intranet website titled "Band II Restructuring roles and responsibilities for <u>Senior Analysts in the IIA and IIB pay ranges</u>..." GAO also indicated that it had posted "straw proposals" regarding the criteria and process for the Band II restructuring on the GAO intranet on September 23, 2005.  GAO's announcement indicated that it had posted the proposals for a 30-day comment period ending October 24, 2005.

On October 7, 2005, prior to the expiration of the comment period, GAO posted Draft Order 2900.3 containing what it characterized as the "latest" version of the "roles and responsibilities" factor to be used in the Band IIB selection, as well as additional information about the straw proposals regarding the other criteria and placement.  Among the allegedly "clarifying details and minor revisions" in the Draft Order was the shift to the use of standardized rating scores (SRS), rather than appraisal averages, for determining eligibility for initial placement into Band IIB.

On October 26, 2005, GAO changed the period for commenting on the Band IIB standards to November 3, 2005 "in order to properly consider comments prior to the Band II restructuring."  On November 3, 2005, David Walker held a "special CG chat" to provide an "overview of decisions related to the Band II restructuring, and key information on the design and implementation of GAO's new compensation system."

On November 4, 2005, a day after the close of the comment period, GAO issued Order 2900.3 captioned "Band II Restructuring" (Order) establishing the policy and procedures for

Testimony of Anne M. Wagner, May 22, 2007

restructuring the then-unified Band II analysts and specialists into two separate pay categories:

Band IIA and Band IIB.  On November 8, 2005, GAO announced a change to the eligibility

requirements contained in the promulgated Order as well as to the meeting schedule for the

centralized panels.  *See* GAO Order 2900.3, ch. 1(1).

      To be eligible to apply for Band IIB placement under GAO Order 2900.3, an employee

was required to meet one of three criteria:  (1) meet certain minimum requirements with regard

to his/her SRS for FY 2003-2005.  The SRS is based on a formula devised by GAO using

standard deviation principles to assess an employee's ratings relative to those of all Band II

employees on his/her mission team[6],  or (2) been converted from a GS-14 position to the Band II

on June 15, 1989, or (3) been appointed to GAO after June 15, 1989 and held a GS-14 or

equivalent position in the federal government prior to appointment.  *See* GAO Order 2900.3, ch.

2(2)(a)-(e).  The SRS of a Band II employee who was not working in a mission team was

determined by comparison to ratings of Band II employees in "small offices," such as the

Congressional Relations, Field Operations, and Human Capital Office.  *See* GAO Order 2900.3,

ch. 2(4)(b).

      On November 7, 2005, GAO's Human Capital Office (HCO) notified Band II staff by

email of their eligibility or ineligibility to be considered for placement in Band IIB.  Of 1238

Band II employees, 670 were found to have met the basic eligibility requirements.

---

[6] The work performed by the GAO's analyst workforce takes place, for the most part, within the
following thirteen mission teams:  Acquisition and Sourcing Management (ASM); Applied
Research and Methods (ARM); Defense Capabilities and Management (DCM); Education,
Workforce and Income Security (EWIS); Financial Management and Assurance (FMA);
Financial Markets and Community Investment (FMCI); Health Care (HC); Homeland Security
and Justice (HSJ); Information Technology (IT); International Affairs and Trade (IAT); Natural
Resources and Environment (NRE); Physical Infrastructure (PI); Strategic Issues (SI).

Testimony of Anne M. Wagner, May 22, 2007

Employees who did not meet the basic eligibility requirements could nevertheless request a "special eligibility determination" by submitting a "written business case" identifying: (1) reasons why the employee should be considered and (2) any unique circumstances that should be considered. *See* GAO Order 2900.3, ch.2(3)(a). The Order provided for consideration of these requests by a panel of senior executives, which consisted of the following staff directors: Jesse Hoskins (HCO); Timothy Bowling, Quality and Continuous Improvement (QCI); Helen Hsing Strategic Planning and External Liaison (SPEL); and Ben Nelson (QCI). Employees seeking special eligibility had to submit their requests by November 9, 2005 and were to be notified of the panel's decision by November 14, 2005. Of the 108 employees who sought a special eligibility determination, the panel approved 96 for eligibility to apply for the Band IIB.[7]

GAO further found as eligible an additional 28 employees who did not have the requisite ratings for FY2003-2005 but could demonstrate qualification based on directly related outside experience. In total, 794 (64% of all Band IIs) were allowed to apply for placement into Band IIB.[8] GAO required that all employees seeking placement in Band IIB submit an application no

---

[7]Ninety-four of the 96 individuals deemed eligible under this provision applied for Band IIB. Only five were selected.

[8] In addition, GAO Order 2900.3 provided that all employees in job series 347 (Analyst) and 511 and 510 (Auditors and Accountants) throughout GAO, and job series 2210 and 1150 (IT Specialists) in the IT team would be presumed to be analysts - as opposed to specialists -for purposes of the restructuring. *See* Order 2900.3, ch. 4(1)(a). However, it also provided that employees could seek review of this classification. *See Id.* at ch.4(2). Employees wishing to challenge their classification had four days – until November 9, 2005 – within which to submit their request. Employees were to be notified of GAO 's decision regarding their classification appeal by November 14, 2005. An employee who was not satisfied with the decision had only two days - until November 16, 2005 - within which to seek reconsideration, the decision on which was to be issued by November 18, 2005.

Testimony of Anne M. Wagner, May 22, 2007

later than November 21, 2005.  Only 757 of those deemed eligible submitted applications for

placement into Band IIB.

The GAO restructuring Order 2900.stated that eligible employees would be assessed for

placement into Band IIB on three factors: (1) roles and responsibilities, i.e., whether the

employee had actually been performing the roles and responsibilities of the IIB pay range to a

significant degree and on a recurring basis; (2) past performance, i.e., had the employee

consistently demonstrated strong relative performance as a Band II employee, and (3)

performance potential, i.e., did the employee have the ability to immediately perform at the

"meet expectations" level in "Developing People" and "Investing Resources." *See* GAO Order

2900.3, ch. 2(8)(a)-(c).  None of these three selection criteria had been validated prior to the

implementation of the restructuring.

As to the decision-making process, the Order provided for a "unit consultation" wherein

each Managing Director was to meet with the team's Directors to obtain input with regard to

each applicant within the team.  *See* GAO Order 2900.3, ch. 2(10).   In preparation for the unit

consultation, the participants were given binders ("notebooks") containing the applications,

performance ratings, standardized rating scores and averages, and Mission Assignment Tracking

System (MATS) data for each applicant employee from that team.  Based on a review of the data

contained in the notebooks and input from the Directors, the Managing Director was to form a

"yes," "no" or "unsure" preliminary recommendation regarding the placement of each applicant

from the team into Band IIB. *Id.*   The unit consultation meetings between the team Managing

Directors and Directors took place between November 22 and December 1, 2005.

In addition, each Managing Director served as a panel member on a Centralized Panel

(Panel) consisting of at least two other Managing Directors.  *See* GAO Order 2900.3, ch. 2(11).

Testimony of Anne M. Wagner, May 22, 2007

Each Managing Director was required to review the data contained in the prepared notebooks for

each of the employee applicants from the other teams represented on his/her Centralized Panel,

and, based on this paper review, make a similar preliminary recommendation of "yes," "no" or

"unsure." *Id.*

> There were five Centralized Panels structured by teams:
>
> > Panel 1:  Homeland Security and Justice (HSJ), National Resources and
> >            Environment (NRE), and Physical Infrastructure (PI)
> >
> > Panel 2:  Education, Workforce, and Income Security (EWIS), Financial Markets
> >            and Community Investment (FMCI), and Health Care (HC)
> >
> > Panel 3:   Acquisition and Sourcing Management (ASM), Defense Capabilities
> >             Management (DCM), International Affairs and Trade (IAT)
> > Panel 4:  Financial Management and Assurance (FMA), Information Technology
> >            (IT), and Strategic Issues (SI)
> >
> > Panel 5:  Small Offices

*See* GAO Order 2900.3, ch. 2(11)(b).  In addition, a sixth Centralized Panel consisting of all

Managing Directors whose teams employed specialists was convened to assess the specialists.

*See* GAO Order 2900.3, ch. 2(12).

Under the Order, Panel members were to meet and discuss whether their preliminary

recommendations as to each employee were appropriate.  *See* GAO Order 2900.3, ch. 2(11)(b).

They were authorized to change their preliminary recommendations, but if they were unable to

reach agreement with regard to selecting the employee for the Band IIB, the employee was to

remain in the "unsure" category.  *Id.*  The Chief Operating Officer and Chief Administrative

Officer served as chair and vice chair, respectively, of the Panels, but were not to serve as panel

members.  *Id.*  After receiving recommendations from the Panel, the COO and CAO were to

make a joint preliminary determination as to whether an employee should be placed in Pay Band

Testimony of Anne M. Wagner, May 22, 2007

IIB.  *See* GAO Order 2900.3, ch. 2(11)(c).  Thereafter, the GAO Human Capital Office (HCO) and Office of Opportunity and Inclusiveness (OOI) were to review the preliminary determinations of the COO and CAO and provide input prior to any final determinations.  *See* GAO Order 2900.3, ch. 2(11)(d).

The Centralized Panels met between December 6 and 9, 2005.  Gene Dodaro (COO) and Sallyanne Harper (CAO) led and facilitated the Panel discussions of the employee applicants.

The Order identified ten characteristics respectively for the Band IIB analyst and specialist "roles and responsibilities" criterion.  *See* Order 2900.3, Appendix I.  Yet, as is clear from their deposition testimony as well as their notes made contemporaneously with the restructuring decisions, Mr. Dodaro and Ms. Harper relied almost entirely on the number of hours analysts worked as an Analyst-in-Charge (AIC) on engagements and on the risk level of the engagements.  With regard to specialists, the defining factor was the number of different engagements that the individual worked on simultaneously.   However, during the FY 2003-2005 time period, GAO employees were not informed that failure to work significant hours as an AIC would be the basis for demotion in the future.  In any event, assignment as the AIC on an engagement was within management's discretion and not within the control of individual analysts or specialists.

Furthermore, we believe that the record would show that the emphasis on the "risk" level of the engagements as a deciding factor was contrived.  According to a number of GAO officials, a "high risk" designation signified primarily that the engagement was to be overseen by the highest levels at GAO.  Such a designation, however, did not necessarily reflect the substantive significance or complexity of the engagement, but instead, might reflect other reasons for

Testimony of Anne M. Wagner, May 22, 2007

management's attention, such as the engagement's political sensitivity, for example, over which the analyst/specialist had no control.[9]

As to the second criterion relating to "past performance," employees were assessed based on their standardized rating scores, their SRS averages, and their annual performance ratings from the three previous annual rating cycles, FY 2003-2005.   However, again, during the FY 2003-2005 time period, GAO employees were not informed, and had no reason otherwise to anticipate, that ratings of "meets expectations" and above might nevertheless be the basis for future demotion.  Furthermore, the PAB/OGC was prepared to question GAO's reliance on the appraisals as the bases for the demotions in light of evidence obtained through the investigation and discovery that at least some GAO managers lowered and manipulated individual ratings under pressure to achieve an artificial dispersion in the ratings.

Moreover, the PAB/OGC's analysis of employees' standardized ratings scores and averages indicated that these did not in fact capture meaningful distinctions in employee performance as claimed by GAO.  Rather, our review of the relevant data for all Band IIB applicants revealed a number of anomalies with regard to the SRS, and particularly the SRS averages, that called into question the reliability of this information as grounds for the restructuring decisions.[10]

---

[9] Moreover, GAO derived the information concerning AIC hours and risk levels from its Mission and Assignment Tracking System (MATS), which evidence showed was not always accurate.

[10] While preparing for litigation of the Band II cases, we met with two statisticians to determine whether to retain the services of a professional to assess GAO's approach to standardizing ratings.  Soon after obtaining the necessary authority to contract with one of them for the purposes of analyzing GAO ratings data, the PAB/OGC entered into settlement negotiations with GAO.  Thereafter, we did not take any further action to enter into a contract for a statistical analysis of the ratings data.

Testimony of Anne M. Wagner, May 22, 2007

The record would also show that in making their preliminary determinations, the COO and CAO applied new "interpretative" standards for determining employee selection into the Band IIB.  Furthermore, in the case of approximately 56 employees, including two petitioners, they declined to follow the Panel's recommendation approving selection for Band IIB and instead rejected the applications.  With approximately five others, they did not follow the Panel's recommendation rejecting the applications, and instead approved the employees' selection for Band IIB.  In approximately two cases for which the Panel indicated that it was unsure, the COO and CAO approved the placement into Band IIB, whereas with approximately twelve others, including another petitioner, they rejected the applicants for Band IIB.

Thereafter, Managing Directors notified employees of the final decisions between December 16 and 23, 2005.  Employees were given until January 13, 2006 to seek "feedback" regarding the decisions.  Employees who were not placed into Band IIB could also request reconsideration from the Comptroller General (CG).  *See* GAO Order 2900.3, ch. 2(13)(b). Under the terms of the Order, the CG was to review each request and the information considered by the Panel.  *Id.*   The Order did not, however, provide the standard to be applied by the CG in reconsidering the decision not to place the employee into Band IIB.   The Order did not notify employees of their right to be represented during the feedback or reconsideration process.   It warned employees that the CG would not consider objections to the restructuring policy or process.

Employees who sought reconsideration were not told that the CG might rely on information beyond the scope of their application.  In fact, Mr. Walker sought and relied upon employee information and data that went beyond the three-year period contemplated by the

Testimony of Anne M. Wagner, May 22, 2007

Order.  In one instance, for example, a petitioner who sought reconsideration and met with Mr. Walker was completely surprised that the CG was relying on pre-2003 performance data in his reconsideration.  Had he known, he could have come to the meeting prepared to address those issues.

Approximately nineteen individuals who sought reconsideration from Mr. Walker were approved for placement into Band IIB.  These included employees who had been recommended, as well as those who had been rejected by, the Centralized Panels for inclusion in the Band IIB. In addition, five individuals whom the COO and the CAO rejected and who did not seek reconsideration were also placed into Band IIB upon reconsideration. Ten of the twelve petitioners sought reconsideration from Mr. Walker.  None were granted.

Ultimately, 433 Band II employees (35% of all Band IIs) were placed into Band IIB and the remaining 324, including the twelve petitioners, were placed into Band IIA.   The effective date of the placement decisions was January 8, 2006.

Prior to the issuance of GAO Order 2900.3, employees in Pay Band II were subject to the same minimum and maximum pay, adjusted by geographical location.  On January 20, 2006, GAO issued a revised Order 2540.3, which, *inter alia,* eliminated annual pay adjustments for Band IIA employees whose pay exceeded the maximum pay rate for Band IIA.  On February 8, 2006, GAO issued the *FY 05 Performance-Based Compensation (PBC) Guide for Analysts, Specialists and Investigators (Guide)* which was intended to supplement GAO Order 2540.3. Appendix 2 to the *Guide* set forth the pay ranges for Band IIA and Band IIB for each geographical zone.  The pay range minimums and maximums applicable to Band IIA were significantly lower than those applicable to Band IIB.

Testimony of Anne M. Wagner, May 22, 2007

The *Guide* provided that any portion of the GAO-wide 2.6% annual pay adjustment that exceeded the maximum rate of pay for Band IIA would be "lost." *Guide* at 6. In addition, it provided that any Band IIA employee whose salary in December 2005 was in excess of the Band IIA maximum rate was covered by the Band IIA Transition provisions. *Guide* at 7. These provisions stipulated that any Band IIA whose salary was in excess of the Band IIA maximum rate would not receive the 2.6% annual pay adjustment, would receive only 50% of their Performance-Based Compensation (PBC) bonus as a permanent salary increase up to the IIA transition salary range maximum, and not receive any of the remaining portion of the PBC as a performance bonus.

As a result of their placement into Band IIA, eleven of the twelve petitioners were denied the 2006 annual pay adjustments and received only part of the performance-based compensation to which they were entitled.

Based on the foregoing, the PAB/OGC was prepared to argue that GAO did not accord petitioners the requisite 30-day notice and meaningful opportunity to respond to GAO's decision to demote them. Specifically, GAO notified employees of their Band IIB eligibility status on November 7, 2005. Employees who wanted to avoid placement into Band IIA had only until November 21, 2005 to make their case through written application. Having been informed on December 16, 2005 of their demotions, they were given only until January 13, 2006 to seek feedback from their Managing Directors, who were not the decision-makers and did not have the authority to alter the decision. The Order 2900.3 did not provide for any opportunity for employees to respond, either orally or in writing, to the COO and CAO. Petitioners were given an opportunity to seek reconsideration from Mr. Walker. However, they were not notified as to

Testimony of Anne M. Wagner, May 22, 2007

the standards and additional evidence that Mr. Walker would rely upon in making his decision.

They were also precluded from raising any challenge to the process.

The PAB/OGC was further prepared to show that the petitioners' demotions must be

overturned in the face of the numerous harmful errors made in the course of relying upon and

applying procedures used in restructuring.  *See*  5 U.S.C. §7701(c)(2).   These included:

1. Failure to notify GAO analysts and specialists prior to, or during, the FY 2003-2005 appraisal years that performance at a "meets expectation" level could lead to demotion;

2. Failure to notify GAO analysts and specialists prior to, or during, the FY 2003-2005 appraisal years that work activity outside of the Analyst-in-Charge role during this period could lead to demotion;

3. Failure to validate the criteria used in the placement process;

4. Inconsistent application of the selection criteria and ongoing revision of the criteria during the course of the restructuring;

5. Reliance on information not identified in GAO Order 2900.3;

6. Reliance on faulty data from the Mission and Assignment Tracking System (MATS);

7. Reliance on the standardized rating scores and SRS averages;

8. Lack of notice to employees with regard to the actual standards and procedures used in the reconsideration process; and,

9. Inconsistent application of standards and procedures in the reconsideration process;

In addition, based upon the facts described above, the PAB/OGC was prepared to show

that the Band II restructuring violated Pub.L. 108-271, §9.  Specifically, we would have argued

that GAO Order 2900.3 established a system to appraise GAO employees that did not meet the

requirements of 5 U.S.C.§4302 as required by 31 U.S.C. §732(d)(1) in that

1. GAO did not encourage meaningful employee participation in establishing standards used in restructuring  Band II.  *See* 5 U.S.C. §4302(a)(2);

Testimony of Anne M. Wagner, May 22, 2007

2. GAO did not adopt standards that permitted, to the maximum extent feasible, the accurate evaluation of job performance on the basis of objective criteria related to the job in question for each employee or position affected by the Band II restructuring;

3. GAO did not evaluate employees for purposes of restructuring on basis of the standards used to evaluate their performance during the three previous years;

4. GAO did not communicate Band II restructuring standards with sufficient advance notice to permit GAO employees an opportunity to conform their work history and performance to avoid demotion to Band IIA; and,

5. GAO's restructuring did not include effective transparency and accountability measures to ensure that its management was fair, credible, and equitable as required by Pub.L. 108-271, §9.  Specifically, there was no transparency and accountability in

   a. GAO's *post hoc* reliance on employee performance and work activity during FY 2003-2005 appraisal years;

   b. a policy that performance at a "meets expectation" level could lead to demotion;

   c. determination that AIC responsibilities and online work would be so critical in assessing analysts for restructuring purposes;

   d.. emphasis on the risk level associated with engagement;

   e. formulation of the GAO workforce analysis, competitive pay rates and market-based survey conducted by PDRI and/or Watson Wyatt;

   f.  manipulation of ratings;

   g.  calculation of the SRS scores;

   h. the application and ongoing revision of the selection criteria during the restructuring; and,

   i. the standards and procedures used in the Band II restructuring reconsideration process.

We also intended to argue that the elimination of petitioners' annual adjustment was contrary to Pub.L. 108-271. This claim presented a question of law that turned upon a straightforward reading of the statutory language and an examination of its legislative history.

Testimony of Anne M. Wagner, May 22, 2007

In addition, we submit that the record would have shown that petitioners' reassignments into Band IIA violated 5 U.S.C. §2302(b)(12).   The elements of that cause of action required a showing of (1) a personnel action (2) that violated a law rule or regulation (3) which implements or directly concerns a merit systems principle.  Each of these elements would have been met here.  First, the reassignments are plainly personnel actions within the meaning of §2302(b)(12).  Second, for the reasons discussed above, the reassignments violated Pub.L 108-271 §§3 and 9.  Third, the cited statutory provisions plainly implemented or directly concerned merit system principles of equal pay for equal work, protection against arbitrary action, and due process rights.

Finally, assuming *arguendo* that the Board found the Band IIB restructuring process to be consistent with law, the PAB/OGC was prepared to show that the petitioners met the criteria as stated in Order 2900.3.

Testimony of Anne M. Wagner, May 22, 2007