## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **James D. Moses** | ) | |
|     **For himself and** | ) | |
|     **All others similarly situated** | ) | |
| | ) | |
|     **Plaintiffs** | ) | |
| | ) | |
|         **v.** | ) | **Case No.    1:06 CV 01712  (JGP)** |
| | ) | |
| **DAVID M. WALKER** | ) | |
| **Comptroller General of the United States,** | ) | |
| **Government Accountability Office (GAO)** | ) | |
|     **and** | ) | |
| **Michael Doheny, Chair** | ) | |
| **The Personnel Appeals Board of the GAO,** | ) | |
|     **Defendants.** | ) | |

### PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
### PLAINTIFF'S MOTION FOR A DECLARATORY JUDGMENT

Plaintiff James D. Moses (Moses), for himself and all other similarly situated, hereby files this reply to Defendants' Opposition to Moses Motion for a Declaratory Judgment that he has substantially prevailed as to his own individual claims of a discriminatory demotion in this case.

### PRELIMINARY STATEMENT:

The sole remaining issue in this Motion is now[1] whether Mr. Moses, and the 110 others who have received relief, have "substantially prevailed" in this case.  It has long been recognized that questions of fact in discrimination cases are difficult to process.  This circuit has very

---

[1]  GAO now concedes, per its supplement, that ADEA, Title VII and EAJA, all invoked by Moses's complaint, allow the Court to award at its discretion, attorney's fees and costs  once a plaintiff has substantially prevailed.

recently revisited the federal employment discrimination arena.  This circuit continues to apply the **McDonnell Douglas**[2] framework to the burdens of proof in both ADEA and Title VII cases, (**Jackson v. Gonzales**, **Atty Gen**, August 10, 2007)[3].

Initially it should be noted by the Court that the GAO has not formally "articulated" as required by the **McDonnell Douglas** format[4], any legitimate reason for the granting of relief for Mr. Moses or the other 110 similarly situated persons.  Moses contends that the correction of the discriminatory results in this case for himself and the others, where no reason for the "corrections" are articulated invoke the principles of res ipsa loquitur.

The only argument which may conceivably apply, is that each one of the 110 persons whose demotions were rescinded, greatly improved.  That assumption is insane.  But that is what

---

[2]  **McDonnell Douglas Corp. v. Green**, 411 U.S. 792, 5 FEP 965 (1973).

[3]  **See--Kevin L. Jackson, Appellant v. Alberto Gonzales, Attorney general, Appellee**, Case No. 06-5053, pages 5-8, decided August 10, 2007.  Despite the fact that **Jackson** was decided against the plaintiff with one judge dissenting, the Court's attention is respectfully directed to the cited pages, 5-8.

"Where, as here, the record contains no direct evidence that the adverse employment action of which the plaintiff complains was caused by prohibited discrimination, we turn to the burden-shifting framework of **McDonnell Douglas Corp. V. Green**, 41 U.S. 792, 802-05 (1973), to analyze the claim." **Holcomb v. Powell**, 433 F.3d 889, 895 (D.C. Cir. 2006).  Although "intermediate evidentiary burdens shift back and forth under this framework, [t]he ultimate burden of persuading the trier of fact that t he defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." **Reeves v. Sanderson Plumbing Prods, Inc.**, 530 U.S. 133, 143 (2000) (quoting **Tex Dep't of Cmty. Affairs v. Burdine**, 450 U.S. 248, 253 (1981) (Alteration in original).

The Mc Donnell Douglas framework first requires the plaintiff to establish a prima facie case of discrimination by showing that:"(1) he is a member of a protected class; (2) he applied for and was qualified for an available position; (3) despite his qualifications he was rejected; and (4) either someone... filled the position or the position remained vacant and the employer continued to seek applicants." **Lathram v. Snow**, 336 F.3d 1085, 1088 (D.C. Cir. 2003)(Quotation marks omitted and alteration in original).  If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant employer to produce "' evidence that the plaintiff was rejected , or someone else was preferred, for a legitimate, nondiscriminatory reason."'.  **Reeves**, 530 U.S. at 142 (quoting **Burdine**, 450 U.S. at 254).  "If the defendant satisfies that burden, the **McDonnell Douglas** framework - with its presumptions and burdens - disappears, and the sole remaining issue is discrimination *vel non*."  **Waterhouse v District of Columbia**, 298 F.3d 989, 992 (D.C. Cir. 2002)....

[4]

2

their revised ratings purport to show.  Realistically, no jury in the world would believe that story,

nor would a judge.  This is particularly true for a group of 110 technical analysts all over the age

of 49.  Surely, they can improve, but not that much.  Therefore, this case, lacking any other

legitimate reason, must have caused the GAO to give up and grant the relief which did in fact

occur.  For this reason, and to put this important case into perspective, a summary of the entire

history of this case is necessary to understand what in fact did occur, and why these facts justify

granting the interim relief requested by granting plaintiff's motion for a declaratory judgment as a

"substantially prevailing" employment discrimination plaintiff.

### STATEMENT OF FACTS

James D. Moses is a 65 year old, African American, analyst at GAO.  He proceeded

successfully through the GAO career ladder for auditor/analyst employees, beginning as a young

man, without incident.  After a 40 year tenure (Pl. Mot, Exhibit 1, pg 1) he reached the level of a

senior  "Band II" analyst, titled an "evaluator".  As an experienced Band II analyst, he ranked

with the second highest level of staff analysts at GAO (Band III is higher).  He was well qualified

with no upper limits in difficulty on his assignments.  He served as the leader of teams of

analysts assigned tasks requested by congress out of the Los Angeles Branch Office.  He also

served as a volunteer counselor in civil rights matters.

When he reached about the age of about 50 (about 1992) he began to perceive material

changes in his own performance ratings affecting his professional status and career.  He

perceived that the changes followed a pattern.  That pattern was based upon both race and age.

In his position as a voluntary counselor he had counseled a large number of other employees.

Through counseling of those other employees, Moses gained more then the usual access and appreciation of examples of the nature of the bias he had independently detected in his own ratings, in the promotion and in the retention process.

In about 1999 Moses began attempts to intervene into a related and ongoing class complaint alleging age discrimination[5]. He was joined in these attempts by two other African American colleagues, Arthur L. Davis and Jimmie Gilbert, also employees of GAO working in branch offices as analysts. These intervention attempts were first delayed for years by GAO opposition, then ultimately denied by the Court.

The Plaintiffs in related cases, which would have included Moses as a class member, repeatedly attempted to have class action(s) certified. Those attempts were thwarted by GAO's opposition. Discovery was undertaken in one related case, Chennareddy et al v. Walker, # 87-3538 (JGP), in the late 1980's and early 1990's. That discovery was pursuant to leave of court granted incident to pending motions for class certification. In another related case, alleging similar complaints, but not filed as a class action, *Janet Vant Leven, et al v. Walker*, # 00-2686 JGP, discovery was undertaken in 2001 and 2002, on the merits of that case[6].

GAO's opposition to class certification was based upon GAO's contentions that GAO policy and practice was to maintain an independent ratings process. GAO represented that each ratings or promotion panel operated independently from the main office or GAO general management. Discovery conducted in conjunction with motions for class certification elicited the responses that GAO did not maintain any employee data base files nor systems to accumulate

---

[5] Venkareddy Chennareddy et al, v. Walker, case 87-3538.

[6] The Vant Leven case was settled before trial.

4

or process that employee profile information.  The Court accepted GAO's representations, and although some laboriously accumulated statistics were contradictory, GAO prevailed in having the several motions for class certification denied.  The denials were uniformly without prejudice for renewal, and uniformly on the grounds of lack of  commonality of typicality of claims set out by the putative class of senior employees.

GAO also contended that there was no central system for controlling "raters" or panels, nor for measuring or recording employee profiles.  GAO's counsel responded to the Court's questions, words to the effect that  "no such [employee profile data] exists and no data base system exists to measure ratings or performance history".

Those representations by GAO, its senior officers and counsel to plaintiffs and the court, which cut across all of the evidence in all of these related cases, was and is, categorically false[7]. However, plaintiffs were stymied by the GAO's refusals to produce true and correct statistical data.  GAO's existing systems and data bases on employee race, age, sex and ratings was hidden from the plaintiffs and the Court.

Years continued to pass.  Mr. Moses, along with Messrs Davis and Gilbert, colleagues at GAO were denied intervention into the still "live" Chennareddy case.  They requested assistance and determined to file their own case based upon actions then happening to them.  Notices of intent to sue were filed, and then they first filed for intervention in about 1999.  In about 2000

---

[7]  These misrepresentations by GAO were of material fact.  They were made during discovery, some under oath and some in direct response to the Court's questions.  The false information was to the effect that: (1) no uniform or all encompassing statistics or data base system existed as to GAO's professional employee personnel profiles and ratings by race and age.  (2) that no centralized system existed whereby GAO could measure or control its personnel actions.  (3) Hence, no possibility of a centralized uniform discriminatory policy or practice existed. Those representations are now known to be categorically false, and known to be such by GAO top management when made.

and 2001 information began to leak out about the true situation at GAO with respect to age discrimination and racial bias.

In depositions taken in 2002 in the related case of **Vant Leven v. Walker**, 00-2686 (JGP) definitive and irrefutable evidence of the GAO's deception, of the plaintiffs and the Court itself, was first elicited.

GAO has consistently denied the existence of the allegations of age and race discrimination, and falsely denied the existence of statistics which would, if released, definitively and indisputably state evidence on the actual distribution, qualitatively and quantitatively, of each particular discriminatory bias. This data base now exists and has secretly existed since 1989[8]. It was built by Mr. William (Bob) Mowbray who has at all times personally maintained the system and its data. He created it in 1989, and the data was gathered retroactive to 1986.

GAO has consistently denied the existence of this evidence through its counsel. GAO has falsely stated to this Court on numerous occasions that it simply does not exist. Nevertheless, and GAO's false statements to the Court notwithstanding, that evidence *does* exist, and plaintiff means to have it. For that reason subpoenas were filed, to which GAO and the PAB have not substantively responded. Instead they filed an objection and a motion for a protective order, alleging burdensomeness, and lack of necessity since there is pending GAO (also specious, see below) motion to dismiss based upon incorrect allegations of untimely filing by Moses. Moses, and all plaintiffs in all related cases allege that the withheld evidence is determinative of

---

[8]   See, record, Testimony Deposition William (Bob) Mowbray, Vant Leven Case, 2002, incorporated by multiple references (without objection) into the record of this case (see Page 9, 10, final paragraph, Moses Opposition to Motion to Dismiss). For the relevant Excerpts See Exhibit 3, hereto, repeated for the convenience of the Court. The entire deposition transcript of Mr. Mowbray appears in the record herein in the related case of Davis et al, in the record of that case as Exhibit 3, referenced in page 12 of Moses Opp. To Defendants' Motion to Dismiss.

all issues in all of these cases, including this one.

That is, as outlined previously, the existing fully developed and highly sophisticated data base system, if ordered disclosed as relevant evidence, answers fully all of the pending technical and factual questions regarding whether or not a bias exists in every facet of GAO's personnel policy. Thereby, once that data is disclosed, the legal questions of this case simply fade into nothingness. For the truth is there for all the world to see. Plaintiffs now have enough data in sample form (like Chennareddy's affidavit in this case) to predict the general pattern and outcome of full production of that evidence. This is the real reason this (Moses case) was so important to bring to a close at GAO. Again, GAO would have skated by without disclosures which would serve to embarrass the top management of that agency.

This is because the discrimination alleged is real, massive, consistent and irrefutable as from GAO's own data, gathered over the entire past 20 year period of the existence of the GAO data base system.


**Recent Events:**

In mid-2006 this plaintiff, James D. Moses, joined by co-plaintiffs Arthur L. Davis and Jimmie Gilbert, having been earlier denied intervention in ***Chennareddy v. Walker***, (# 87-3538) filed their first United States District Court case. That case[9] is also a putative class action claiming essentially the same claims as Chennareddy pertaining to a uniform age bias in retention, ratings and promotions, but adding a dimension of Title VII discrimination based upon race. That case (06-1002) remains open at this time, motion to dismiss or other action has ever

---

[9] That related case is ***Arthur L. Davis, et al v. Walker***, number 06-1002 (JGP).

been filed.  No scheduling order has been issued by the Court.  Conceivably, these plaintiffs

could file a Motion to Amend that complaint, thereby mooting the GAO's pending Motion to

Dismiss the Moses case.  But, that move is expected to prove unnecessary since all plaintiffs in

all cases have moved to consolidate all of the related cases for all purposes.  That motion also is

still pending.

Although counsel have met for purposes of the initial meeting of counsel, no scheduling

order has been scheduled in any of these related cases.


**Motions to Amend or Consolidate All Related Cases:**

Plaintiffs in all of these related cases, some of which were filed as class actions, all allege

essentially the same pattern and practices which violate federal equal employment law.

There are essentially only two issues in thee related cases.  The determinative facts in

those two issues may easily be determined by just one relatively simple trial.  Those issues are:

(1) Is there a policy and practice at GAO, which is common to all of the related cases

whereby age, race, gender or other discriminatory prohibited personnel practices exist at GAO?

(2) If so, what is the impact upon each of the complaining protected groups/classes of that

illegal discriminatory practice?


## THE CONTEXT OF THE INSTANT MOTION

In the fall of 2005 GAO announced a plan (the Band II Split), to split the existing "Band

II"[10] into two segments, Band II A (the lower ranking) and Band II B (the higher ranking). Moses position before the split was at the top of the Band, qualifying him for leadership positions, grade increases, and cost of living increases (COLAs). Each member of band II was required to submit to a performance reevaluation. Some persons were "selected" to receive the higher band (II B), and some were not selected.

Those who were "not selected" were relegated to Band II A. Moses was not selected. In the selection process, age was without a shadow of a doubt, an important determinative factor in the non-selection. This statement is based upon the unaddressed and therefore un-refuted statistical opinion submitted by former GAO statistical expert, Dr. Venkareddy Chennareddy. Dr. Chennareddy's opinion is based upon what purports to be a 100% sample of all persons 49 years of age and older who were the subject of the reevaluations that gave rise to the Band II split. Neither the data, which purports to be from GAO files, nor the methodology of Dr. Chennareddy has been challenged by GAO. Presumably, as a former GAO statistical expert, Dr. Chennareddy's credentials will not be challenged.

The opinion states with virtual certainty, that age was a determining factor in the Band II split process. Of course, if GAO can somehow be convinced to honor the United States District Court subpoenas which are pending, the complete release of GAO's data files would enable an ability to fine tune that opinion given the full data base for all employees, those affected and those not affected by those demotions.

---

[10] Band II was where Moses , Davis, and Gilbert had been firmly ensconced for many years. But by the fall of 2005 both Davis and Gilbert had seen the writing on the wall, and succumbed to pressures to retire. They did so, leaving Moses the receive the latest round of the perceived bias, resulting in this case.

**GAO's Pending Motion to Dismiss**

GAO timely filed a Motion to Dismiss this case, alleging untimeliness. That motion has been fully addressed in separate filings by the plaintiff, and is still pending. Moses suggests that the credibility concerns expressed above impact the outcome of this Motion. In a word, it is based upon incorrect information. Moreover, Moses was never given proper instructions (nor was anyone else) as to how the timeliness constraints were to be handled in accordance with GAO's special procedures on the Band II Split Reconsideration process.

PAB General counsel commented upon those deficiencies which are addressed elsewhere in this record. Given the credibility concerns stated above as to representations by GAO to the Court, compared to Moses position as a counselor who was never properly notified of his duties, and who has submitted a detailed sworn refutation of GAO's factual allegations refuting GAO's untimeliness allegation, that motion can be described in one word, specious. It simply has no good faith foundation. Therefore, that motion is simply irrelevant to this Motion which should be granted.

GAO regulations, newly written to cover this plan, allowed a "reconsideration" of selection by contact directly with the Comptroller General. Moses elected that route, and in fact timely filed all necessary papers as instructed to do by the GAO office of inclusiveness. He had a 45 minute conversation with the Comptroller General (CG, Walker) himself, with the sole purpose of reconsideration of the CG's decision (Moses Affidavit, Exhibit I to ECF Document # 11, Filed, 1/24/07) in opposition to GAO's Motion to Dismiss[11]). That conversation, and the

---

[11] As to the substance of the presently undecided Motion to dismiss, plaintiff contends that Motion to be entirely unsupported, even specious. There has been no refutation, or even opposition to the facts as stated in Moses sworn declaration pertaining to the timeliness of his filing (See, ECF Document 11, filed January 24, 2007. Exhibit I

CG's final decision contained therein occurred on February 16, 1006.  Moses contacted the

Office of Inclusiveness one day later (Exhibit 1, referenced above).  Neither the CG nor any other

evidence has refuted that evidence presented by Moses of the actual date of the CG's final

decision to downgrade him.  Thus, the issue of timeliness in filing, the only issue raised in

GAO's motion to dismiss, is conceded by GAO.  There is no other basis for the dismissal of this

case in the record of this case.  Therefore, the motion was specious when made and must be

denied.


### MOSES AND THE RESTORED CLASS MEMBERS HAVE IN FACT SUBSTANTIALLY PREVAILED.

Thus, Moses contends that the relief he received meets all of the prerequisites for him to

---

to Pl's Opposition to Def's Motion to dismiss, pages 2, 3, ¶¶ 3-8) relevant parts of those facts follow:

" 3. On February 7, 2006, I received the CG's response dated February 2, 2006, denying my request to be placed in Band IIB (Attachment 2, hereto).

4.  On February 7, 2006, I wrote the CG a letter acknowledging his decision to not place me in Band IIB and asked to meet with him personally as was my rights under the special regulations. (Attachment 3).

5.  The CG granted me a telephone meeting with him, but not the personal meeting I had requested.  On February 16, 2006 that telephone meeting occurred.  After about 40 minutes of talking with me, he did not grant my request to be placed in Band IIB.  (The CG was accompanied during this phone call by Ms. Barbara Sember).

6.  On February 17, 2006, I contacted a counselor in the Office of Opportunity and Inclusiveness (OOI) about filing a discrimination complaint against the Band II Split.  At that time, my initial contact with a counselor for this complaint, I was not informed in writing of my right to file a class complaint as required by GAO Order # 2713.2.

7.  March 30, 2006, I filed a formal discrimination complaint with OOI.  I did not include in the written complaint the fact that I wished to make it a class complaint because I was never informed by OOI that this was necessary.  But it was clearly discussed with OOI that this was my intent when they aided me in filing that complaint.

8.  On April 25, 2006, the OOI Managing Director acknowledged my complaint of discrimination and the fact was implicit that it was timely.  At that time no question was raised as to timing and they knew full well that I had been through the special reconsideration process. Also, there was not any recognition in that notice that it was or was not a class action complaint.

be declared a "substantially prevailing plaintiff".  Moses filed this motion seeking to be declared a "substantially prevailing plaintiff" and that he be allowed to petition for interim fees and costs to which he is entitled.

Moses seeks this declaratory judgment as a legally required prerequisite[12] to a petition for interim costs and fees as a "substantially prevailing" plaintiff", whether under ADEA, Title VII, or the Equal Access to Justice Act, EAJA.  Moses claims that he, by virtue of the fact of the relief being granted for him and about 110 others who are members of the as of yet uncertified class have prevailed in their claims contained in this lawsuit.  GAO has failed to articulate any reasons for GAO's granting Moses and the other 110 person the relief they have received.

Certainly, GAO's apparent, but unarticulated position, that all of the 110 (and none of the 100 who received no relief) and Moses, were all deficient when demoted, and then made astounding recoveries, to where they were promoted slightly over a year later can not be considered credible.  This is particularly true, where as here, no part of GAO's performance evaluations have ever been validated as based upon merit.  If fact, the statistics show they are bias driven, bias against older persons and minorities.  Yet the true explanation is quite simple.  GAO had to act precipitously as to all analysts who were similarly granted prevailing plaintiff status, solely because of this lawsuit.  The Court is requested to note that all of these persons were over the age of 40.  Such astounding recovery is simply not possible, for all 110 persons here involved.

Moses claims that GAO's stated reasons for its restoration "promotions" of Moses and

---

[12] **See *Buckhannon Bd. & Care Home, Inc., v. W. Va Dep't of Health and Human Res.,* *532 U.S. 598 (2001),*,**

12

the 110 co-workers who received similar relief, are unsupported by credible facts.  Moses alleges, based upon his own knowledge that the stated reasons, improved performance of each such "promoted" person are pretext for the actual reasons for the corrective and restorative promotions.

Moses alleges that GAO has taken this action to prevent the class certification by evisceration of the class, and attempting to create a "headless class".  This is a well known tactic of class action defendants.  The known and provable pattern of discrimination refutes GAO's entire position and cover story which is in fact based upon non-credible and unprovable ratings.  A hearing will prove GAO engaged in the gerrymandering of ratings to accomplish GAO's discriminatory objectives.  GAO's own statistics will demonstrate the pattern of age and race discrimination in all employee ratings, promotions and benefits of employment in recent memory.

Moses contends that there is utterly no valid credible reason, *other than this lawsuit*, why GAO would rescind the demotions of Moses and 110 other class members.  As to Moses himself, GAO has rescinded, effective on February 7, 2007, the great bulk of the adverse monetary, ranking and employment grade effects of the adverse action upon Moses (detailed below).  In addition, he has been restored to full viability as a professional leader at GAO.

Moses alleges, and, if given the opportunity he has requested, will prove at hearing, that GAO's proffered reasons for this action, are *universally the same* with respect to the other 110 who were also restored fully to their former employment status.  Moses will also prove, with GAO's own information gathered from subpoenas to which GAO has failed to respond, that GAO's stated reasons for the restorations are pretext.

13

The implicit reason given for the relief granted (no reason has been articulated in this case or otherwise) is that Moses performance (as measured by his ratings) improved over the latest performance ratings periods, justifying the purported "promotion". This conclusion is false and is the pretext required by the **McDonnell Douglas** framework. Moses will prove at the hearing requested that the real reasons that his demotion was rescinded are other then those given by the GAO management. Moses actual performance, as distinguished from the purported ratings for that performance, remained constant throughout the relevant ratings periods [13].

**New Evidence of the Existence of "Hard Numbers";**
**The Same Numbers Denied to Exist:**

Mr Ron Stroman (Director of GAO's OOI) was interviewed regarding GAO statistics. His comments in the magazine article quoted following (Exhibit 2) are instructive.

---

[13] See, Moses declaration, Exhibit 1 to the Motion for a Declaratory Judgment, ECF Document 41 (which is also uncontradicted) states in pertinent part that his actual performance remained unchanged during all of the relevant time period (page 1, ¶ 4)(resubmitted herein for the convenience of the Court, see Exhibit 1):

"...4. I have reviewed my notes, recollections and all documents available to me and hereby state under the penalties of perjury as follows:

A. My actual duties, responsibilities and job performance, including all aspects of my reports to superiors on work I have done have been substantially the same for all of those time periods.
B. My ratings however were lower for the early periods, and increased materially for the latest period.
C. It is my opinion, that those ratings increased, not because of any actual or objective criteria, but rather, other reasons of which I am not aware to increase my ratings to justify a return to my former status as a Band II fully successful leader.
D. I have searched my records and memory, and there is no other reason of which I am aware for this change in my ratings. I conclude that the ratings are subjective and essentially meaningless as applied to me. I believe that this principle and practice applies across the board to all of my contemporaries and colleagues. This part of my declaration is based upon personal observation and many dozens of interviews with my contemporary fellow employees at GAO is that for more than 20 years, my employer has not followed the mandated federal government policy and practice of equal employment opportunities based upon merit. My observations are also based upon my experiences in counseling many co-workers in my capacity as a voluntary EEO counselor."...

The cover of the magazine, was captioned, "Hard Numbers, GAO's Ronald Stroman exposes disparities in promotions and performance ratings."

The lead article of the July issue of Government Executive Magazine, confirmed what GAO older employees in these cases have been alleging for years. It also confirmed the oft denied fact of the existence of the "Hard Numbers" Mr. Stroman exposes as discriminatory. The interior of the article starts off as quoted following (see Exhibit 2 for full text):

### *The Government Accountability Office's Ronald Stroman exposes disparities in promotions and performance ratings.*
****
...the data revealed a gap between performance appraisals of blacks and whites. It also showed that the gap widened the longer employees stayed at the agency.

In the context of this motion, this information is relevant to demonstrate that in fact Moses has substantially prevailed in forcing GAO to grant relief. This is just another snapshot of the biased use of the ratings system(s) at GAO which contravene the law. Moses has represented and maintains that Mr. Stroman's comments merely represent another partial snapshot of the actual hidden factual situation at GAO. These snapshots pale to insignificance beside the indisputable and consistent bias known to exist in the actual statistics kept for the past 20 years by GAO. The testimony in related cases shows that those statistics are routinely used for management control and decisions. Thus, the results are well known and intentional to whatever effect those "hard numbers" actually show. It is thus, completely understandable as to why GAO would go to such lengths to avoid access to that evidence by plaintiffs.

Those statistics show exactly what happened and to whom and when. The opinion of Moses expert in this case is illustrative as to what the relevant numbers will show for the entire

15

relevant period of time.  That opinion is based upon the ages of all of the persons over 49 rated in the occurrences of this case.  It shows with near 100% certainty discrimination in ratings, selection and promotions.

Those same numbers, are those quoted by Stroman.  Those numbers were made available to Mr. Stroman.  Those statistics are absolutely definitive evidence of what actually happened to each protected group over the years those statistics exist.  Moses alleges, that those numbers will show that for all these years GAO has been rigging the ratings in favor of young white persons, with age and race as determinative factors.  What else those numbers will show is unknown, but it might be expected to reveal disparities in gender, Veteran's status and disabilities as well.

**With this Background, Whatever Ratings GAO has Used to Support the Adverse Actions, and the Later Reversal of those Adverse Actions, GAO's Proffered Reasons are Pretext:**

Similar non-credible and meaningless ratings account for the original demotions, and later belated "promotions" of the other 110 persons who have similarly prevailed over the past year.  Analysis and expert opinion of the employment data of 100% of those persons subjected to the process who were 49 years of age and older demonstrated a pattern of non-selection identical to that of Moses.  It appears virtually certain that age was a determining factor.  Moses believes and has alleged that race also was a factor in the original adverse actions of demotion.

**GAO's Actions, In Issuing the Unilateral Promotions, Result from This Case:**

These facts, if litigated and lost by GAO, pose very real threats to GAO's viability as a credible Federal Government Agency[14].  GAO's overall credibility is being questioned by this

---

[14]    GAO is known as "the watchdog agency" of the federal government, a position where credibility is paramount.

16

lawsuit.  That credibility is threatened by being caught manipulating its own employee data to foster discrimination, and misinforming this Court as to the existence of key evidence.  Such a finding would be an ultimate disaster for this agency.  This is the real reason GAO has succumbed and granted relief to this plaintiff and 110 putative class members.

In the Government's opposition brief, as modified by defendants' supplement, defendants concede entitlement to costs and fees under the above statues, or a combination of those provisions of US code, *if* Moses has actually prevailed.  Moses has indeed prevailed.  Contrary to GAO's argument, Moses does not claim, nor does he state that he is seeking relief for some ephemeral "catalyst theory" of measuring prevailing.   Rather, Moses claims that the great bulk of the monetary relief he demanded in his lawsuit was granted, *to him*.  In addition, his demotion was effectively rescinded. The same for the other 110 persons.

**The Effect of Buckhannon, supra, On Attorney's Fees and Costs To Plaintiffs For Prevailing in this Case:**

The primary reason ***Buckhannon, supra*** was mentioned in plaintiffs Motion for a Declaratory Judgment of "Substantially Prevailing" is to recognize that the result achieved by Moses, et al, flows from this case and not some other coincidental cause.  Under Supreme Court authority, a Court <u>must</u> recognize and find a change in legal status, as *resulting from the lawsuit* in order for relief to be granted.  Here, that is exactly what happened.

This conclusion must be deemed to be true[15], if the proffered reason for granting relief as stated by the defendant ("oh, his performance improved") is found to be pretext.  Next, Moses

---

[15]  Under the authority of the McDonnell Douglas format, ***See, McDonnell Douglas Corp. v. Green***, 411 U.S. 792, 5 FEP 965 (1973).

lawsuit must be deemed to be the causative force resulting in the change in legal status resulting from the restoration of Moses, and the other class members to their former status.

Of course, GAO's position must be found to be pretext, because the performance ratings are all entirely subjective, unsupportable and well known to be such by all employees. This, deficiency in ratings methodology, coupled with the fact that Moses actual performance remained unchanged completes the statement of cause and effect facts. Those facts are contained in Moses affidavit, to the effect that his own personal performance remained unchanged during all of the applicable performance ratings periods.

Given these facts, the cause and effect relationship of the recisions of the demotions is clear. That pattern has been proven by Moses by his expert opinion based upon a 100% sample of all persons rated for the demotion 49 years of age and older. That opinion remains uncontradicted (See-Exhibit II to Plaintiffs Opposition to Defendant's Motion to Dismiss). Defendant has not responded to that opinion to this date.

**Moses has Actually Prevailed:**

Finally, Moses has actually prevailed since GAO granted him the great bulk of the relief he requested personally. And so have the 110 others in that position. Under ***Buckhannon, supra***, if the unilateral action is traceable to his Court activities, he is entitled to a Court Order recognizing that fact. Again, so are the others who have received that substantial relief. Any other result would be nonsense.

To recognize false and pretext reasons for just giving up (as GAO has done here) would enable any guilty defendant agency to thwart justice by just making up its reasons for cancelling

18

its discriminatory actions, thereby evading costs and fees.  That is what GAO seeks to do here.
This result is not the intent of the law.

For Moses to get his costs and fees, Moses prevailing status, must be actual, and not a
mere catalyst for the action taken.  But that is what Moses alleges.  He was no catalyst.  He
actually did prevail.  His actions made GAO rethink and modify its position.  Then, GAO
actually granted relief to many of the similarly situated persons constituting the class.  There is
no credible evidence at all of record, at this time, for *any* other cause of GAP's belated
restoration of status and pay to the about 110 persons (including Moses) who were restored to
their former status at the top of Band II.  In actual effect, that is what each one of the 110
demoted persons Band II B restoration promotions accomplished.

Thus, the Court should find that Moses did in fact actually "substantially prevail".  Nor
was he somehow a catalyst for the actions taken by GAO, which amounted in sum to the virtual
full restoration of the status and pay before the demotions.

Under these circumstances, Moses is entitled to costs and fees under one of the afore-
cited statutes containing jurisdictional and immunity waivers of immunity by the Federal
Government for its agencies.

**THE ONLY REMAINING ISSUE IS ONE OF FACT; A HEARING IS NECESSARY:**

As a result of the concession by GAO that the law allows interim fees, defendants'
argument now shifts from a lack of a legal basis to a position based upon fact.  Whether Moses
(and each one of the 110 others) has prevailed or not, the reasons therefore, and whether his
claims of prevailing are "substantial" is the sole remaining dispositive issue as to the availability

of interim costs and fees as to Moses personally as to this Motion.

A further issue could conceivably apply to the about 110 others, should the defendants claim that the reasons for their also prevailing are somehow different from those herein specified by Moses. However, at this time, the government has not pled that defense. If it is so pled, it will be dispensed with accordingly in similar fashion.

**THE HEARING REQUESTED WOULD DEMONSTRATE THAT:**

It is the defendants' burden to prove the factual foundation for their motion to dismiss. It is also the defendant's burden, where Moses has been promoted back to the position from which he was removed, that it articulate some legitimate or legally cognizable reason other then this lawsuit that it contends created that change. Moses, then would have the burden, under the *McDonnell Douglas* framework, of proving that the proffered reasons for first the demotions, and then the promotions, were in fact not as represented, but rather pretext for GAO's failed discrimination scheme. Moses welcomes that opportunity[16].

In the case cited immediately foregoing, Mr. Jackson failed to convince a majority of the appeals court that he was entitled to a trial on the merits of his claims. Given the magnitude of the evidence of record herein, and the quality of the evidence which has been discovered, but not yet produced although subpoenaed, Mr. Moses does not perceive a problem in meeting his own

---

[16] Applicable case law in circumstances similar to this case within the various burdens under the McDonnell Douglas framework are explained with great clarity in the just decided case of *Kevin L. Jackson, Appellant v. Alberto Gonzales, Attorney general, Appellee*, Case No. 06-5053, pages 5-8, decided August 10, 2007.
    Despite the fact that *Jackson* was decided against the plaintiff with one judge dissenting, the Court's attention is respectfully directed to the cited pages, 5-8.
    Here Moses welcomes the opportunity to expose to the light of day the blatant, even bizarre, nature of GAO's discriminatory ratings procedures. Of course the first thing that GAO should explain, is why GAO officials and counsel denied the existence of the personnel data and statistics in all of these related cases for all of these years.

burdens in this case.

Therefore, if GAO and/or the PAB do not concede the facts contained herein, and then a hearing is necessary on this Motion. Plaintiff hereby requests such a hearing at the Court's earliest convenience. At that hearing Plaintiff will prove the following facts, and support his assertion of lack of credibility of the defendant's factual assertions as follows:

**Facts which Will be Proven at the Requested Hearing:**

1. The original ratings causing the demotions were meaningless and biased against blacks and older long term employees protected by ADEA. The pattern of ratings will be demonstrated to clearly and greatly violate the thresholds indicative of age and race discrimination.

2. The real reason for the original non-selections was age and race discrimination.

3. The selections for the later promotions (for the about 110 persons who received them) was not based upon any correlation to actual improvements in performance for any of the 110 persons.

4. That, as a universal general rule, the new ratings overstated the *actual* performance of the 110 persons there involved, since their actual performance remained constant.

5. The real reason (for the downgrading) was that the "raters" had received orders from management, to downgrade selected classes of persons of a targeted particular age and race

6. The real reason for the (belated promotions) was that the "raters" had received orders from management, to promote the persons who had been discriminated against initially because of the embarrassment and pressures brought by this case.

7. Therefore, that the entire cover story by GAO is simply that (a cover story) and a pretext for what actually happened.

8. Race and Age discrimination in ratings was implicit in the time periods at GAO.  The actual pattern is demonstrated by the actual pattern contained in the secret in-house statistical data and system (which GAO still denies exists in its false stance before this Court).

9.  That all of the relief granted by the GAO was entirely because of a desire to defeat the class certification, and this lawsuit.  The only way to do that was to give up.  GAO also came to the sudden realization that it had to defeat this lawsuit or suffer enormous consequences, affecting the very existence of the agency and the purposes for which it was formed by the Congress, to whom it is responsible.

10.  That under these circumstances, both ADEA and Title VII require that this Court award attorney's fees and costs as interim fees and costs authorized by federal statutes, ADEA, Title VII and EAJA.

11.  The jurisdiction of this Court was properly and timely invoked under ADEA, Title VII and the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq in plaintiff's class complaint.

12.  That in all relevant performance periods, before and after the adverse employment actions Moses performance was virtually the same, and always satisfactory or better in his assigned tasks.

13.  That GAO has conceded that fees and costs are available under ADEA and EAJA, as well as Title VII.  That leaves only the fact of the substantially prevailing to be decided by this Court which has a duty to award fees under applicable law.

**ARGUMENT**

**I.  It is Beyond Doubt that This Court Has the Power and Duty to Award Interim Costs and Attorney's Fees Where Plaintiff Has Substantially Prevailed:**

**A.  Defendant's Concede This Point In Page 2,**
**the Supplement to the Opposition Filed on August 1, 2007.**

Defendant state (Supp. Pg. 2, ¶ 1):

"Defendants do not dispute that a prevailing party in an age discrimination case may be  awarded attorney fees."

This concession conforms to the law in this circuit as expressed in numerous cases,

whether based upon ADEA, Title VII, or EAJA.  The case of ***Nowd, v. Dept of the Treasury***, 76

F.3d 25 (Cir 1, 1996), originally cited by Defendants for a contrary holding, clearly supports the

authority to award fees and costs.  That Court held:

"**CONCLUSION**
In sum, we hold that the ADEA, 29 U.S.C. § 633a, does not mandate an award of attorney fees and expenses against the United States for the benefit of a prevailing public sector employee, but that the EAJA, 28 U.S.C. § 2412(b), nonetheless permits a discretionary [29] award of attorney fees and expenses against the United States for the benefit of a prevailing ADEA claimant.
***For the foregoing reasons, we vacate the district court order and remand for further proceedings consistent with this opinion.*** [emphasis in original]

Thus, although arguing to the contrary in the original opposition, the defendants now

apparently recognize that fees and costs may be awarded in an appropriate case.[17]

**II.  Now, Defendants Shift Their Opposition to a Factual Matter, Incorrectly Claiming Moses has not Substantially Prevailed as the Result of This Lawsuit:**

In a supplement filed on August 1, 2007, defendants concede the legal authority to award

fees and costs, but take the factually unsupportable position that Moses has not actually

prevailed[18].   This is not an FHAA or ADA case wherein, plaintiffs lawsuit created a catalyst

---

[17]  The Court should note, however, that in Moses original complaint, he cited as authority for jurisdiction of this Court,, ADEA, Title VII and EAJA.  Both Title VII and EAJA authorize the relief requested by Moses.

[18]  The defendants state their defense (D's Supplement, filed 8/1/07, pg. 1 paragraph 2) as:

action resulting in some ancillary relief for himself and the other about 110 others who have also been granted relief at this time.

Rather, this lawsuit caused the GAO to give up, and to grant a substantial part of the actual relief demanded. Moses and the others actually received, from the defendant GAO, promotions, bonuses and recisions of their demotions. The only point of Moses citing *Buckhannon*[19] in his Motion for a Declaratory Judgment, is that *Buckhannon* does seem to require, even for an ADEA or Title VII case, that the Court recognize the prevailing status of the plaintiff as a prerequisite for the award of interim fees. Where as here, there has been very substantial relief, where no reason at all exists for that relief except this case, and where the case is expected to be ongoing for months, if not years, what could be more fair and appropriate than to award fees and costs to the prevailing plaintiff. Certainly, absent this lawsuit, no relief would have been awarded Moses. All facts are to the contrary on that point.

### III. But for this Lawsuit, no part of the 110 Restored Persons would Have Prevailed in Their Claims:

Based Upon Moses Own Experience, The Ratings, Demotions, and Later Promotions Are Unsupported by Performance Improvements for the 110 Persons Who Received Restoration to their Former Status:

Moses alleges, and will prove at hearing that in fact, **but for** this lawsuit, neither Moses

---

"The critical point here is that **Plaintiff is not a prevailing party**." (Emphasis added).

Plaintiff disagrees. He has been afforded substantial legal and monetary relief, representing the bulk (but not all) of his monetary and status claims by a promotion to his former status from which he was demoted, and received a cash bonus equivalent to his denied COLA.

[19] *Buckhannon Board & Care Home, Inc., Et Al. V. West Virginia Department of Health and Human Resources et al*, No. 99-1848 (2001) 532 U.S. 598 (2001).

or any of the other 110 persons similarly situated would have received relief.  They now have prevailed, by being returned to their status before the demotions effective on February 6th, 2006.  There is no reason whatever, for that change in status other than this lawsuit.  It follows that they would have been afforded no relief whatever had this lawsuit not been brought and strenuously litigated.

**IV.  Whether Moses (and the others) Have Substantially Prevailed  is a Question of Fact that, Given GAO's Denial, Requires an Evidentiary Hearing to Resolve the Disputes of Fact:**

**A.  Moses (and the other 110) Have Substantially Prevailed:**

Moses and the other persons voluntarily returned to their former position, before demoted, have now substantially prevailed.  Moses has been granted unilateral relief by the defendant GAO in that his pay lost from his demotion has been restored, and his position as a band II unfettered team leader has been restored to its former level, the level from which he was effectively demoted.  Similar if not identical relief has been awarded all 110 of the other older employees who represent about half of the putative class Moses seeks to represent.  The other 100, or most of them at least have left the agency.

**B.  Requirements Of the Law:**

The law requires, before any *interim* fees or costs are awarded, four things to have happened:

1. **First**, there must be a substantive change in the legal posture of the plaintiff vis a vie the defendant(s).  Here, that change is fully met for Moses individually (and also the other about 110 similarly situated persons whose demotions have been rescinded) in that he:

25

(1)  Was restored to the position from which he was demoted, and;

(2)  Was paid a "bonus" approximating the amount of his cola denial (denial valued at $ 1,875, bonus of  $ 1,800) and;

(3) Was restored to his position as a qualified leader of analysis teams at GAO, and;

(4) Was, as the result of 1-3 above, and placed (in effect restored) as a member of Band IIB.  As a band IIB he is now eligible for further promotion.

(5) However, Moses still has not received full and complete relief from his procedural and due process complaints and denials of procedural systemic civil rights, nor has any part of the putative class.  As stated above, about 110 other members of the putative class have received similar "adjustments" in their status.  In addition, about another 100 have received no relief.

(Note) Moses continues to represent the class and himself in the remaining uncorrected and continuing harm resulting from GAO's overall failures to follow the civil rights anti-discrimination statutory requirements.

2.  The **second** predicate for interim fee and cost award is that the federal government must have specifically waived sovereign immunity for the claims made by plaintiff.  Here, the government (now in the August 1supplement) concedes that either ADEA or EAJA (Supp. Pg 4, ¶ 1) are applicable to this case and authorize payment where warranted and that sovereign immunity has been waived by the federal government.

3.  *Third*, for interim fees and costs to be awarded, which is what is being requested here[20], both parties recognize that the plaintiff must have actually prevailed (which happened, see 1 above);

_____

[20]  Via leave to file a petition for interim costs and attorney's fees.

26

4.  Fourth, and finally, (under *Buckhannon*)[21] the Court must recognize the change in legal status for that plaintiff.

That fourth reason is why this motion was filed by the plaintiff, for the Court to consider and rule upon the root cause of Moses (and the 100+ others) change in their legal status, i.e., their restoration to fully functional status as a GAO analyst/investigator.

In addition, there must be an actual change in legal status of the plaintiff, and that change recognized by the Court.  The legal actions by the plaintiff herein, must be deemed to be the root cause of the change in legal status.  Here, there is no other reason, other than this lawsuit for the relief being granted.  Moses attests (Exhibit 1, pg 1, 2 ¶ 4) that:

"A.  My actual duties, responsibilities and job performance, including all aspects of my reports to superiors on work I have done have been substantially the same for all of those time periods.

B.  My ratings however were lower for the early periods, and increased materially for the latest period.

C.  It is my opinion, that those ratings increased, not because of any actual or objective criteria, but rather, other reasons of which I am not aware to increase my ratings to justify a return to my former status as a Band II fully successful leader.

Moses attests, Exhibit 1, page 2, that based upon all of the information available to him there were no other *actual* changes in his performance or assignments, or status.

It appears from the record, that what GAO has done is to order the "raters" to promote

---

[21] *Buckhannon Bd. & Care Home, Inc. V. W. Va Dep't of Health and Human Res*., 532 U.S. 598 (2001).

27

these persons to achieve their end result needed.  That end result was for this class action case to

be resolved.  Given these facts, at the hearing requested, GAO will be unable to produce an

substantial credible evidence of any improvement at all in any of the 100 plus persons

performance.

The inescapable conclusion is that GAO's discriminatory record machinations, not real

performance differences, explain GAO's management flip-flops in result.

In other words, GAO has succumbed to the pressures exerted by this case, and the very

real probability of GAO management being subject to severe criticism for obstruction and record

manipulation.  Here, there can be no serious question that this plaintiff has individually, and the

100 others who received belated "promotions", have "substantially prevailed" within the

meaning of the law.

## V.  DEFENDANTS ARE ATTEMPTING TO EVISCERATE THE CLASS:

Defendants are obviously attempting to evade their responsibilities to the class by these

unilateral actions.  There is no credible evidence of record to date, and plaintiff submits that in

fact none such exists, which would support GAO's position that the relief granted plaintiff and

each similarly situated person was the result substantive improvement of performance for each

such person.  Applying the framework of McDonnell Douglas, the Court should rule that Moses

and each of the 110 members of the putative class have prevailed.

The class should be certified as per the pending Motion, and this interim relief granted by

issuance of a Declaratory Judgment on Behalf of Mr. Moses.

## VI.  REQUEST FOR A HEARING ON THIS MOTION

Plaintiff hereby requests a hearing on this motion at the Court's earliest convenience.

Respectfully submitted,

Signed, *charltonw2428*

Walter T. Charlton, Attorney for Plaintiffs
D.C. Bar # 186940
Walter T. Charlton & Associates
1156 15th, Street N.W. LL 10
Washington D.C., 20005-1704
Phone 410 571 8764, Fax 410 897 0471
charltonwt@comcast.net
Counsel for Plaintiff and the Putative Class


CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that I filed on August 13th, 2007 in the ECF system for the United States District Court, this Reply to Defendants' Opposition to Plaintiff's Motion for a Declaratory Judgment, with the expectation that a copy of this Motion would be sent to Andrea McBarnette, AUSA, counsel for the defendants, in the normal course of business.


[s]
CharltonW 2428

29

## INDEX OF EXHIBITS

**Exhibit 1 -**     **Declaration of James D. Moses In Support of Plaintiffs Motion For a Declaratory Judgment.**

**Exhibit 2 -**     **Magazine Article, Interview with Ronald Stroman, GAO's Director of Office of Inclusiveness (OOI) (Formerly Civil Rights Office).**

**Exhibit 3 -**     **Excerpts of Deposition, Related Case, Describing GAO's Purportedly Non-Existent Employee Profile Data Base And Attributes of the GAO Employee Data Base Profile System.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **James D. Moses**                                               ) | |
|     **For himself and**                    ) | |
|     **All others similarly situated**      ) | |
|                      ) | |
|     **Plaintiffs**                          ) | |
|                      ) | |
|     **v.**                                  ) | **Case No.    1:06 CV 01712  (JGP)** |
|                      ) | |
| **DAVID M. WALKER**                                              ) | |
| **Comptroller General of the United States,**                   ) | |
| **Government Accountability Office (GAO)**                       ) | |
|     **and**                                 ) | |
| **Michael Doheny, Chair**                                        ) | |
| **The Personnel Appeals Board of the GAO,**                      ) | |
|     **Defendants.**                          ) | |

_____)

**ORDER**

Upon consideration of Plaintiff's Motion for a Declaratory Judgment that plaintiff James

D. Moses has "substantially prevailed" by the award of financial relief he demanded in this case,

now therefore the Motion is Granted.

A declaratory judgment that the GAO has voluntarily acceded to his demands in the

following respects shall be entered in the Record of Proceedings before this Court.

1.  The Court finds that the relief received has been the direct result of litigation in this

case.

2.  The Court finds that the financial aspects of Mr. Moses demand relating to his

demotion has been effectively rescinded effective on February 6th, 2007.

3.  The monetary amounts representing damages demanded by Mr. Moses by the actions

of the employer have been substantially satisfied, effective initially on February 6th, 2007, and

1

continuing to date with the restoration of his former status and duties.

4.  That in sum, these concessions by GAO amount to Mr Moses substantially prevailing within the definitions contained in Title VII, ADEA and interpretive case law.

5.  The Court finds that the declaration of Mr. Moses, that his duties remained constant throughout the three promotion cycles following his reduction in rank to Band II A is persuasive and is not contradicted by any probative evidence presented by the employer, GAO.

6.  Plaintiff and his counsel are hereby granted leave to file a petition for fees and costs to date as authorized by 29 USC § 633, et seq as amended, the Equal Pay Act, and/or 42 USC § 2000e et seq, and EAJA within 30 days of this Order.

7.  The Defendants' Motion to Dismiss is Denied.  There is no evidence supporting the position that Moses was in any way untimely, nor that the GAO gave its employees the necessary instructions, which is GAO's duty under existing federal code and regulations, on how to avoid an untimeliness defense by the GAO.  It appears that an official of the GAO PAB, one of the defendants, agrees that GAO's notification mechanism for notification was defective with respect to the plaintiff and the class he seeks to represent in this case.  At least that individual so testified in a sworn statement before Congress.

8.  The Plaintiff's Motion to Certify the Class is granted.  Counsel shall forthwith confer and inform the court as to a date they are available for further proceedings to notify the class and related housekeeping matters with respect to the class, including class definitions to conform to now known facts.

_____

United States District Court Judge

EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| James D. Moses )<br>    For himself and )<br>    All others similarly situated )<br> )<br>    Plaintiffs )<br> )<br>      v. )<br> )<br>DAVID M. WALKER )<br>Comptroller General of the United States, )<br>Government Accountability Office (GAO) )<br>    and )<br>Michael Doheny, Chair )<br>The Personnel Appeals Board of the GAO, )<br>    Defendants. )<br>_____) | Case No.    1:06 CV 01712  (JGP) |

_____

## DECLARATION OF JAMES D. MOSES IN SUPPORT OF
## PLAINTIFF'S MOTION FOR A DECLARATORY JUDGMENT

1.  I, James D. Moses, the plaintiff in this case, hereby declare under the penalties of perjury that the facts contained in this declaration are true and correct.

2.  I am 65 years of age and all events in this case upon which I rely occurred when I was over the age of 40.  I am an African American and have worked for GAO for 40 Years.

3.  I have been asked by my counsel to specify the details of my duties, responsibilities and actual performance on my job for the last 3-5 employee ratings periods as compared to my ratings for those periods by my superiors..

4.  I have reviewed my notes, recollections and all documents available to me and hereby state under the penalties of perjury as follows:

    A.  My actual duties, responsibilities and job performance, including all aspects of my reports to superiors on work I have done have been substantially the same for all of those time periods.

    B.  My ratings however were lower for the early periods, and increased materially for the

1

latest period.

      C.  It is my opinion, that those ratings increased, not because of any actual or objective criteria, but rather, other reasons of which I am not aware to increase my ratings to justify a return to my former status as a Band II fully successful leader.

      D.  I have searched my records and memory, and there is no other reason of which I am aware for this change in my ratings.  I conclude that the ratings are subjective and essentially meaningless as applied to me.  I believe that this principle and practice applies across the board to all of my contemporaries and colleagues.  This part of my declaration is based upon personal observation and many dozens of interviews with my contemporary fellow employees at GAO is that for more than 20 years, my employer has not followed the mandated federal government policy and practice of equal employment opportunities based upon merit.  My observations are also based upon my experiences in counseling many co-workers in my capacity as a voluntary EEO counselor.

5.  My observations, I believe to be supported by substantial statistical studies based upon all of the data, over these years, and continuing to date to which I, and my counsel has had access.  I have recently become aware that GAO, has for all years since 1987, maintained a set of employee data bases which, when analyzed by modern analytical means will entirely support, and not refute in any respect, my personal observations and factual conclusions.

I declare under the penalties of perjury that the foregoing statements are true and correct.

[Signed in Original, held in counsel's office]

_____

James D. Moses     July 10th, 2007

Exhibit 2

# FEATURES Hard Numbers

By Karen Rutzick *krutzick@govexec.com* *Government Executive* July 1, 2007

*The Government Accountability Office's Ronald Stroman exposes disparities in promotions and performance ratings.*

Ronald Stroman was hauled before a joint Senate-House hearing in May to explain why black analysts at the Government Accountability Office were receiving lower performance ratings than their white counterparts.

How did Congress know about the discrepancy? Stroman handed over the data himself - at least indirectly. And he's glad that he did.

Stroman is managing director of the Office of Opportunity and Inclusiveness at GAO. When Comptroller General David M. Walker hired him in 2001, he gave Stroman a mandate to promote diversity at the agency. Stroman responded with a controversial suggestion: publicize all the agency's promotions and performance ratings by race, gender, age, disability, veteran status, location and payband.

Senior GAO officials warned that this move would open the door to lawsuits and fuel unhappiness. But Walker approved the idea and Stroman began releasing the data annually on GAO's intranet. Sure enough, from 2002 to 2005, the data revealed a gap between performance appraisals of blacks and whites. It also showed that the gap widened the longer employees stayed at the agency.

"I have stood outside the Rayburn House Office Building wearing a suit and a tie during the middle of the day, trying to hail a cab, only to have that cab driver pass me by in order to pick up a white person standing less than five feet behind where I stood," Stroman told the committee. "Race, gender, ethnicity, disability, age and sexual orientation do matter."

Airing the data on the intranet was the first step to solving discrimination, according to Stroman. "What gets measured gets done," he says. "It becomes, I think, the linchpin to improving diversity."

Stroman believes GAO is the first and only federal agency to release diversity data to employees. In fact, a number of federal employee groups - including Federally Employed Women and the African American Federal Executive Association - went to Congress recently with a request for data. They want the Office of

Personnel Management to offer more detailed information on how many minorities, women, people with disabilities and veterans each agency employs. They didn't go so far as to ask for data by promotion or performance rating.

"Current OPM reports group all minorities in grades GS-14, 15 and [the Senior Executive Service] together," William A. Brown Sr., national president and founder of AAFEA and retired senior executive at the Army Corps of Engineers, told Congress in May. "This presents a distorted view of diversity. We need an accurate baseline to measure progress or lack thereof."

Brown and his group are asking GAO to conduct a detailed study of diversity across all agencies. He wants to know, for example, whether his suspicions are true that blacks who reach the Senior Executive Service are older than others in the SES, giving them a shorter turn in power.

Brown's urgency to get the data stems from the opportunity he sees to diversify the upper ranks of government as many retire in the coming decade. Stroman wants to protect employees from the new wave of pay for performance. He says such pay systems pave the way for discrimination by giving managers more room to be subjective.

More important than giving diversity data to Congress or even to advocacy groups is sharing it with middle managers, according to a new report from The Conference Board Inc., a nonprofit business research group in New York. Written by executives from corporations such as Avon Products Inc., Hewitt Associates, Merrill Lynch & Co. and Safeco Corp., among others, the report finds that middle managers are the biggest roadblock to diversity initiatives. Middle managers, they said, are the ones who actually handle the promotions and performance reviews that executives from on high analyze for diversity. "The middle management layer seemingly douses the spreading diversity fire, smothering it through inertia rather than outright opposition," according to the report.

To fan the fire, these executives say, give middle managers the data. The Conference Board recommends releasing diversity data four times a year. "A common and legitimate complaint on the part of middle managers is that they don't know the score," the report noted. "They're used to getting that data on a regular basis on inventory, productivity and response times and are expected to monitor these regularly and take necessary corrective action. Diversity should be no different."

In Stroman's discussions with GAO employees, he singled out a central reason for

the discrepancies in performance scores: Managers were afraid to talk to their employees of color about their performance reviews. "When [employees of color] get their ratings back, it is a surprise to them oftentimes," Stroman says. "There is a different level of communication going on with regard to performance with staff of color than with white staff. I think that reflects the culture that we live in. Having difficult discussions at work is difficult in any setting, but when you overlay that with gender, race, sexual orientation, it becomes more difficult. That disadvantages the staff of color."

But as much as Stroman and Walker believe in their system, it has opened them up to congressional backlash.

Rep. Danny Davis, D-Ill., chairman of the House Subcommittee on the Federal Workforce, Postal Service and the District of Columbia, said at the hearing that members of GAO's Blacks in Government branch came to him with concerns about the disparity between black and white analysts. The performance ratings had greater consequences for employees since a pay restructuring took place at GAO gave some employees a chance at higher pay and capped others at a lower level.

"It would appear that African-Americans at GAO have been harmed by the restructuring, and this brings into question the fairness and credibility of GAO's performance management system," Davis said at the hearing. Other critics complain that the raison d'être for GAO's diversity office - dealing with discrimination com-plaints - languishes. Janice Reece, general counsel for the GAO's Personnel Appeals Board from 1999 to 2005, told lawmakers that GAO was underfunding Stroman's office. "The lack of resources for the operation of the civil rights office, or the office of opportunity and inclusiveness, has created substantial delays of processing in [Equal Employment Opportunity] complaints," Reece said. "The delays caused many employees to inform me that they wanted to forgo their claims of discrimination completely."

Stroman's controversial approach of airing diversity statistics is starting to pay off. When GAO first started disseminating promotions and performance review data, employees who worked at the Washington headquarters were shown to have higher marks than their counterparts in field offices such as Atlanta, Dallas and San Francisco. After the disparity was revealed, ratings and promotions nationwide leveled out almost immediately. This shift gives Stroman hope that parity can prevail.

Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **James D. Moses** )  | |
|    **For himself and** ) | |
|    **All others similarly situated** ) | |
| ) | |
|    **Plaintiffs** ) | |
| ) | |
|      **v.** ) | **Case No.  1:06 CV 01712  (JGP)** |
| ) | |
| **DAVID M. WALKER,** ) | |
|    **Comptroller General of the** ) | |
|    **United States Government** ) | |
|    **Accountability Office (GAO)** ) | |
|    **and** ) | |
| ) | |
| **Michael Doheny, Chair** ) | |
| **The Personnel Appeals Board of the GAO,** ) | |
|    **(PAB)** ) | |
| ) | |
| **Defendants.** ) | |

_____)

**Excerpts, Relevant Parts of Deposition Testimony of William (Bob) Mowbray
Related Case of Vant Leven, et al V. Walker, June 27, 2002**

**[Mr. Mowbray's Testimony; With Marina Braswell, AUSA, Defendant's counsel present]**

   **Mr. Mowbray** described the contents and capabilities of the system starting at page 8 of his deposition as verbatim excerpted following:**]**

   *(Page 8)*
Q.  Okay.  So you built this database.  Is there a description somewhere of the elements in that database?
A.  There's not a written one.
Q.  Not anywhere?.  There must be come kind of system definition ---
*(Page 9)*
A.  Yes.
Q.  – – as to what the fields are?
 A.  Well, yes, I can run—it's a SAS database.  I can run contents at any time, and it will

1

tell me precisely which variables exist in the database.

Q.  Okay.  Has that database remained roughly consistent from the beginning until now?

A.  Yes.

****

Q.  So there is a separate database for each year, starting in 1989?

A.  That's correct.

*(Pg. 10)*

A.  SAS is Statistical Analysis System.  It's a programming language.

Q.  "Do you have a slightly different program for each year?

A.  Obviously, any program which requests some analysis of variables from that dataset, we have to name what those variables are.  So, to the extent that there may be slightly different variables names from year to year, then the access program would differ slightly.

Q.  So if anyone requested you to perform an analysis on any particular year, I presume you would have to use the program for that year?

A.  Or modify another program.

Q.  Are they easily done?

A.  It's not difficult.

*(Pg. 11)*

Q.  Is this data base maintained even as we speak?

A.  Yes, it exists.

Q  And is it still under your maintenance and control?

A.  That's correct.

Q.  You do it all alone?

A.  Yes, I do.

Q.  .... approximately how many variables there are in this database?

A.  I would have to guess.  I would say maybe 60 to 90; I don't know, something like that.

*(Pg. 20)*

Q.  So you get input from that data base–you get other input also?

A.  Exactly.

Q.  What is your other input?

A.  All of the demographic data such as race, gender

*(Pg 21)*

org. code, date of birth,...Social Security number of each person.  So by merging that, those files, with files from the NFC system, which do have all that demographic data, I can combine those two and add in the variants.

Q.  What is the official name of the databases, each year's database that you maintain that we've been talking about?

A.  There is no official name.  Maybe "Bob's database" is it.

*******

[Thus, defendant's representations that no employee profile data exists in database format, and no programs to analyze and extract data exist, as would be relevant [and quite possibly determinative] evidence in this case for all purposes are simply not accurate].

2