## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **James D. Moses** )<br>    **For himself and** )<br>    **All others similarly situated** )<br>)<br>    **Plaintiffs** )<br>)<br>    **v.** )<br>)<br>**DAVID M. WALKER,** )<br>    **Comptroller General of the** )<br>    **United States Government** )<br>    **Accountability Office (GAO)** )<br>    **and** )<br>)<br>**Michael Doheny, Chair** )<br>**The Personnel Appeals Board of the GAO,** )<br>    **(PAB)** )<br>)<br>**Defendants.** )<br> ) | **Case No.  1:06 CV 01712  (JGP)** |

## PLAINTIFF'S OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

Plaintiff through counsel opposes Defendant's Motion to Dismiss this putative class action on the grounds of failure to state a claim (Def's Motion Pg. 1, ¶ 1).

### I.  Preliminary Statement

Defendant has submitted evidence in the form of affidavits and documents consisting of 11 pages of Exhibits.  If the Court considers this extraneous evidence, that consideration converts this Motion to Motion for Summary Judgment.  Essentially all of the relevant facts are in dispute. The previous Motion to Dismiss pursuant to Rule 12(b)(6) was filed with two affidavits, raising matters outside the pleadings.  Those facts are also still of record in this case.  Plaintiff also filed

declarations and evidence, and files another declaration hereto. Thus, essentially all of the factual matters stated in the original complaint are disputed.

## II. The Arithmetic In GAO's Calculations of Untimeliness is Wrong:

But there can be no dispute about the timeliness of Moses filings. The effective date of his demotion, the adverse employment event which caused of this specific compliant, was February 16th, 2006. That was the date of his first paycheck in his demoted status, and February 16th, 2006 was also the date the Comptroller General denied Moses request for a meeting with the Comptroller General which did occur, and at which (Telephonic Meeting) the Comptroller General refused to reconsider his demotion. That meeting, and the right to reconsideration was covered in a specific GAO Order setting forth the ground rules for the demotion (The "Band II Split" process). The final step in that process was the right for reconsideration by the Comptroller General, which Moses did in fact exercise. Thus, the starting point for a calculation of timeliness in timely notice filing was the effective date of the adverse employment action on February 16th 2006.

Within the 180 days set out by the statute, on August 14, 2006, Moses filed his "Notice of Intent to Sue", and more than 30 days thereafter he filed this lawsuit, on October 4th, 2006. Thus, Mr. Moses was timely under the authority of ***Stevens v. Treasury***, 500 U.S., 1, (1991).

GAO's calculation of the purported 90 day deadline (D. Brief, pg. 6, ¶ 2), is also wrong. Moses filed his Notice of intent to sue on August 14th, 2006, and filed his lawsuit on October 4, 2006. Thus, even if there were such a limit, and there is not, Moses was timely.

### III.  This Motion is Procedurally Incorrect and Must Be Overruled.

This motion is filed as a Rule12(b)(6) motion, but with two affidavits attached raising

matters outside the pleadings.  As the Court stated in *Jung v..American Association of American*

*Medical Colleges* , Civil Action No. 02-0873 PLAINTIFF) (D.D.C. 2/11/04).

> On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must assume the truth of the facts alleged in the complaint and may grant the motion only if it appears that the plaintiffs will be unable to prove any set of facts that would justify relief.
>
> See *Summit Health, Ltd. V. Pinhas*, 500 U.S. 322, 325 (1991); *Browning v. Clinton*, 292 F3rd 235, 242 (D.C. Cir. 2002; *Haynesworth v. Miller*, 820 F.2d 1245, 11254 (D.C. Cir. 1987).

Under these standards, that the Motion must be denied is obvious.  It is apparent,

therefore, that defendants intended this Court to consider the attached affidavits and the matters

raised therein in deciding the motion.  This Court is not required to consider extraneous matters,

but if it does so, then it converts the motion to dismiss into a motion for summary judgment and

the standards for the latter motion apply.  Judge Robertson in *Microsensor, Inc., v SMK*

*Corporation*, USDC DC CA No., 05-0342 (JR) stated:

> ... *Aamot v. Kassel*, 1 F3d 441, 445 (6th, Cir. 1993) ("[C]onversion takes place at th e discretion of the court, and at the time the court affirmatively decides not to exclude the extraneous matters.")... I agree with Professor Moore, and with the Fourth, Sixth and Ninth Circuits, that the "better view" requires that a court recognize, or rely upon, or at least indicate that it is not excluding material outside the pleading before a motion to dismiss "converts" to a motion for summary judgment. (P.3)

The court in that opinion cited multiple precedent including *Swedberg v. Marotzke*, 339 F.3d

1139 (9th, Cir. 2003; *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp*[, 109 R. 3d

993, 995-997 (4th, cir. 1997).

Plaintiff submits that this Court should not convert this motion into one for summary

judgment but rather, should simply deny the motion under Rule 12(b)(6) standards.  It is

premature to consider a motion for summary judgment where defendant has not filed an answer

and neither party has had any opportunity for reasonable discovery.  Moreover, Judge Sullivan

stated in the last Court status hearing, "the parties will have discovery."

In the event the Court decides, in its discretion, to convert this motion into one for

summary judgment, Plaintiff clearly sets forth herein the factual bases for his claims, and if any

judgment should be summarily granted, it is Plaintiff to whom judgment should be granted.  As

stated in *Ohrenz v. Donnelly*, 2002 DDC 182 (DDC, 2002):

> Summary Judgment is appropriate in those cases where there is no genuine dispute as to
> any material fact, and where the moving party is entitled to judgment as a matter of law.  Fed. R.
> Civ. P. 56©.  In deciding a motion for summary judgment the Court must view all evidence in
> the light most favorable to the non-moving party, but the non-moving party must proffer proper
> evidence to support any material factual assertions.  *Bennett v. Spear*, 520 U.S. 154, 168 (1997).
> ("[A] plaintiff must set forth by affidavit or other evidence specific facts to survive a motion for
> summary judgment...").

The plaintiff has met its burden; the defendant has not.

### IV.  The Defendant Attempts to Miscast the Nature of Moses Complaints As
### To Both Moses and the Class He Seeks to Represent:

Defendant's argument seeks to put Moses and the class claims into the simple box of a

series of grievances about ratings resulting in loss of a promotion or two.  This is far from the

truth.  What Moses alleges, is a demotion which defendant concedes should not be dismissed,

and also "hostile work environment" wherein *all* older persons, and specifically those who were

in Band II, and thus, candidates for the downgrade to Band II A were subject to downgrading on

the basis of their age.

What we have here is a group selection process based (according to Dr. Chennareddy's

4

expert model) where there is a 100% likelihood that non-selection was influenced by a age in excess of the protected age under ADEA.  This result is consistent in this selection process with GAO's known and measured practices of exclusion because of an exclusionary age, applied on an across-the-board basis.  This pattern is the same as alleged in the accompanying related cases, and which pattern (Moses alleges) will be proven beyond dispute by the database files of Mr. William (Bob) Mowbray.  The magnitude and extent of the bias, reasonably expected to result from analysis in discovery will be so striking as to prove beyond doubt a systemic bar employment advancement.  This bar applies to ratings, promotions and retention amounting to an exclusionary bar affecting, in violation of the law, all older analyst employees at this agency for the relevant period of time.  This meets the "one event" test of *Morgan, infra*, discussed immediately following.

Under the law of ***National Railroad Passenger Corp. V. Morgan***, 536 U.S.101 (2002) where the violations complained of are a single systemic intentional violation, designed to thwart Congressional Intent of expungement of discrimination from the workplace (as alleged here), the "hostile work environment" theory applies.  Under that doctrine, even if Mr. Moses was untimely in his administrative complaint process, and he was not, the strictures relied upon by defendant do not apply where a hostile work environment encompasses the continuing violations doctrine.

Also, under ***Morgan, supra***, equitable principles of estoppel and tolling apply where warranted.  Here, the facts pertaining to Moses, including failures of the GAO "office of inclusiveness" (OOI) to timely process his claims (the OOI has never resolved Moses two latest claims, one over two years old, and one nearly two years old) would warrant tolling of deadlines were that indeed necessary.  Further, the OOI never informed Moses in writing of his rights, and

duties under the administrative complaint process. However, as demonstrated above and

following this is not necessary. As a factual matter Moses met all procedural deadlines.

### V. GAO is Wrong In Its Allegations of Untimeliness:

Defendant's allegations of lack of jurisdiction by the court is based upon untimeliness of

plaintiff's complaint. Defendant has once again misled the Court, and perhaps its own counsel,

the United States Department of Justice. This time it was by omission of key information.

**The Error:**

Mr. Moses has been asked, once again to review the facts relating to the timeliness of his

filing, and all of them. Mr. Moses latest declaration is attached as Exhibit # 1 for the

convenience of the Court.

The dates urged by GAO for the start of the allowable period to complain about Mr.

Moses (Moses) latest discrimination allegations urged are simply wrong. The materials omitted

by GAO from its argument are key applicable regulations governing the specific complaint

process applicable to this specific "Band II Split" process. The GAO regulation applicable to this

"Band II Split" process is attached. (See Exhibit 1, Moses Declaration, Attachment number 1

thereto). That attachment is an official GAO publication stating regulations and instructions

covering that Band II split process. The new regulation allows for each employee to ask for

reconsideration following a specific process before the decision as to him becomes final. Mr.

Moses followed that procedure faithfully.

Those instructions, and the operative regulation of GAO under which they were

promulgated, state a process whereby, in the Band II split process, any aggrieved employee, may

apply for reconsideration directly to the Comptroller General before the selection process becomes final.  That is precisely what Moses did, and he was timely in doing so.  The fact of the existence of that process was left out of the GAO's allegations and calculation of untimeliness.

Moses avers, and his correspondence confirms that:

1.  During the first week of January, 2006, Moses was informed by the FMA Managing director that he was not selected for the grade equal to his existing grade (Band II B)(Declaration, Exhibit I, pg 1, ¶ # 1.

2.  Before January 20th, 2006 Moses asked the Comptroller General (CG) to reconsider his decision (As was his right) pursuant to Exhibit I, Attachment 1 thereto.  On February 7th, he received the CG's response (Exhibit I, Attachment 2), dated February 2, 2006 (Declaration, Exhibit I, pg. 2, ¶ # 3).

3.  On February 7th, 2006 Moses wrote the CG a letter requesting reconsideration and a personal meeting with the CG (Exhibit I, Attachment # 3; Exhibit I, pg. 2 ¶ # 4).  The personal meeting was not granted, but a telephone conference did occur on February 16th, at which Moses requested reconsideration.  There was a witness to that telephone conference  (Exhibit I, pg 2 ¶ # 5).  After the 40 minute telephone conversation the Comptroller General made his final decision denying Moses' request for reconsideration and thereby finally demoting him during that telephone conference (on February 16, 2006).

4.  On February 17, 2006, Moses contacted a counselor in the OOI office about filing his complaint.

5.  On March 30th, 2006, Moses filed his formal discrimination complaint with OOI (Exhibit I, pg 2, ¶ # 7).  All there understood that he was filing a class action complaint.

7

6. On April 25, 2006, the OOI Managing Director acknowledged his complaint, implicitly agreeing that it was timely. At that time no question was raised as to timing and the counselors and manager knew full well that he had invoked and used the special reconsideration process (Exhibit I, pg. 2, 3 ¶ # 8).

7. On June 5, 2006 he applied for promotion from his demoted position to his former position, Band II B. ON June 26th, 2006 he was notified that he did not even make the "best qualified list". (Exhibit I, pg 3, ¶ #s 9, 10).

8. As of January 22, 2007 Moses has not received any notice of the result of the investigation of his 2006 complaints. He did receive in 2006, the results of the investigation of his 2002 complaints. He has never received any notices or right to sue, or any formal notices of denial of his claims as contained in and required by the pertinent Official GAO Order, Order # 2713.2. (Exhibit I, pg. 3, ¶ # 12).

9. Moses first paycheck with the restructured pay, with cola denial effective, reducing the amount received was on February 16, 2006. (Exhibit I, pg. 3, ¶ # 13).

10. Moses filed notices of intent to sue, through counsel, on the following dates: June 10th, 1999, as an unnamed Plaintiff; on May 3rd, 2000 as an applicant intervenor into case # 87-3538; finally, by certified mail delivery on August 14th, 2006 for the new claims included in this case. (Exhibit I, pg. 4, ¶ 2).

11. The lawsuit in this case was filed on October 4th, 2006. That date is more than 30 days after Moses had filed his last notice of intent to sue. (Exhibit I, pag 4, ¶ 3).

12. That filing, on October 4th, 2006, was more than 180 days after Moses had filed his timely written complaint with OOI, on March 30th, 2006.

13. Moses has not yet, as of May 28th, 2006 received any final decision from the OOI on his two latest complaints.

**VI. Moses' Filings and Notices Were Timely:**

When the correct regulations and dates are applied to Mr. Moses actions, it is obvious that he was timely in all aspects of his complaint process as to the Band II Split. Mr. Moses actions are entirely in accord with the correct procedures as set forth in *Stevens v. Department of the Treasury et al*, 500 U.S. 1, 6, 7 (1991); the Court interpreted the statute as follows, at page 6 and 7:

**Statutory Requirement of Stevens:**

> But the statute reads otherwise as to both requirements. It calls for a notice of not less than 30 days to the Commission [the EEOC or Equivalent-here the OOI] of an intent to sue (not notification within 30 days), and it provides that the notice shall be filed with the Commission within 180 days of the alleged unlawful practice (not filed within 180 days of the notice). Clearly, petitioner Stevens met both requirements. The EEOC was notified on October 19, 1987, the 176th day after the alleged discriminatory action - petitioner's transfer and demotion of April 27, 1987 - had occurred. 1 [500 U.S. 1, 7] And suit was not filed until May 3, 1988, a date more than 30 days after the notice was given. [footnote 1, omitted]

**Facts as to Moses Filings:**

The date of the Comptroller General's final decision demoting Moses was February 16th, 2006. That date, February 16th, 2006, was also the date of Moses fist paycheck when the demotion became effective. Thus, the "adverse employment action" was finalized and effective on the very same day. It is undisputed that Moses filed his "Notice of Intent to Sue" on August 14, 2006. Thus, Moses filed his notice of intent to sue 178 days later, within the statutory 180

days of the adverse employment event.  Then, he waited until October 4, 2006 and filed his complaint, more than 30 days after his statutory notice requirement.

Therefore, Moses met the timeliness requirement of the filing and the GAO position is in error.

Moreover, Moses cannot be said to have failed to exhaust his administrative remedies since he waited more than 180 days for the agency to act on his complaint, and it never did act in determination of his claims.  The agency has not acted even until now (4/28/08).  Therefore, he has satisfied both of the available routes to the Court.


### VII.  GAO's Allegation that Plaintiff has Failed to State a Claim is Without Merit

#### A.  The Band II Split Process In Fact Used Age as a Determinative factor; GAO's Stated Reasons are Pretext for Discrimination Based Upon Age:

The Band II split process used age as a determinative factor for selection or non-selection. That usage is a blatant, intentional, hostile, and prohibited systemic violation of law.  The Band II split is but the latest in the series of age discriminatory actions taken by GAO.  In this complaint Moses alleges overt rigging of the ratings and selection process, not just in this one selection, but for many years.  This systemic discrimination is accomplished by a complex scheme, utilizing central control over all senior managers, with feedback and goals based upon intentional bias against older persons.  Central to that process is GAO's secret data base which includes as one data element the age of each professional employee.


#### B.  Data from the GAO Official Records on Age Bias In the "Band II Split".

The data acquired demonstrates that 419 employees in Band II were 49 years of age and older.  Of those, 282 other Band II employees were similarly downgraded in pay (cost of living denied) and status.  137 or 1/3 were selected to remain in their former position.

Plaintiff alleges age bias in this process and result.

The data in the expert opinion hereto attached was, on information and belief, obtained from official GAO files.  That data is believed to be accurate and may be easily cross-checked, if challenged, to the official data base files of GAO.  The age and years of service enable GAO to easily cross-check to their records each of the employees for whom the data was received.  All 419 persons are GAO professional employees who were at that time 49 years and older and who were subject to the "Band II Split" process.  Those employees are listed in the sequence received.  All of those employees constitute the universe of data which was considered by plaintiffs expert witness as the foundation for his opinion.  No names or social security numbers are listed.  But according to the source, the data represents all such employees who were considered and selected or rejected for the Band II downgrade.  There were 419 of those employees.  One third were selected and two thirds were rejected.

Exhibit 2, Figure 1, page 8, of that opinion, is instructive.  It depicts the probability of selection into the existing level and not being downgraded in comparison to the ages of each of the applicants.  That chart shows that the probability of selection.  The court will please note that exactly one-third, or 33% were selected for retention in grade.  The Court will please note that the percentage of selection drops uniformly from a better than average probability of 47% at age 49, to a far lower probability of selection, 14%, at age 69.  The selection for the younger persons is expected to show a similar preference for younger employees, once discovery is obtained of

11

that data.

Because of the large number of observations, the expert opinion states with nearly 100% certainty that age plays a determinative part in the selection process (opinion page 9).

**C.  The Statistical Opinion:**

The opinion of plaintiff's expert (Exhibit II, Attached, referenced to page 9) is:

"In other words, the confidence in the conclusion that intentional age discrimination is clearly exhibited in GAO, by statistical evidence , is practically one hundred percent."

**D.  The Reasonable Implications of this Data and Information:**

This data therefore confirms plaintiffs allegations in this case and in all related cases.  It also confirms the data previously submitted to this court in the history of related cases.  Plaintiffs can now state with near certainty that GAO's secret data base has been withheld and the Court has been misinformed as to its existence, simply because the content (like this data) is so damning.  This data essentially proves plaintiffs entire set of allegations as confirmed in objective data from GAO's own files.

Thus, GAO's posturing of "failure to state a claim" should be viewed as just that and nothing more.  It is simply without merit and should be held to have been interposed only for purposes of delay.

At the time of filing of the original version of this opposition, plaintiff filed an accompanying Motion for Preliminary and Permanent Injunctive Relief.  That motion was filed to attempt to prevent a continuation of inequitable and harmful conduct by GAO.  Congressional

hearing have since addressed that conduct, and unionization has occurred at GAO as one result of these same actions. Now, GAO continues its attempts to eviscerate the class by contacting putative class members without prior notice to counsel. By accompanying Motion, plaintiff once again requests equitable and injunctive relief in the nature of immediate certification of the class, and notification of class members of their rights, including the right to participate in class relief requested by this lawsuit.

## VIII.  CONCLUSION

For all of the above reasons the Motion to Dismiss should be denied.

A HEARING ON THIS MOTION IS HEREBY REQUESTED

Respectfully submitted,

/s/ charltonw 2428

Walter T. Charlton, D.C. Bar # 186940
Counsel for the Plaintiffs and the Class
They Seek to Represent
230 Kirkley Road,
Annapolis, Maryland 21401
Telephone 410 571 8764
Email, charltonwt@comcast.net

| | |
|---|---|
| <u> </u><br>**James D. Moses, et al** )<br>    **and all others similarly situated** )<br>   )<br>  **PLAINTIFFS,** )<br>   )<br>   )<br>**DAVID M. WALKER** )<br>**Comptroller General of the** )<br>**United States c/o United States General** )<br>**Accountability Office (GAO)** )<br>    **and** )<br>**Michael Wolf, Chairman** )<br>**United States Government Accountability Office** )<br>**Personnel Appeals Board (PAB)** )<br>  **DEFENDANTS.** )<br><u> </u>) | **CASE NO: 06 01712 (JGP)** |

### INDEX OF ATTACHMENTS TO MOSES'S (RENEWED)
### OPPOSITION TO MOTION TO DISMISS

Exhibit 1- Declaration of James D. Moses with Attachments
    Attachment 1, GAO Order # 2900.3, Instructions for GAO Employees Who
        Request Reconsideration of their Placement into Band II A
    Attachment 2, Letter to James Moses of February 2, 2006

    Attachment 3, Letter to Walker from Moses, February 7, 2006

Exhibit 2- Affidavit of Dr. Venkareddy Chennareddy, PhD

    Opinion and Methodology
    Chart of Results
    Source Data, from GAO files

Exhibit 3-Qualifications of Dr. Venkareddy Chennareddy

Exhibit 4- Declaration of James D. Moses, Updated to April 28, 2008.

Exhibit 5-Moses renewed and updated Declaration, May 28th, 2008,  Detailing GAO's Failure to
    Address His Complaints (After Two years of Waiting).

Exhibit 6- Deposition of William (Bob) Mowbray, May 16, 2008.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **James D. Moses, et al** | ) |
|     **and all others similarly situated** | ) |
| | ) |
|     **PLAINTIFFS,** | ) |
| | )     **CASE NO: 06 01712 (JGP)** |
| **DAVID M. WALKER** | ) |
| **Comptroller General of the** | ) |
| **United States c/o United States General** | ) |
| **Accountability Office (GAO)** | ) |
|     **and** | ) |
| **Michael Wolf, Chairman** | ) |
| **United States Government Accountability Office** | ) |
| **Personnel Appeals Board (PAB)** | ) |
|     **DEFENDANTS.** | ) |
| | ) |

_____

**ORDER**

Upon consideration of Defendants' Motion to Dismiss the Court finds as follows:

1.  The Defendant has filed a Motion to Dismiss based upon two propositions.  First, that

Plaintiff, James D. Moses (Moses) was somehow untimely in his presentation of the complaint to

the GAO office of Inclusiveness (OOI).  Second that Moses has presented no basis for his claims

upon which relief can be granted.  The Court also takes judicial notice of the fact that there is

pending before the Court Mr. Moses Motion for a Declaratory Judgment that he has substantially

prevailed in his claims.  During the pendency of this lawsuit, Mr. Moses has been restored to his

former position, but he has not been afforded complete and full relief for his claims.  Similarly, a

substantial number of other complainants, who are members of the putative class described by

Mr. Moses in his complaint have also been afforded partial relief for their claims.  Other

claimants, including one prospective intervenor (Wagner)  have not been afforded any relief

1

whatsoever.

2.  The Court notes that the Defendant has submitted two affidavits in support of the Defendant's

original position, and one declaration and three exhibits supporting this Motion.  Those

affidavits, declarations and exhibits represent materials outside of the pleadings.  The court must,

in order to decide anything relevant to this case, consider those affidavits and the content thereof.

This action by the Court would necessarily convert this motion to a motion for summary

judgment.

3.  In that event, the Court must next consider the materials presented by the Plaintiff tending to

refute the allegations of the defendant.  In the absence of discovery, this would result in judgment

for the Plaintiff which is premature at this time, unless the Defendant concedes the statistical

evidentiary material is determinative of plaintiffs allegations.  The record does not support that

finding at this time because the content of Mowbray's database is not yet accessed or certain.

4.  The Court therefore declines to convert this Motion to a Motion for Summary Judgment.  As

the record now stands all allegations of the Plaintiff must be taken as true.  The Court is satisfied

that those allegations are sufficient under the rules of pleading in this Circuit at this stage of the

case to state a claim upon which relief can be granted, taking all allegations to most favor the

plaintiff herein.

It is therefore, HEREBY ORDERED THAT:

The Motion to Dismiss is DENIED:

SO ORDERED

_____
United States District Court
Magistrate Judge Deborah A. Robinson

2

**Certificate of Service**

I hereby certify that I filed a copy of this Opposition, with attachments in the ECF system of the District Court on the 28th, th , day of May, 2008, with the expectation that it would be delivered  to counsel for the Defendants who will also be served by automatic service through the ECF system.  That counsel is:


Heather Graham-Oliver, AUSA
Judiciary Center Building
555 4th, Street, N.W.
Washington, D.C. 2001.

        /S/ Charltonw 2428
_____

Walter T. Charlton

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Case No   06-017012 (JGP)

DECLARATION OF JAMES D. MOSES January 19th, 2007

Defendant Incorrectly Argues that Plaintiff's 2006 notice was untimely (page 6):

The facts as I know them to be contradict that statement as follows:

The proposed Band II Restructuring became effective on about January 8, 2006.  The series of events progressed as follows:

1.  About the first week in January, 2006 I was informed by the FMA Managing Director that I was not selected for Band IIB and was placed in Band IIA.  This would be a demotion in grade.  It also resulted in a loss of cost of living increases, now and for the future.

2.  Before January 20, 2006, I asked the Comptroller General (CG) to reconsider his decision to place me in Band IIA instead of Band IIB.  This reconsideration was pursuant to the regulations and procedures established by the CG for processing the band two split decisions and disagreements and complaints thereunder.  In other words, the normal procedures and time schedules were changed for this particular process (herein referred to as the "Band II Split" process. (See Attachment 1 hereto, for the written materials pursuant to GAO Order # 2900.3 which was furnished to employees adopting that time schedule for these complaints).

1

3. On February 7, 2006, I received the CG's response dated February 2, 2006, denying my request to be placed in Band IIB (Attachment 2, hereto).

4. On February 7, 2006, I wrote the CG a letter acknowledging his decision to not place me in Band IIB and asked to meet with him personally as was my rights under the special regulations. (Attachment 3).

5. The CG granted me a telephone meeting with him, but not the personal meeting I had requested.  On February 16, 2006 that telephone meeting occurred.  After about 40 minutes of talking with me, he did not grant my request to be placed in Band IIB.  (The CG was accompanied during this phone call by Ms. Barbara Sember).

6. On February 17, 2006, I contacted a counselor in the Office of Opportunity and Inclusiveness (OOI) about filing a discrimination complaint against the Band II Split.  At that time, my initial contact with a counselor for this complaint, I was not informed in writing of my right to file a class complaint as required by GAO Order # 2713.2.

7. March 30, 2006, I filed a formal discrimination complaint with OOI.  I did not include in the written complaint the fact that I wished to make it a class complaint because I was never informed by OOI that this was necessary.  But it was clearly discussed with OOI that this was my intent when they aided me in filing that complaint.

8. On April 25, 2006, the OOI Managing Director acknowledged my

2

complaint of discrimination and the fact was implicit that it was timely.  At that time no question was raised as to timing and they knew full well that I had been through the special reconsideration process.   Also, there was not any recognition in that notice that it was or was not a class action complaint.

9.  On June 5, 2006, I again applied for promotion to Band IIB.

10.  On June 26, 2006, I was notified that I did not make the BQ list for the promotion.

11. On  July 6, 2006, I sent an email to OOI to amend my complaint and add race and age discrimination and retaliation for the Band IIB promotion denial.

12.  As of today, January 22, 2007, I have not received the result of the investigation, for the complaints filed in 2006, however I did receive notices of ongoing investigations of the 2006 claims.  I received, in 2006 the results of the 2002 investigation, but I have never received any right to sue letters or formal notices of denial of my claims as contained in and required by the pertinent Official GAO Order, Order # 2713.2.

13.  My first paycheck with the restructured pay, with cola denial was on February 16th, 2006.  All persons similarly situated with me, that is Band IIA analysts, over 40 years of age who were denied their status as full band II members, and thereafter placed in subordinate positions to the younger persons who received Band IIB status, were likewise notified in accordance with the foregoing schedule.

3

14.  Notices of Intent to Sue and Motions to Intervene in On-Going Court Proceedings:

I have filed notices of intent to sue through my counsel, Walter T. Charlton, of Washington D.C. on the following dates.  June 10th, 1999, as an unnamed Plaintiff; On May 3, 2000 as an applicant intervenor in Chennareddy, et al Class action, Case Number 87-3538 USDC DC; on April 6th, 2005 in a Notice and Re-Notice of Intent to Sue as an additional class representative, and intervenor and finally, on August 9th, 2006 my counsel filed for me another notice of intent to sue as a class action.  I am informed by my counsel that the certified mail delivery occurred on August  14th, 2006.  The tracking number is 7005 3110 0001 4015 5920.

The lawsuit in this case was filed on October 4th, 2006.  That date was more then 180 days after I had filed my written complaint with OOI and more than 30 days after I had filed my last notice of intent to sue.  I believe from my training as a counselor, that those filings were as dictated by GAO regulations.  Those regulations are include in GAO Order # 2713.1, and have been in existence for years.  I also believe that the office of inclusiveness does not do its job correctly, resulting in discouraging many GAO employees from following the correct and authorized Civil Rights Administrative process.  I also believe based upon my own experiences that OOI that GAO discourages the completion of timely investigations resulting in near complete frustration of the administrative process at OOI.

4

Plaintiff alleges that GAO's Band II restructuring was discriminatory and that the restructuring constituted a demotion.  Also, Plaintiff challenges the denial of a Cost of Living Adjustment (COLA).  That cost of living denial was effective in my paycheck of February 16th, 2006 and in each paycheck thereafter.

The defendants are attempting to make the Band II restructuring and the COLA two separate events in order to support their contention that the Plaintiff's Notice of Intent to Sue was untimely.   The Defendants are wrong because the two events, GAO's restructuring and the COLA cannot be separated with regards to the Plaintiff's suit.  The only reason that the Plaintiff did not receive a COLA is because he was placed in Band IIA and not Band IIB.  If the Band II restructuring was fair, Plaintiff would have been place in Band IIB and would have received a COLA because he would not have been over the salary range.  Therefore, the denial of the COLA to Plaintiff cannot be conclusively made until a decision of whether the GAO's Band II restructuring was fair and equitable.  Thus, the Plaintiff's notice of intent to sue dated August 9, 2006, was timely and the following statements provided to respond to the Defendants motion to dismiss in the related and earlier case are still accurate and applicable.

Defendant Alleges Incorrectly that Plaintiff Has failed to state a Prima Facie Case Regarding His 2002 Administrative Complaint

(Note:  In footnote 4 on page 7, Defendants statement that Plaintiff Moses was placed in Band IIB is incorrect).

5

The Defendants chooses to ignore a key claim by the Plaintiff regarding establishing a prima facie case.  In his response to the Defendants motion to dismiss, Plaintiff clearly stated that he had not abandoned any of his claims in the 2002 case, including the claim regarding an award.

Plaintiff Moses is still pursuing all of his claims under the 2002 administrative complaint including performance ratings for 2000 and 2001 and not receiving an award that he should have received.

The Defendants statement, that Plaintiff Moses has not established a prima facie case under the ADEA with regards to his claims in not true.  Under <u>McDonnell Douglas</u> a plaintiff bears the initial burden of establishing a prima facie case that (1) he/she is a member of a protected class: (2) he/she suffered from an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.  Defendants claim that Plaintiff Moses cannot establish the second of these prima facie elements (adverse action) in regards to the administrative claim filed in 2002.

In fact Plaintiff Moses established all three of the prima facie elements including the second element, an adverse action.  In 2002 Plaintiff Moses was denied an award of $300 that he should have received.  There were three members on the assignment where the award was given.  The two female members (both of whom were much younger than Plaintiff Moses -- one member was under 40) received the $300 award.  There is no other clear or documented reason, other than age, to not have given Plaintiff Moses the award citation, along with the $300 cash.

<u>THESE ACTIONS CONSTITUTE IMMEDIATE AND IRREPARABLE HARM:</u>

The lower ratings that Plaintiff Moses received were also an adverse action. Plaintiff Moses ratings were among the lowest in the entire group of 47 people, completely out of character with what he had been fairly awarded for preceding years and which were well earned by hard work and accomplishments.  Both

6

females received higher ratings than Plaintiff Moses with no documented reasons. Moses alleges that statistics on ages of all persons over 49 rated and subject to the Band II split demonstrate with near 100% certainty that age discrimination is the result of the ratings process, and the process for those years.  The lower ratings correlate 1 for 1 with non-selection for band IIB and also 1 for 1 with age.

The lower, and unfair, ratings that Plaintiff Moses received were embarrassing and psychologically draining.  The lower ratings and not receiving the award disrespected Plaintiff Moses and caused him to lose status among his peers. Also, these discriminatory actions against Plaintiff Moses because of his age, affected his future status and potential advancement in the GAO organization.

I have examined and compared the accompanying expert opinion of Dr. V. Chennareddy with my knowledge of what occurred in the band II split as to age bias.  The data on employees appears to correlate with my knowledge of what did occur, and the ratings and selection criteria used.  The conclusion of Dr. Chenareddy appears to be on all fours with the facts as I have observed them to be.

What happened to me is also consistent with my observations as a counselor over the years.  I understand that the Mowbray statistics are fully expected to establish the consistent pattern and practice of age discrimination for the entire period of time, and the fact that this latest "band II split" episode is just more of the same.

When this happens to a professional at GAO, you are effectively sidelined, and your career as a creative, active, viable professional is finished.  That event, as has just happened to me, is therefore the cause of immediate and irreparable harm to every person to which it happens.  This harm flows throughout the entire career process at GAO and all ratings, assignments and future expectations.  You are finished.  For this reason, injunctive relief is essential in this case.

7

I declare under the penalties of perjury that the foregoing statements are true and correct.

[SIGNED BY DECLARANT]  January 18, 2007

James D. Moses ORIGINAL ON FILE IN COUNSEL'S OFFICE

.

8

December 16, 2005

## Prior Announcement: Band IIb Placement Reconsideration

In accordance with GAO Order 2900.3 Band II Restructuring, employees who have received Band IIb placement decisions may request relevant feedback from their team Managing Director. If requested, staff will receive feedback from their MD between December 19, 2005 and January 13, 2006. After receiving feedback, staff may request a reconsideration of the placement decision from the Comptroller General.

Instructions for the Reconsideration Process are as follows.

Staff requesting reconsideration must have received feedback and must submit an email to the CG. The email should contain a written explanation as to why the staff member believes the decision was incorrect by addressing only the assessment factor(s) they were informed they did not meet. The staff should send the email electronically to the BandIIb Placement mailbox, with a courtesy copy addressed to their MD. The email requesting reconsideration must be submitted no later than January 20, 2006. Staff requesting reconsideration will be notified of the final placement decision in writing.

The effective date of Band IIb staff placements will be January 9, 2006, including staff that receive a favorable reconsideration decision after that date.

Staff with questions regarding the reconsideration process should contact Ron Famous at (202)512-6479.

## Prior Announcement: Important Information on APSS Performance Appraisals and Pay

The 2006 APSS Performance Appraisal Cycle is being adjusted to end on January 31, 2006. This change is being made to better align the APSS performance cycle and PBC with the annual adjustment and the analyst and attorney cycle.

APSS staff will receive the 2.6% annual adjustment effective January 22, 2006, and will receive their PBC in late March or early April (about 5 months earlier than they would under the current cycle).

The changes are as follows:

# G A O

Accountability * Integrity * Reliability

**United States Government Accountability Office**
**Washington, DC  20548**

**Comptroller General**
**of the United States**

February 2, 2006

James Moses
Senior Analyst
FMA
Los Angeles Field Office

Dear Mr. Moses:

This is in response to your request for reconsideration of the decision to place you in Band IIA instead of Band IIB.  I personally gave serious consideration to your reconsideration request.  Unfortunately, after detailed review of the statement you provided and pertinent data, I am unable to grant your request for placement into Band IIB.  While you are a valued member of GAO and your team, you did not meet the requirements for strong relative past performance through September 30, 2005. If you asked for reconsideration of any of the other assessment factors, I did not consider those because I determined you did not meet the past performance factor.

As I have stated previously, no one in the Band IIA pay range will have his or her pay reduced as a result of this placement decision.  As a result, you will retain your current salary and will, at a minimum, be able to earn annual performance based adjustments up to the maximum Band II rate that was in effect in 2005 (e.g. $118,700 in Washington, D.C.).

GAO will hold another Band IIB placement process in the near future.  This will give you another opportunity to be considered for possible placement effective as of the end of June 2006.  In the initial placement process, employees had to meet a high bar for placement into Band IIB.  In addition to fulfilling the relative performance criteria, employees needed to have demonstrated that they actually performed the required roles and responsibilities of a Band IIB to a significant degree and on a recurring basis through September 30, 2005.  In contrast, future cycles will be competitive and similar to our current promotion procedures.  The competitive pool will differ from the pool that was recently considered for Band IIB placement, and an employee's chances for movement into Band IIB should increase.  In addition, over the coming months, you should gain further relevant experience which should help improve your opportunity for Band IIB placement.

The Band IIB placement process was one of the most difficult issues that GAO has undertaken. The decisions relating to it were not easy, but they were necessary. I realize that you still may have questions about the process and I am willing to meet with you personally if you would like to discuss this matter. Please contact Beth Miller, Confidential Assistant, on 512-5500 if you would like to set up an appointment with me regarding my reconsideration decision.

Thank you for your service to GAO, the Congress and our country.

Sincerely yours,

David M. Walker
Comptroller General
of the United States

HENRY A. WAXMAN, CALIFORNIA
CHAIRMAN

TOM LANTOS, CALIFORNIA
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
BRIAN HIGGINS, NEW YORK
JOHN A. YARMUTH, KENTUCKY
BRUCE L. BRALEY, IOWA
ELEANOR HOLMES NORTON,
   DISTRICT OF COLUMBIA
BETTY McCOLLUM, MINNESOTA
JIM COOPER, TENNESSEE
CHRIS VAN HOLLEN, MARYLAND
PAUL W. HODES, NEW HAMPSHIRE
CHRISTOPHER S. MURPHY, CONNECTICUT
JOHN P. SARBANES, MARYLAND
PETER WELCH, VERMONT

TOM DAVIS, VIRGINIA,
   RANKING MINORITY MEMBER

DAN BURTON, INDIANA
CHRISTOPHER SHAYS, CONNECTICUT
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
MARK E. SOUDER, INDIANA
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, TENNESSEE

DARRELL E. ISSA, CALIFORNIA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
VIRGINIA FOXX, NORTH CAROLINA
BRIAN P. BILBRAY, CALIFORNIA
BILL SALI, IDAHO
— —

ONE HUNDRED TENTH CONGRESS

# Congress of the United States
## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225-5051
FACSIMILE  (202) 225-4784
MINORITY  (202) 225-5074
TTY  (202) 225-6852

http://oversight.house.gov

March 16, 2007

The Honorable David M. Walker
Comptroller General
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

Dear Mr. Walker:

In a March 12, 2007, *Federal Times* article entitled, "Comptroller General Pans CRS Study of GAO Pay," you imply that the GAO Human Capital Reform Act of 2004 (GAO Reform Act) required you to pay employee salaries that would be comparable to what they would make in the labor market, and to pay employees performing work of equal value the same amount. You made similar comments during a GAO Town Mall Meeting on February 27, 2007. In the *Federal Times* article, you also expressed disappointment that the Congressional Research Service (CRS) did not permit you to review their study on GAO's personnel system, and said that you could not provide details of the Watson Wyatt compensation study that you commissioned because it was "proprietary."

As you are aware, the GAO Reform Act was submitted to Congress in 2003 for consideration by GAO. You referred to it in your July 16, 2003, testimony before the predecessor to this Subcommittee on Federal Workforce, Postal Service, and the District of Columbia as the "GAO proposal." The Senate report on the legislation states that it is "based on the Comptroller General's recommendations." You, and your special assistant at the time, Helen Hsing, actively advocated for passage of the Act. The legislation was not forced upon you and it did not *require* you to conduct a market-based compensation study on which to base employees' pay. Neither does the law require you to match local pay rates. Specifically, Sec. 3(a) of the Act states that in making annual pay adjustment determinations, the "Comptroller General shall *consider*" various principles, including the principle that "equal pay should be provided for work of equal value within each local pay area."

Furthermore, as Members of Congress, we take very seriously commitments that are made to us on the record. Such commitments would be meaningless if the individual making the commitment can change their mind without first consulting with, and seeking the approval of, Congress. Therefore, it is very disturbing that you did not keep your 2003 commitment to Congress to guarantee GAO employees who "met expectations" the 2006 and 2007 annual across the board increases, and you did so without Congressional knowledge or consent.

CRS provides legislative research analysis, at the request of Members of Congress. Unlike GAO, CRS works for us on a confidential basis when requested to do so, and does not provide an opportunity for agency comments. This is a longstanding CRS policy and an exception was not made for GAO, nor should it have been. Additionally, in the course of researching GAO's personnel restructuring, CRS requested that GAO provide specific information on the Watson Wyatt study. For example, CRS asked for an October 29, 2004, Watson Wyatt document that reportedly describes the study's design objectives and methodology. GAO refused to provide this document, saying it was "deliberative in nature." CRS also asked whether any outside organizations to which GAO had lost employees in the past were excluded from the pay study, but GAO did not answer this question. CRS also asked a series of questions regarding GAO's use of its pay authority, including (1) whether GAO considered the placement of Band II into Band IIA a "reduction in grade or band" under Section 4 of the GAO Reform Act; (2) how GAO could freeze the pay of Band I and Band III employees who were clearly not "reduced in grade or b a n d ; and (3) how GAO could use factors other than the maximum rate for the grade or band to determine that Band IIB and Band III employees were overpaid (e.g., "speed bumps" and performance requirements above "meets expectations"). GAO refused to answer any of these questions, saying they "raised legal issues pending before the Personnel Appeals Board." In the Federal Times article, you were quoted as saying that you could not divulge the details of the Watson Wyatt compensation study because "the report is proprietary."

Congress's authority and power to obtain information, including but not limited to propriety information, is extremely broad. Such power is essential to the legislative function as to be implied from the general vesting of legislative powers in Congress. Therefore, we are requesting that you provide all information and communications relating to the Watson Wyatt compensation study that you relied upon to make pay determinations. The data should include, but not be limited to the outside organizations GAO compared itself to (how the companies were selected, specifically, did GAO state which companies should or should not be included in the study), and which occupations within those organizations were compared to GAO analysts and specialists. You should also answer all questions that CRS posed to GAO last November regarding the implementation of your authority under the GAO Reform Act that you did not answer at that time.

Please provide this information within 14 days of the receipt of this letter.  If you would like to discuss this matter further, please contact Tania Shand on (202) 225-5147.

Sincerely,

Danny K. Davis
Chairman
Subcommittee on Federal Workforce,
 Postal Service, and the District of Columbia

Eleanor Holmes Norton
Member of Congress

Elijah Cummings
Member of Congress

Stephen Lynch
Member of Congress

John Sarbanes
Member of Congress

Dennis Kucinich
Member of Congress

Wm. Lacy Clay
Member of Congress

Chris Van Hollen
Chris Van Hollen
Member of Congress

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Arthur Davis and James Moses  et al**<br>**and all others similarly situated**<br>**PLAINTIFFS,** | )<br>)<br>)   **CASE NO: 06 1002 (JGP)**<br>) |
| **DAVID M. WALKER**<br>**Comptroller General of the**<br>**United States c/o United States General**<br>**Accountability Office (GAO)**<br>        **and**<br>**Michael Doheny, Chair**<br>**United States Government Accountability Office**<br>**Personnel Appeals Board (PAB)**<br>    **DEFENDANTS.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF VENKAREDDY CHENNAREDDY

After first being duly sworn in accordance with law, I make this affidavit, as given below, under the penalties of perjury.

I have received data from counsel purporting to be print-outs from GAO's official personnel records.  No names or social security numbers were associated with that data. The data purports to be a list of all persons over or equal to the age of 49.0 years subject to the Band II split related process. The data used for this opinion are given in the attachment A

## STATISTICAL OPINION OF VENKAREDDY CHENNAREDDY IN THE CASE OF SELECTION TO BAND II-B (II-B BEING HIGHER THAN II-A) IN GAO

### INTRODUCTION

I, Venkareddy Chennareddy, Ph.D (Experienced as an Economist as well as a Statistician), am a retired employee of GAO, presently living in Colorado Springs.  I was requested by Mr.

1

Walter Charlton, the Counsel for the putative Age Class Action case to give my statistical opinion based on data furnished to me. I analyzed the data—purported to be the ages of all staff members considered for selection and either selected or not selected to GAO Band II-B. My statistical methodology for analyzing the data is given below. That methodology is well accepted as correct under the facts of the case as presented to me.

## METHODOLOGY

I estimated a Logit model, which is a more accurate statistical model according to the references given in the end of my opinion. The model is given below.

**Log [P/(1-P)]  =  A  + B\*AGE + C\*TOTALSER + D\*APRATING + E\*EDUCTN + e**

Where
| | | |
|---|---|---|
| P | = 1 | if a staff member was selected for Band II-B |
| | 0 | if a staff member was placed in Band II-A |
| | | (Band II-A is lower than Band II-B) |
| AGE | = | Age in years of the staff member in Band II, who was placed in Band II-A and Band II-B after abolishing Band II |
| TOTALSER | = | Total years of service of the staff member |
| APRATING | = | Average supervisory performance ratings for the staff member |
| EDUCTN | = | Years of education of the staff member |

A, B, C, D, E are the regression coefficients and e is the random error term.

**Assumptions**: Years of education or the equivalent for a staff member (EDUCTN) is a constant for most of the staff members and, therefore, there is no significant variation in this variable. Also, according to my knowledge of GAO personnel procedures, there are no points for education of a staff member in panel members' consideration for rating the applicants for arriving the best qualified list and for consideration of the selecting official for final selection for promotions. This is also based on my personal knowledge of panel procedures and final selections in GAO for the

2

last 25 years in GAO.  Since there is little variation in the years of education of the staff members
and no points are given for education in promotion selections, the correlation between a staff
member's selection to Band II-A and Band II-B and the years of education of that staff member
would be consistently extremely low.  Therefore, the regression coefficient of the years of
education (E) would not  be statistically significantly different from zero.  Therefore, this variable
(the years of education), is not included in the model. Moreover, data for this variable is
unavailable.

It is hypothesized that the average supervisory performance ratings (APRATING) for a
staff member is negatively associated with the age in years of that staff member.  If this hypothesis
is statistically accepted in the sense that the regression coefficient of the average supervisory
ratings (APRATING) in a regression model with the average supervisory performance ratings as
the dependent variable and the age in years as an independent variable **is** negative and statistically
significantly different from zero, then it provides statistically significant evidence for age
discrimination in supervisory performance ratings for staff members in GAO. If the regression
coefficient of the age in years for a regression model for average supervisory performance ratings
is **not** statistically significantly different from zero, then non-inclusion of average supervisory
performance ratings in the Logit model, as given above, is not an error.  If the regression
coefficient of the age in years for a regression model for average supervisory performance ratings
is positive and statistically significantly different from zero, then the average supervisory
performance ratings is an indication of merit with the age in GAO.  If that is the case, probability
of selection to Band II-B should be positively related to the age in years and therefore, any

3

negative statistically significant relationship between the probability of selection to Band II-B and the age in years indicates a very strong statistical evidence for intentional age discrimination in selection to Band II-B in GAO. Therefore, non-inclusion of average supervisory ratings for staff members in the Logit model, as given above, is not an error.

It is found that the total number of years of service of a staff member is positively correlated with the age in years of a staff member, which was the result expected. In the preliminary estimation of the Logit model, as given above, with the two variables, age in years (AGE) and total years of service (TOTALSER), the regression coefficient (C) for total years of service (TOTALSER) is negative and not statistically significantly different from zero, while as the regression coefficient of age in years (B), is negative and statistically significantly different from zero. Because of statistical insignificance of the coefficient for the total years of service (TOTALSER), this variable was excluded in the estimation of final model. Therefore, the Logit model, as given above, was chosen with only age in years (AGE) as an independent variable (Also, see Reagan, 2002, the Federal Judicial Center paper published in Jurimetrics). Therefore, the finally chosen Logit model for estimation for a statistical assessment of intentional age discrimination in selection to Band II-B, which is higher than Band II-A, is the one with only one independent variable, age in years (AGE). The empirical results from the estimated Logit model are given below.

## ESTIMATION

The chosen Logit model is estimated using the Maximum Likelihood estimation procedure and Shazam Econometric Software.

4

## EMPIRICAL RESULTS

The estimated Logit model is given below.

**Logit [P/(1-P)]   =  A + B\*AGE**

**A = 3.8959         T-Ratio  = 2.5594**

**B = -0.082499      T-Ratio  = -3.0270**

**Elasticity at mean age = -3.1 (rounded off to one decimal)**

Elasticity is computed based on the basis of the result for change in probability, as given in Pindyck, Robert S and Rubinfeld, Daniel L, 1993, p.299, last portion.   Sample size (N=419) is considered to be very large for reliable statistical inference (see Walpole, 1968, p. 157). Data on staff members' ages (in years) range from 49. years to about 70.6 years.  Models are not estimated for disaggregated data reducing data to offices, divisions, and regional offices because detection of the embedded true age discrimination in GAO organization gets blocked in small samples.  Mr. Wolf (Chair) of the  Personnel Appeals Board, the General Accounting Office, wrote "Unnecessary disaggregation  reduces the power of statistical tests, thereby making it difficult to distinguish genuine effects from sampling error. In plain words, breaking up the data into little subsets reduces the chance of finding disparities if they do exit."  In other words, PAB, which has the oversight responsibility, of GAO, argued against analysis at each little subset of data (see Wolf, 1999, p. 36, last paragraph).

The Likelihood  ratio for the model = 9.73908 with 1 D.F    P-Value = 0.0018.

The regression coefficient (B) of the variable "age in years (AGE)" is negative and statistically significantly different from zero at far less than 1-percent probability (it is 0.001293)

5

level of significance.  The elasticity of probability of selection to Band II-B with respect to age of a staff member at mean age is -3.1, which indicates that a 10-percent increase in the age of a staff member applicant  leads to 31-percent decrease in the probability of selection to Band II-B. This leads to a statistical inference that intentional age discrimination (disparate treatment of older professionals) is clearly evident in the selection process for Band II-B in GAO  Based on one-tail test (discrimination is indicated only by negative sign), the chance of this conclusion being wrong is practically zero (.001293) or 1 out of 773. In other words, the confidence in this statistical inference of intentional age discrimination in the selection process for Band II-B  is practically hundred percent.

### ESTIMATED PROBABILITY PERCENTS AT SELECTED AGES

The estimated probability percent of selection to Band II-B for a staff member with a given years of age, as derived from the estimated Logit model, is given below.

**P   =   100*EXP(3.8959 – 0.082499*AGE)/[1+EXP(3.8959-0.082499*AGE)]**

Table 1 provides estimated probability percents at selected years of age of staff members.

The estimated probability percent of selection to Band II-B at the age of 49 years is 46.34 percent which is 3.26 times the estimated probability percent (14.23) of selection at the age of 69. The estimated probability percent of selection to Band II-B at the age of 54 years is 36.38 percent which is 2.56 times the estimated probability percent (14.23) of selection at the age of 69. The estimated probability percent of selection to Band II-B at the age of 59 years is 27.46 percent which is 1.93 times the estimated probability percent (14.23) of selection at the age of 69.

Table 1.  Probability Percent of Selection to Band II-B in GAO at Selected Years of Age of  Staff
Members

| Age in years  of a staff member | Probability percent of selection to Band II-B in percent |
|---|---|
| 49 | 46.34 |
| 54 | 36.38 |
| 59 | 27.46 |
| 65 | 20.04 |
| 69 | 14.23 |

Note: Probability percent is rounded off  to 2 decimal points

The estimated probability percent of selection to Band II-B at the age of 64 years is 20.04 percent

which is about 1.41 times the estimated probability percent (14.23) of selection at the age of 69.

Figure 1 shows the steady down trend of the probability percent of selection to Band II-B in GAO

 as the age in years of a staff member applicant  progresses.

# Figure 1. Probability Percent of Selection to Band II-B in GAO



## CONCLUSION

An inference of intentional age discrimination (or disparate treatment of older professionals) in the selections to Band II-B in GAO is drawn based on statistical testing using the selection data. The elasticity of probability of selection to Band II-B with respect to age of a staff member at mean age is -3.1, which indicates that a 10-percent increase in the age of a staff member applicant leads to 31-percent decrease in the probability of selection to Band II-B. Based on one-tail test (discrimination is indicated only by negative sign of the coefficient), the chance of this conclusion being wrong is practically zero (0.001293) or 1 out of 773. In other words, the confidence in the conclusion that intentional age discrimination is clearly exhibited in GAO, by statistical evidence, is practically 100 percent.

## REFERENCES

1. Reagan, Robert Timothy, "Federal Judicial center Statistical Examples Software Prototype: Age Discrimination Example", *Jurimetrics,* 42, Spring 2002, pp. 281-372
2. Hosmer, David W and Lemeshow, Stanley*, Applied Logistic Regression,* John Wiley & Sons,Inc., New York, 1989
3. Pindyck, Robert S and Rubinfeld, Daniel L*, Econometric Models and Economic Forecasts, Second edition,* McGraw-Hill Book Company, New York, 1993
4. Whistler, Diana et al., *Shazam Econometrics Software, Version 10*, Northwest Econometrics, Ltd., Vancouver, B.C., Canada, 2004
5. SAS Institute, The Logistic Procedure (Chapter 27), *SAS Manual, Version 8*, North Carolina
6. Walpole, Ronald E, *Introduction to Statistics*, The Macmillan Compny, New York, 1968
7. Wolf, Michael, Wolf (Chair), *Promotions of Banded Employees (1991-1995)*, Personnel Appeals Board, U.S. general Accounting Office, Suite 560, Union Center Plaza II, Washington, D.C. 20548.

**ATTACHMENT  A**

Data provided by the Counsel for the AGE Class Action

| Selected to Band II-B Or not (1,if selected 0, if not selected ) | Age in years | Total years of service |
|---|---|---|
| 0.000000 | 59.00000 | 34.60000 |
| 0.000000 | 53.40000 | 14.10000 |
| 0.000000 | 58.50000 | 43.10000 |
| 0.000000 | 52.50000 | 1.000000 |
| 0.000000 | 56.50000 | 7.400000 |
| 0.000000 | 52.70000 | 31.60000 |
| 0.000000 | 59.60000 | 34.40000 |
| 0.000000 | 51.70000 | 8.500000 |
| 0.000000 | 68.30000 | 34.20000 |
| 0.000000 | 56.80000 | 32.00000 |
| 0.000000 | 49.30000 | 26.60000 |
| 0.000000 | 58.80000 | 26.90000 |
| 0.000000 | 57.30000 | 27.60000 |
| 0.000000 | 60.50000 | 36.60000 |
| 0.000000 | 58.40000 | 29.30000 |
| 0.000000 | 57.50000 | 35.50000 |
| 0.000000 | 51.20000 | 24.70000 |
| 0.000000 | 57.40000 | 35.50000 |
| 0.000000 | 53.20000 | 26.10000 |
| 0.000000 | 58.80000 | 36.60000 |
| 0.000000 | 56.20000 | 17.10000 |
| 0.000000 | 59.50000 | 35.70000 |
| 0.000000 | 56.00000 | 33.80000 |
| 0.000000 | 57.50000 | 32.10000 |
| 0.000000 | 64.20000 | 27.50000 |
| 0.000000 | 51.60000 | 30.10000 |
| 0.000000 | 55.90000 | 19.80000 |
| 0.000000 | 53.80000 | 31.50000 |
| 0.000000 | 53.90000 | 26.40000 |
| 0.000000 | 55.20000 | 34.80000 |
| 0.000000 | 54.30000 | 21.20000 |
| 0.000000 | 57.90000 | 27.70000 |
| 0.000000 | 57.50000 | 22.30000 |
| 0.000000 | 57.50000 | 32.30000 |
| 0.000000 | 54.80000 | 18.70000 |
| 0.000000 | 58.50000 | 35.40000 |
| 0.000000 | 68.70000 | 16.00000 |
| 0.000000 | 51.90000 | 45.20000 |
| 0.000000 | 52.00000 | 29.70000 |
| 0.000000 | 57.00000 | 23.10000 |
| 0.000000 | 50.50000 | 27.60000 |
| 0.000000 | 52.30000 | 31.50000 |

10

```
0.000000        52.20000        27.60000
0.000000        57.80000        7.900000
0.000000        57.30000        25.50000
0.000000        55.60000        29.90000
0.000000        64.90000        39.80000
0.000000        55.10000        16.40000
0.000000        54.10000        32.90000
0.000000        62.60000        16.40000
0.000000        51.20000        21.50000
0.000000        55.20000        30.20000
0.000000        53.50000        16.60000
0.000000        59.30000        20.20000
0.000000        57.50000        21.10000
0.000000        62.00000        39.60000
0.000000        56.00000        2.800000
0.000000        53.40000        28.10000
0.000000        67.80000        34.60000
0.000000        61.30000        34.30000
0.000000        62.50000        38.30000
0.000000        54.00000        30.50000
0.000000        51.40000        27.30000
0.000000        51.60000        26.30000
0.000000        56.00000        25.90000
0.000000        51.20000        7.300000
0.000000        50.20000        27.60000
0.000000        56.40000        27.50000
0.000000        55.80000        25.70000
0.000000        64.90000        36.40000
0.000000        60.80000        38.50000
0.000000        55.30000        17.50000
0.000000        56.00000        33.60000
0.000000        66.60000        32.20000
0.000000        60.80000        31.70000
0.000000        52.80000        7.800000
0.000000        52.90000        30.70000
0.000000        58.20000        27.30000
0.000000        54.60000        26.30000
0.000000        57.40000        35.20000
0.000000        56.20000        29.60000
0.000000        57.60000        22.40000
0.000000        53.20000        27.90000
0.000000        58.30000        15.60000
0.000000        54.30000        29.60000
0.000000        57.60000        33.40000
0.000000        58.10000        28.60000
0.000000        67.30000        8.400000
0.000000        57.00000        31.00000
0.000000        57.60000        18.50000
0.000000        51.30000        27.00000
0.000000        62.90000        11.80000
0.000000        57.60000        22.90000
0.000000        57.00000        35.20000
0.000000        60.20000        38.40000
0.000000        57.00000        8.400000
0.000000        51.20000        26.60000
0.000000        53.10000        18.80000
0.000000        57.70000        13.00000
0.000000        54.40000        11.10000
0.000000        56.10000        22.20000
```

11

| 0.000000 | 55.10000 | 15.40000 |
|---|---|---|
| 0.000000 | 53.50000 | 11.60000 |
| 0.000000 | 53.50000 | 23.30000 |
| 0.000000 | 66.50000 | 36.20000 |
| 0.000000 | 58.00000 | 35.50000 |
| 0.000000 | 62.90000 | 30.20000 |
| 0.000000 | 55.40000 | 31.50000 |
| 0.000000 | 55.40000 | 32.60000 |
| 0.000000 | 54.90000 | 29.70000 |
| 0.000000 | 56.10000 | 14.30000 |
| 0.000000 | 53.00000 | 31.60000 |
| 0.000000 | 55.40000 | 19.00000 |
| 0.000000 | 59.00000 | 16.00000 |
| 0.000000 | 57.10000 | 29.90000 |
| 0.000000 | 54.20000 | 34.80000 |
| 0.000000 | 53.60000 | 17.40000 |
| 0.000000 | 54.20000 | 30.90000 |
| 0.000000 | 56.60000 | 33.90000 |
| 0.000000 | 50.40000 | 25.20000 |
| 0.000000 | 50.70000 | 24.70000 |
| 0.000000 | 57.90000 | 32.70000 |
| 0.000000 | 51.60000 | 27.00000 |
| 0.000000 | 56.50000 | 36.40000 |
| 0.000000 | 58.70000 | 19.50000 |
| 0.000000 | 53.90000 | 30.00000 |
| 0.000000 | 57.80000 | 35.50000 |
| 0.000000 | 60.40000 | 29.60000 |
| 0.000000 | 60.90000 | 31.80000 |
| 0.000000 | 58.50000 | 32.40000 |
| 0.000000 | 55.50000 | 27.30000 |
| 0.000000 | 51.70000 | 28.20000 |
| 0.000000 | 61.30000 | 39.20000 |
| 0.000000 | 56.10000 | 32.60000 |
| 0.000000 | 51.30000 | 25.90000 |
| 0.000000 | 62.40000 | 37.70000 |
| 0.000000 | 55.50000 | 31.50000 |
| 0.000000 | 50.20000 | 17.80000 |
| 0.000000 | 50.80000 | 5.500000 |
| 0.000000 | 59.20000 | 25.70000 |
| 0.000000 | 60.50000 | 36.50000 |
| 0.000000 | 65.30000 | 16.90000 |
| 0.000000 | 53.60000 | 26.60000 |
| 0.000000 | 52.50000 | 22.80000 |
| 0.000000 | 55.10000 | 2.400000 |
| 0.000000 | 50.30000 | 14.30000 |
| 0.000000 | 53.40000 | 35.50000 |
| 0.000000 | 52.80000 | 23.50000 |
| 0.000000 | 53.50000 | 17.00000 |
| 0.000000 | 65.70000 | 37.60000 |
| 0.000000 | 54.60000 | 21.00000 |
| 0.000000 | 50.90000 | 28.60000 |
| 0.000000 | 51.10000 | 25.60000 |
| 0.000000 | 53.60000 | 31.70000 |
| 0.000000 | 51.90000 | 3.300000 |
| 0.000000 | 63.30000 | 39.60000 |
| 0.000000 | 52.00000 | 29.60000 |
| 0.000000 | 57.90000 | 38.80000 |
| 0.000000 | 62.20000 | 32.70000 |
| 0.000000 | 64.10000 | 29.60000 |

12

| 0.000000 | 66.80000 | 31.60000 |
| 0.000000 | 60.90000 | 35.60000 |
| 0.000000 | 57.30000 | 31.00000 |
| 0.000000 | 56.30000 | 31.60000 |
| 0.000000 | 54.10000 | 7.200000 |
| 0.000000 | 60.00000 | 33.90000 |
| 0.000000 | 64.10000 | 39.80000 |
| 0.000000 | 55.80000 | 32.70000 |
| 0.000000 | 59.10000 | 8.100000 |
| 0.000000 | 58.50000 | 23.90000 |
| 0.000000 | 52.30000 | 28.50000 |
| 0.000000 | 54.30000 | 29.50000 |
| 0.000000 | 61.60000 | 34.90000 |
| 0.000000 | 60.30000 | 21.60000 |
| 0.000000 | 54.30000 | 22.60000 |
| 0.000000 | 55.30000 | 31.30000 |
| 0.000000 | 52.70000 | 23.20000 |
| 0.000000 | 56.90000 | 30.50000 |
| 0.000000 | 61.80000 | 34.80000 |
| 0.000000 | 54.90000 | 35.00000 |
| 0.000000 | 53.10000 | 29.40000 |
| 0.000000 | 53.40000 | 31.30000 |
| 0.000000 | 65.10000 | 25.70000 |
| 0.000000 | 54.10000 | 15.30000 |
| 0.000000 | 52.40000 | 3.300000 |
| 0.000000 | 56.10000 | 30.70000 |
| 0.000000 | 56.30000 | 34.00000 |
| 0.000000 | 54.30000 | 31.20000 |
| 0.000000 | 59.50000 | 24.30000 |
| 0.000000 | 62.60000 | 22.70000 |
| 0.000000 | 53.50000 | 5.500000 |
| 0.000000 | 58.20000 | 21.50000 |
| 0.000000 | 52.20000 | 27.00000 |
| 0.000000 | 53.30000 | 31.40000 |
| 0.000000 | 60.70000 | 27.40000 |
| 0.000000 | 60.90000 | 25.30000 |
| 0.000000 | 70.60000 | 44.80000 |
| 0.000000 | 53.80000 | 25.10000 |
| 0.000000 | 51.60000 | 36.00000 |
| 0.000000 | 56.60000 | 31.50000 |
| 0.000000 | 57.70000 | 15.00000 |
| 0.000000 | 52.90000 | 30.60000 |
| 0.000000 | 55.50000 | 15.60000 |
| 0.000000 | 58.50000 | 25.80000 |
| 0.000000 | 50.70000 | 29.50000 |
| 0.000000 | 55.90000 | 29.30000 |
| 0.000000 | 52.80000 | 28.50000 |
| 0.000000 | 58.30000 | 34.40000 |
| 0.000000 | 56.40000 | 31.20000 |
| 0.000000 | 53.60000 | 31.60000 |
| 0.000000 | 58.80000 | 30.50000 |
| 0.000000 | 55.40000 | 30.20000 |
| 0.000000 | 53.60000 | 15.40000 |
| 0.000000 | 53.50000 | 21.10000 |
| 0.000000 | 51.50000 | 27.20000 |
| 0.000000 | 65.20000 | 42.30000 |
| 0.000000 | 51.40000 | 26.00000 |
| 0.000000 | 59.50000 | 19.10000 |
| 0.000000 | 60.50000 | 36.90000 |

13

| | | |
|---|---|---|
| 0.000000 | 53.00000 | 6.300000 |
| 0.000000 | 56.20000 | 31.50000 |
| 0.000000 | 63.50000 | 35.90000 |
| 0.000000 | 50.30000 | 6.300000 |
| 0.000000 | 61.40000 | 20.40000 |
| 0.000000 | 61.70000 | 15.40000 |
| 0.000000 | 53.30000 | 16.70000 |
| 0.000000 | 58.80000 | 21.20000 |
| 0.000000 | 55.40000 | 33.00000 |
| 0.000000 | 52.20000 | 28.70000 |
| 0.000000 | 52.60000 | 26.30000 |
| 0.000000 | 64.90000 | 32.50000 |
| 0.000000 | 58.90000 | 24.60000 |
| 0.000000 | 56.10000 | 31.70000 |
| 0.000000 | 58.30000 | 25.20000 |
| 0.000000 | 57.80000 | 24.50000 |
| 0.000000 | 59.70000 | 18.30000 |
| 0.000000 | 59.50000 | 24.80000 |
| 0.000000 | 54.40000 | 29.80000 |
| 0.000000 | 55.30000 | 32.50000 |
| 0.000000 | 57.80000 | 20.30000 |
| 0.000000 | 58.80000 | 33.30000 |
| 0.000000 | 66.60000 | 20.00000 |
| 0.000000 | 62.50000 | 29.90000 |
| 0.000000 | 50.30000 | 29.10000 |
| 0.000000 | 51.30000 | 29.30000 |
| 0.000000 | 58.40000 | 24.00000 |
| 0.000000 | 66.00000 | 33.30000 |
| 0.000000 | 53.70000 | 16.10000 |
| 0.000000 | 58.20000 | 36.60000 |
| 0.000000 | 57.70000 | 27.60000 |
| 0.000000 | 54.80000 | 32.50000 |
| 0.000000 | 54.10000 | 24.20000 |
| 0.000000 | 65.10000 | 27.60000 |
| 0.000000 | 56.60000 | 33.50000 |
| 0.000000 | 52.50000 | 25.90000 |
| 0.000000 | 52.20000 | 19.00000 |
| 0.000000 | 54.20000 | 24.30000 |
| 0.000000 | 54.00000 | 18.00000 |
| 0.000000 | 61.70000 | 21.60000 |
| 0.000000 | 64.00000 | 29.90000 |
| 0.000000 | 51.20000 | 25.90000 |
| 0.000000 | 52.80000 | 30.90000 |
| 0.000000 | 52.80000 | 29.60000 |
| 0.000000 | 58.80000 | 27.60000 |
| 0.000000 | 57.00000 | 28.60000 |
| 0.000000 | 50.00000 | 26.60000 |
| 0.000000 | 61.50000 | 17.60000 |
| 0.000000 | 54.50000 | 25.90000 |
| 0.000000 | 56.40000 | 33.40000 |
| 0.000000 | 55.20000 | 29.50000 |
| 0.000000 | 62.10000 | 32.70000 |
| 0.000000 | 51.30000 | 25.90000 |
| 0.000000 | 58.90000 | 33.90000 |
| 0.000000 | 53.60000 | 17.50000 |
| 0.000000 | 60.10000 | 14.60000 |
| 0.000000 | 54.00000 | 23.90000 |
| 0.000000 | 51.40000 | 7.400000 |
| 0.000000 | 51.30000 | 26.60000 |

14

```
0.000000        54.50000        16.70000
0.000000        59.30000        4.100000
0.000000        58.00000        33.90000
0.000000        61.10000        5.700000
1.000000        53.30000        16.30000
1.000000        55.30000        18.10000
1.000000        51.00000        8.700000
1.000000        54.20000        31.50000
1.000000        52.70000        26.50000
1.000000        51.60000        21.10000
1.000000        59.10000        25.90000
1.000000        55.70000        33.50000
1.000000        61.50000        14.50000
1.000000        51.00000        18.00000
1.000000        59.70000        27.30000
1.000000        56.80000        34.50000
1.000000        53.50000        32.00000
1.000000        52.80000        29.60000
1.000000        56.70000        27.90000
1.000000        54.10000        26.10000
1.000000        52.10000        20.80000
1.000000        50.70000        20.50000
1.000000        56.60000        22.70000
1.000000        54.50000        32.70000
1.000000        55.20000        21.70000
1.000000        50.70000        24.90000
1.000000        51.60000        23.50000
1.000000        57.70000        29.50000
1.000000        59.10000        31.60000
1.000000        57.70000        31.50000
1.000000        56.70000        34.50000
1.000000        60.90000        9.300000
1.000000        54.30000        17.10000
1.000000        52.60000        25.60000
1.000000        51.20000        27.00000
1.000000        49.20000        21.40000
1.000000        61.90000        28.90000
1.000000        63.10000        27.90000
1.000000        59.20000        15.50000
1.000000        57.60000        31.60000
1.000000        65.80000        20.20000
1.000000        53.70000        29.50000
1.000000        53.70000        17.40000
1.000000        57.60000        35.50000
1.000000        61.10000        36.50000
1.000000        50.40000        29.20000
1.000000        50.40000        5.000000
1.000000        58.50000        16.80000
1.000000        52.10000        18.50000
1.000000        61.50000        20.30000
1.000000        51.40000        29.60000
1.000000        51.60000        24.90000
1.000000        53.10000        31.80000
1.000000        57.00000        27.30000
1.000000        52.20000        20.00000
1.000000        53.00000        8.900000
1.000000        52.30000        28.30000
1.000000        57.80000        21.10000
1.000000        56.20000        33.50000
```

15

| 1.000000 | 59.80000 | 33.30000 |
|----------|----------|----------|
| 1.000000 | 59.00000 | 36.00000 |
| 1.000000 | 50.10000 | 7.200000 |
| 1.000000 | 52.10000 | 21.50000 |
| 1.000000 | 57.90000 | 28.80000 |
| 1.000000 | 54.40000 | 35.80000 |
| 1.000000 | 54.00000 | 27.50000 |
| 1.000000 | 50.30000 | 27.60000 |
| 1.000000 | 59.30000 | 36.60000 |
| 1.000000 | 50.40000 | 28.00000 |
| 1.000000 | 50.30000 | 28.20000 |
| 1.000000 | 60.20000 | 7.500000 |
| 1.000000 | 52.50000 | 21.10000 |
| 1.000000 | 58.50000 | 18.20000 |
| 1.000000 | 60.70000 | 20.20000 |
| 1.000000 | 50.50000 | 10.80000 |
| 1.000000 | 62.80000 | 30.80000 |
| 1.000000 | 56.10000 | 33.50000 |
| 1.000000 | 52.30000 | 17.80000 |
| 1.000000 | 56.20000 | 31.50000 |
| 1.000000 | 50.20000 | 3.700000 |
| 1.000000 | 51.30000 | 14.80000 |
| 1.000000 | 57.50000 | 22.20000 |
| 1.000000 | 55.90000 | 18.80000 |
| 1.000000 | 64.10000 | 39.50000 |
| 1.000000 | 54.30000 | 25.30000 |
| 1.000000 | 56.00000 | 34.50000 |
| 1.000000 | 55.90000 | 35.60000 |
| 1.000000 | 51.80000 | 31.50000 |
| 1.000000 | 59.90000 | 19.00000 |
| 1.000000 | 50.90000 | 26.70000 |
| 1.000000 | 53.50000 | 31.20000 |
| 1.000000 | 55.20000 | 30.80000 |
| 1.000000 | 59.00000 | 18.70000 |
| 1.000000 | 53.50000 | 32.00000 |
| 1.000000 | 50.40000 | 24.40000 |
| 1.000000 | 59.90000 | 0.1000000* |
| 1.000000 | 50.50000 | 13.30000 |
| 1.000000 | 61.40000 | 21.00000 |
| 1.000000 | 54.80000 | 33.80000 |
| 1.000000 | 55.80000 | 33.60000 |
| 1.000000 | 58.00000 | 34.80000 |
| 1.000000 | 54.50000 | 33.70000 |
| 1.000000 | 51.60000 | 29.60000 |
| 1.000000 | 55.60000 | 26.50000 |
| 1.000000 | 55.20000 | 25.40000 |
| 1.000000 | 53.80000 | 31.60000 |
| 1.000000 | 50.50000 | 25.90000 |
| 1.000000 | 54.50000 | 21.50000 |
| 1.000000 | 55.70000 | 22.90000 |
| 1.000000 | 56.30000 | 34.20000 |
| 1.000000 | 53.80000 | 26.30000 |
| 1.000000 | 51.20000 | 15.80000 |
| 1.000000 | 51.00000 | 29.60000 |
| 1.000000 | 51.50000 | 16.50000 |
| 1.000000 | 56.40000 | 34.80000 |
| 1.000000 | 53.80000 | 30.00000 |
| 1.000000 | 56.70000 | 36.50000 |
| 1.000000 | 63.20000 | 40.10000 |

16

```
1.000000          53.30000          29.90000
1.000000          51.70000          26.40000
1.000000          52.00000          30.70000
1.000000          57.80000          13.80000
1.000000          55.10000          18.50000
1.000000          57.10000          21.70000
1.000000          60.10000          11.10000
1.000000          55.50000          22.00000
1.000000          49.00000          26.10000
1.000000          57.00000          26.40000
1.000000          52.50000          21.50000
1.000000          60.50000          33.00000
1.000000          52.50000          7.300000
1.000000          51.30000          24.80000
1.000000          59.30000          35.80000
1.000000          52.80000          21.50000
1.000000          57.80000          17.30000
1.000000          59.70000          15.00000
1.000000          57.30000          29.90000
1.000000          57.10000          29.40000
1.000000          64.30000          32.60000
1.000000          57.20000          30.60000
1.000000          57.50000          18.40000

Total number of observations = 419
```

*This item appears to be a typographical or data entry error by GAO. Because of statistical insignificance of the regression coefficient of this variable, total years of experience, in the estimation of preliminary model, this variable was excluded in the estimation of final model.  Therefore, this error in this data point did not affect the estimation of the final model chosen and the results from that model for my opinion.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

## Case No   06-1002 (JGP)

### DECLARATION OF JAMES D. MOSES May 28, 2008

#### Declaration of James D. Moses, Plaintiff on Defendant's
#### Partial Motion to Dismiss

I have filed notices of intent to sue through my counsel, Walter T. Charlton, of Washington D.C. on the following dates. June 10th, 1999, as an unnamed Plaintiff; On May 3, 2000 as an applicant intervenor in Chennareddy, et al Class action, Case Number 87-3538 USDC DC; on April 6th, 2005 in a Notice and Re-Notice of Intent to Sue as an additional class representative, and intervenor and finally, on August 9th, 2006 my counsel filed for me another notice of intent to sue as a class action.  I am informed by my counsel that the certified mail delivery occurre2006.  The tracking number is 7005 3110 0001 4015 5920. D on August 14th, 2006.

### <u>Plaintiff's 2006 notice was timely</u>

The proposed Band II Restructuring became effective on about January 8, 2006.  The series of events for me progressed as follows:

1.  about the first week in January, 2006 I was informed by the FMA Managing Director   that I was placed in Band IIA.

2.  Before January 20, 2006, I asked the Comptroller General (CG) to reconsider his decision to place me in Band IIA instead of Band IIB...

3. On February 7, 2006, I received the Cog's response dated February 2, 2006, denying my request to be placed in Band IIB.

4.  On February 7, 2006, I wrote the CG a letter acknowledging his decision to not place me in Band IIB and asked to meet with him personally.

5.  The CG granted me a telephone meeting with him on February 16, 2006.  After about 40 minutes of talking with me, he did not grant my request to be placed in Band IIB.  (The CG was accompanied by Ms. Barbara Sember)

6.  On February 17, 2006, I contacted a counselor in the Office of Opportunity and Inclusiveness (OOI) about filing a discrimination complaint against the Band II Split.  At that time, my initial contact with a counselor for this complaint, I was not informed in writing of my right to file a class complaint as required by GAO Order # 2713.2.

7.  March 30, 2006, filed a formal discrimination complaint with OOI.  I did not state the complaint in writing to include the fact that I wished to make it a class complaint because I was never informed

by OOI that this was necessary.

8.  On April 25, 2006, the OOI Managing Director acknowledged my complaint of discrimination.   There was not any recognition that it was or was not a class action complaint.

9.  On June 5, 2006, I applied for promotion to Band IIB.

10.  On June 26, 2006, I was notified that I did not make the BQ list for the promotion.

11. On July 6, 2006, I sent an email to OOI to amend my complaint and add race and age discrimination and retaliation for the Band IIB promotion denial.

12. as of today, May 28, 2008 I have not received the final decision on my complaint from GAO.  Also, I have never received any right to sue letters or formal notices of denial of my claims as contemplated and required by the pertinent Official GAO Order, Order # 2713.2.

13.  My first paycheck with the restructured pay, with cola denial, was on February 16, 2006.  All persons similarly situated with me, Band IIA analysts, over 40 years of age who were denied their status as full band II members, and thereafter placed in subordinate positions to the younger persons who received Band IIB status, were

likewise notified in accordance with the foregoing schedule.

## Plaintiff Has failed to state a Prima Facie Case Regarding His 2002 Administrative Complaint

The Defendants statement, that Plaintiff Moses has not established a prima facie case under the ADEA with regards to his claims in not true. Under McDonnell Douglas a plaintiff bears the initial burden of establishing a prima facie case that (1) he/she is a member of a protected class: (2) he/she suffered from an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. Defendants claim that Plaintiff Moses cannot establish the second of these prima facie elements (adverse action) in regards to the administrative claim filed in 2002.

In fact Plaintiff Moses established all three of the prima facie elements including the second element, an adverse action. Plaintiff Moses was denied an award of $300 that he should have received. There were three members on the assignment where the award was given. The two female members both of whom were much younger than Plaintiff Moses (one member was under 40) received the $300 award. There is no other clear or documented reason, other than age, to not have given Plaintiff Moses the award with $300 cash. One official told the investigator of my complaint that the two female employees who received spot awards were working overtime whereas I did not. Official records showed, however, that no overtime was worked by me or my co-workers. Another official who rated me told the investigator that that he was without personal

knowledge of my work so he used a "blind technique" to issue my rating and, at the same time, stated that he recommended my co-workers for awards because my performance did not exceed expectations. See attachment I, my memorandum to the Managing Director, to get an indication of how I felt about the Spot Award being given only to my co-workers)

The lower ratings that I received were also an adverse action. My ratings were among the lowest in the entire group of 47 people, completely out of character with what I had been accustomed. Both females received higher ratings than me with no documented reasons. The lower ratings that I received were embarrassing and psychologically draining. The lower ratings and not receiving the award disrespected me and caused me to lose status among my peers and younger staff in the office. Also, these discriminatory actions against me because of my age, affected my future status and potential advancements in the GAO organization. Also, the rating official, without personal knowledge of my performance, denied me a spot award because of my rating

I declare under the penalties of perjury that the foregoing statements are true and correct.

_James D. Moses_
**James D. Moses**

5/28/08
**Date**



*Attachment I*

2002 JAN FEB 20 PM 5:03 10

# Memorandum

2002 FEB 20 PM 5:10

**Date:**       February 15, 2002

**To:**         Managing Director, Tax and Administration of Justice –
                Norm Rabkins

**From:**       Senior Evaluator, Los Angeles / Jim Moses

**Subject:**    Spot Awards on the INS Benefit Fraud Job

It was good to see you on Monday, 2/4/02. As always, when you come to Los Angeles you stop by my office and chat a bit. You called a brief staff meeting on Wednesday to present spot awards to Bonnie Hall and Carla Brown. I was on that job too. I am a very strong individual but I was really hurt and shocked by this blatant display of continued retaliation against me causing both emotional suffering and embarrassment. I did an offer lot on the benefit fraud job and I thought you were aware of this. I guess Jim Blume or Rich Stana or both suggested the spot awards. Frankly, when you look at all the facts, it would seem impossible to give the two young females an award and simply exclude me (the old man). On 20 or more pages of the 34 pages in the report you will find significant contributions from me. In some cases you will find that I inserted statements and paragraphs and in others I wrote the entire section. Take the technology section for example, I identified the findings, researched and obtained sufficient evidence, wrote the section in the report, indexed the section and answered referencer's comments. I fought to get September 11 mentioned in the report and was successful. Practically all the conclusions were written by me and incorporated into the report almost verbatim. I could go on and on but suffice to say that I had a major impact on the benefit fraud job. We are already reaping some positive benefit from the work I did on the TEC/IBIS project. California Service Center officials told me they are already running all applications against TEC/IBIS. They hired two full time employees to do this. I haven't had a chance to verify it, but I would assume that the other service centers are also running TEC/IBIS checks. This is a significant accomplishment. Yet, I am not included in a small $50 dollar spot award.

The last time I wrote you a memo about my situation with Stana you told me that you Were not in a position to act. You are now. Paul Jones told me that your hands are tied. I don't believe this. You are the Managing Director and that has to give you some control. How can you just listen to your managers' side of the story? Aren't you interest in what I have to say? In the spot award situation, I guess a continuing attempt is being made to pit Blacks against Blacks. You already have Weldon McPhail in your camp. I am very good at what I do in GAO, Norm. In fact, I feel that with my experience and knowledge, I am better at age 60 than in earlier years.

86

If your managers intended to embarrass and hurt me by giving an award to the two females, tell them they were successful. Also tell them, however, that this is not the way managers treat staff and that you don't build a strong team with these retaliatory kinds of tactics. Since Jim Blume is retiring I guess you don't have to tell him anything. Rich Stana is still there, however. What concerns me more in this situation is where you stand, Norm? Hopefully you don't support managers who are flat out wrong. Immediately after you presented the awards, people were talking and looking at me, apparently wondering what happened. Why wasn't I given an award since I too was on the benefit fraud job? Blatant disrespect of this magnitude shouldn't happen to anyone in GAO, especially someone who has been with this organization 35 successful years.

The Washington Post 2/15/02 article on the report was good. It included examples from the report that I wrote and a direct quote from the opening statement in the conclusion that I also wrote.

Page 2

87

1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                     )
VENKAREDDY CHENNAREDDY, et al.,      )
                                     )
            Plaintiff,               )    Civil Action 87-3538 (EGS)
                                     )
       vs.                           )
                                     )
DAVID M. WALKER,                     )
                                     )
            Defendant.               )
_____)

Deposition of:

**WILLIAM R.  Mowbray**

called for examination by counsel for the Plaintiff pursuant to

notice and agreement of the parties, beginning at approximately

9:30 a.m., on Friday, May 16, 2008, at the offices of Assistant

United States Attorney, 555 Fourth Street, N.W., Washington, D.C.

20530, before Cynthia Thomas, a Notary Public in and for the

District of Columbia, when were present on behalf of the

respective parties:

2

**APPEARANCES:**

On Behalf of the Plaintiff:

WALTER T.  CHARLTON, Esquire
D.C. Bar #186940
230 Kirkley Road
Annapolis, Maryland
Tele: 410-571-8764
Fax:  410-897-0471
email: Charltonwt@comcast.net


On Behalf of the Defendant:

CHRISTOPHER B. HARDWOOD, Esquire
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C.  20530
Tele: 202-307-0372
Fax:  202-514-8780
email: Harwood@usdoj.gov

Also present:

John A. Bielec, Senior Attorney, GAO
Lincoln Schroth, Senior Attorney, GAO

3

EXAMINATION BY:                                          PAGE

Walter Charlton                                            4



EXHIBITS          TITLE                                  PAGE

     1            Deposition of Mowbray,
                   June 27, 2002                           8

     2            Subpoena in Case No.  1:06-01712 JGP     8
                   dated 5/31/2007

     3            Subpoena in Case No.  1:87-03538 (EGS)  10
                   (DAR) dated 5/1/2008

     4            Mowbray Printouts and Descriptions      35
                   (Large brown folder)

   4A(1)          Agency Data Dictionary 08/15/03         39

   4A(2)          MSP Promotion Data                      44

   4B             Mission and Assignment Tracking System
                   MATS Users' Manual                     54

     5            Pay for Performance Data                74

(Exhibits are bound under separate cover due to volume of the
same.)

4

1                **P R O C E E D I N G S**

2                              (Time Noted: 10:27 a.m.)

3     Whereupon,

4                **WILLIAM R.  MOWBRAY**

5     was called as a witness, and, having been first duly

6     sworn, was examined and testified as follows:

7                MR. HARWOOD:  Let me just state for the

8     record that we are not going to waive signing

9     authority.  We want to read and sign.

10                And it's about 10:27, this deposition was

11    noted for 9:30 and Defendants were here at 9:30.

12                MR. CHARLTON:  I would like to apologize for

13    being late.  We -- I noted to Mr. Harwood that we would

14    have -- we always have difficulty getting in from

15    Annapolis.  Today is a rainy day and we had traffic

16    jams all the way.  Then my two parking lots were full,

17    so I had to walk eight blocks.  I'm happy that my heart

18    held up.  I'll try to make it up on the back end.

19                MR. HARWOOD:  Appreciate it.

20                MR. CHARLTON:  Because I know that time is

21    valued by everybody.  I have a few preliminary

22    questions.

5

1        **EXAMINATION BY COUNSEL FOR THE PLAINTIFF**

2            BY MR. CHARLTON:

3        Q.  Mr. Mowbray, I'll show you a document and ask

4    you if you recognize it.  This is a printout from -- an

5    electronic printout.  I'm not asking you do you

6    recognize the contents, but, have you ever seen that

7    document?

8            MR. HARWOOD:  Are you marking that as an

9    exhibit?

10           MR. CHARLTON:  Yes, I'm going to mark it as

11   Exhibit No. 1.

12           MR. HARWOOD:  Do you have copies for counsel?

13           MR. CHARLTON:  I do not.  This is the -- I

14   don't plan to refer to it extensively, just the fact of

15   the existence of that document.  I am sure you all have

16   a copy.

17           Now, let's see, that's a 78 page deposition

18   of Mr. Mowbray on June 27, 2002, with attached

19   documents.  That particular copy does not have a waiver

20   of signature and so I really don't know if Mr. Mowbray

21   has ever seen it or not.

22           MR. HARWOOD:  Okay.

23           MR. CHARLTON:  I will ask him though.  It's

24   not a rhetorical question.

25           MR. HARWOOD:  The question is just if you've

26   seen it before?

6

1            THE WITNESS:  Yes, I've seen it before.

2            BY MR. CHARLTON:

3      Q.  Did you go over it at the time as you recall?

4            MR. HARWOOD:  Objection.  What time?

5            BY MR. CHARLTON:

6      Q.  At the time you saw it?

7            MR. HARWOOD:  Objection.

8            THE WITNESS:  I don't think so.

9            BY MR. CHARLTON:

10     Q.  You never read that document; is that what

11  you're saying?

12     A.  No.  I've seen this document.  I was given

13  this document after the deposition, but I'm not sure at

14  what time.

15     Q.  Okay.  Do you recall whether you waived the

16  signature on it or not?  Do you know what I mean by

17  "waiving signature"?

18     A.  No, I don't.

19     Q.  Well, Mr. Harwood just referred to, we're not

20  going to waive signature on this deposition.  And what

21  that means is when the deposition is all done you get

22  to go over it to see if the court reporter made any

23  mistakes and you can correct them.  That's the purpose

24  of the signature at the end.  So I'm asking you, do you

25  recall any such -- about the last page in there will be

26  a place for your signature and there is none.

7

1      A.  I don't --

2           MR. HARWOOD:  There's not a question.

3           BY MR. CHARLTON:

4      Q.  Yeah, there's not a question.

5      A.  I see.

6      Q.  But, the question is, do you recall reading

7   and waiving signature on this?

8      A.  I recall seeing it.  I don't recall waiving

9   signature.

10     Q.  Okay.  At the time that you saw it, was there

11  any -- all right.  At the time that you originally saw

12  that document, did you have any corrections that you

13  can recall at this moment?

14     A.  I don't recall whether I did or not.

15     Q.  Okay.  All right.  I just want to enter this

16  into the record and this is Exhibit No.  1.

17                          [Mowbray Deposition

18                          Exhibit No. 1 was marked

19                          for identification and

20                          made a part of the

21                          record.]

22          MR. CHARLTON:  I have here a copy of a

23  subpoena which I would like marked a as Exhibit No. 2.

24                          [Mowbray Deposition

25                          Exhibit No. 2 was marked

26                          for identification and

8

1                                    made a part of the

2                                    record.]

3             MR. HARWOOD:  Do you have a copy of that for

4    counsel?

5             MR. CHARLTON:  I do not.  You may look at it,

6    if you want.  I am not going to have extensive

7    questions about that document either.  It's an old

8    subpoena.

9             MR. HARWOOD:  I would note for the record

10   that the subpoena is not issued in this case.

11            MR. CHARLTON:   It is not issued in this

12   case.  I am showing you Exhibit No. 2 which was a

13   subpoena issued in a case, it was Vant Levin, I

14   believe.  No, in the Moses case approximately a year

15   ago.

16            BY MR. CHARLTON:

17        Q.  My question to you is this, have you ever seen

18   that document?

19        A.  No, I have not.

20        Q.  Well, I represent to you that this was in fact

21   served upon GAO and so the real question is, was it

22   served upon you or not?  And you're saying -- your

23   answer is no; is that correct?

24            MR. HARWOOD:  Objection.  I would object to

25   questions about a subpoena that was issued in another

26   case.  All questions.

9

1          MR. CHARLTON:  Your objection is on the
2    record.  Your objection is noted.
3          THE WITNESS:  What was the question?
4          BY MR. CHARLTON:
5     Q.  The question is, I just want to make sure that
6    your testimony is clear that you have not seen that
7    document?
8     A.  I have not seen that document.
9     Q.  All right.  That's fine.  Thank you.
10         MR. CHARLTON:  Now I want to show you -- this
11   will be No. 3.
12                         [Mowbray Deposition
13                         Exhibit No. 3 was marked
14                         for identification and
15                         made a part of the
16                         record.]
17         BY MR. CHARLTON:
18    Q.  I am now going to show you a document that has
19   been issued in this case, marked Exhibit No. 3.  You
20   want to take a look at it, of course.  Again, this is
21   an electronic printout of what was in fact served.  And
22   this particular document was -- service was accepted by
23   Mr. Harwood who is here today.  And I ask you, have you
24   seen this document, Exhibit No. 3?
25    A.  No, I have not.
26    Q.  All right.  I would ask you to turn to page --

10

1   I don't know what the page number is, but of the

2   attachment to it.  I guess it's the third page of the

3   subpoena which is Attachment No. 1.  I ask you, have

4   you ever seen that page or the information contained in

5   that page?

6           MR. HARWOOD:  Objection.

7           MR. CHARLTON:  What are the grounds?

8           MR. HARWOOD:  The information contained in

9   that page are vague.  We'll have to read the entire --

10          MR. CHARLTON:  He will, perhaps, have to read

11  it.  But I'm asking you -- let me be specific then.

12  Okay.  Withdraw the question and ask another question.

13          BY MR. CHARLTON:

14      Q.  Have you ever seen Attachment No. 1 that

15  appears to be that Attachment No. 1?

16      A.  No.

17          MR. CHARLTON:  Okay.  I want to go off the

18  record.

19          [Discussion held off the record.]

20          MR. CHARLTON:  We can now go back on the

21  record.

22          MR. HARWOOD:  Are we on the record?

23          I'll just say for the record that Exhibit No.

24  3, which is a subpoena that was issued on May 1st,

25  2008, the time for Defendant to respond to that

26  subpoena has not yet lapsed.  At the time that Mr.

11

1    Charlton and I agreed that we would have the deposition
2    of Mr. Mowbray this day Mr. Charlton had served the
3    notice of deposition to Mr. Mowbray and that notice of
4    deposition contained document requests.  And Mr.
5    Charlton and I agreed that Defendant would do his best
6    to respond to the document requests contained in the
7    notice of deposition and that it has in fact responded
8    to the document request and has produced documents in
9    response to the document request contained in the
10   notice of deposition.
11          Defendant has not yet responded to the
12   subpoena, which when I spoke to Mr. Charlton, he
13   represented that it was largely overlapping and that it
14   would be sufficient for Defendant to respond to the
15   notice of deposition prior to this deposition of Mr.
16   Mowbray.
17          MR. CHARLTON:  All right.  I'm sorry for the
18   confusion and with that explanation I think I know
19   where we are now.  So it appears that we are on track
20   for a later response to the subpoena or some such.  And
21   with that I guess we can proceed.
22          BY MR. CHARLTON:
23   Q.   Now, Mr. Mowbray, as we sit here today, are
24   you aware of any errors of fact or anything else that
25   you might want to correct in your very much earlier
26   deposition regarding the contents and functioning of

12

1    your database system?

2            MR. HARWOOD:  Objection.

3            MR. CHARLTON:  That is -- let me rephrase

4    that.

5            BY MR. CHARLTON:

6        Q.  Do you think that the deposition that you gave

7    earlier was fully complete and truthful insofar as all

8    questions asked to you are correct?

9            MR. HARWOOD:  Objection to the extent of the

10   -- I'll let him answer if he thinks that everything

11   that he said in the deposition before was accurate.

12           BY MR. CHARLTON:

13       Q.  That's the essence of it.

14       A.  I think it was accurate.

15       Q.  Okay.  That's all.

16           Now, I'm going to try to shorten everything

17   down so we get out of here pretty quick today.  I don't

18   want this to drag on.  So I may speak in terms of

19   summary matters just to get a sense of what Mr.

20   Mowbray knows because that's why we're here, to search

21   for truth as to Mowbray's knowledge.

22           Now, if you could summarize for us when you

23   came to work at GAO, under what circumstances and who

24   you reported to.  And start with that as a starting

25   point and give us a brief history of your career before

26   you were actually hired by GAO, and being hired by GAO

1    up to the present time.  I would like specifically for

2    you to mention who your bosses are in the chain of

3    command.

4            MR. HARWOOD:  I'm going to object because you

5    have a lot of information in the question.  If you want

6    him to give you a summary of his work history at GAO,

7    I'm fine with that.  Is that what you are looking for?

8            MR. CHARLTON:  That's what I'm looking for.

9            THE WITNESS:  Just at GAO or prior to?  You

10   said "prior to" also.

11           MR. CHARLTON:  I know because I remember your

12   deposition that I just read again that you worked for

13   IRS to start off with.  But just before -- just before

14   GAO.

15           THE WITNESS:  Just before GAO I worked at

16   GPO.

17           BY MR. CHARLTON:

18       Q.  GPO.  Okay.

19       A.  Correct.  And my boss there was Clyde Meade.

20   And I was -- I'm not sure -- I don't remember my job

21   title.  I worked in quality assurance, quality

22   assurance of printed product.

23           I came to work at GAO in 1985, April of 1985.

24   I worked in what was called a TAG group, a technical

25   assistance group.  I was an operations research

26   analyst, GS-14.  My boss was Barry Snyder.  I worked in

14

1    -- that was the Information Management Technology

2    Group, IMTEC.  I worked there until 1989, November of

3    1989.  I became a data systems analyst in the Office of

4    the Assistant Comptroller General for Operations,

5    ACGOPS.

6         Q.  And who was that?

7         A.  I think the ACGOPS at the time I went to work

8    there was Jim Howard.  But I think I reported directly

9    to John Luke who was the Assistant Comptroller General

10   for Human -- for Human Resources.

11        I have been in that position since.  I am now

12   -- my job series changed to mathematical statistician

13   some years ago, but I am still in the same position.

14   ACGOPS has now become the office known as CAO, Chief

15   Administrative Office.

16        Q.  And who do you report to now?

17        A.  Now, my immediate supervisor is Cheryl

18   Whitaker.

19        Q.  And in between, did you have other

20   supervisors?

21        MR. HARWOOD:  Between when?

22        BY MR. CHARLTON:

23        Q.  In between John Luke and Cheryl Whitaker?  Or,

24   I mean, the last name I recognized or heard you talk

25   about as to who you reported to was John Luke.  I

26   happen to know he's not there anymore.

1      A.  Correct.

2      Q.  And for some years he's not been there.  So,

3  was John Luke the last -- did you leave anybody out

4  between Barry Snyder and John Luke in who you reported

5  to?

6      A.  I'm trying to remember.  It's been a while and

7  I'm not -- I don't know of anyone else.  I'm trying to

8  think of who did performance appraisals.  I don't

9  believe there's anyone else.

10     Q.  Are you saying that John Luke did the

11  performance appraisals back then and that's who you

12  reported to?

13     A.  I think so.  I believe so.

14     Q.  And does Cheryl Whitaker do the performance

15  appraisals now and that's who you report to?

16     A.  That's correct.

17     Q.  And there was no one in between?

18         MR. HARWOOD:  Objection.

19         BY MR. CHARLTON:

20     Q.  Was there or was there not someone in between;

21  to the best of your recollection?

22     A.  I'm trying to think and I can't think of any.

23     Q.  All right.  Was there ever a time -- okay.

24  Now, in the chain of command, where do these people fit

25  in terms of the Comptroller General?  That is, he being

26  the boss, under the boss there is AGCs of one kind or

16

1    another and then where does Cheryl Whitaker or John

2    Luke fall?

3        A.  Well, John Luke -- well, organizations have

4    changed over time.  So it's a little hard to be

5    specific.  John Luke reported to -- because he was the

6    Assistant Comptroller General for Human Resources --

7    reported to Joan Dodaro who was the Assistant

8    Comptroller General for Operations.

9        Q.  All right.  There's the Comptroller General.

10       A.  Right.

11       Q.  And then there's Joan Dodaro and then there's

12   John Luke; is that the chain of command?

13       A.  That would have been some years ago, yes, when

14   they were here.

15       Q.  Okay.  Then that changed.  And what happened?

16   What was the change?  What happened next in terms of

17   the chain of command?

18       A.  Well, the chain of command now is Cheryl

19   Whitaker is my immediate supervisor, reports directly

20   to SallyAnne Harper.

21       Q.  Harper is above?

22       A.  Correct; who is the Chief Administrative

23   Officer.

24       Q.  She reports to whom?

25       A.  She reports to the COO, the Chief Operating

26   Officer, who is Gene Dodaro.

17

1       Q.  Now, who is he?

2       A.  Who is now the acting Comptroller General.

3       Q.  And when he was not the Comptroller General

4    before he got to be -- he then reported to the

5    Comptroller General?

6       A.  Exactly.

7       Q.  So, there's -- and that apparently was

8    Comptroller General Gene Dodaro, then Harper, and

9    Whitaker and you.

10       A.  Correct.

11       Q.  And what is -- just so I have this chart

12    right, what is your title now?

13       A.  My title now is mathematical statistician.

14       Q.  And, is it true that you, for this whole time,

15    were the man -- you reported to the person in charge of

16    performance appraisals; is that what you just said a

17    few minutes ago?

18            MR. HARWOOD:  Objection.

19            THE WITNESS:  No.

20            BY MR. CHARLTON:

21       Q.  Would you straighten that out, please?

22       A.  I did not say anything about performance

23    appraisals.

24       Q.  Well, you said something.

25            MR. HARWOOD:  He said that his supervisors

26    did his performance appraisals.

18

```
 1            THE WITNESS:  I was talking about who did my
 2    performance appraisal.
 3            BY MR. CHARLTON:
 4    Q.  Oh, I --
 5    A.  That's how I was identifying supervisors.
 6    Q.  I apologize.  I totally misunderstood that.
 7            Okay.  All right.  Let's get back on the track
 8    here.  So that -- all right.
 9            Now, in between you mentioned Joan Dodarao;
10    about when was that when she was in the chain of
11    command?
12    A.  I think she left GAO roughly, roughly around
13    1999 or 2000.  That's just an approximation.
14    Q.  I understand.  And then when she left
15    SallyAnne Harper came into her slot?
16    A.  That's correct.  Well, not necessarily her
17    slot, because, as I say, organizations changed and it
18    wasn't one structure that never changed where one
19    person simply left and another moved into the chair.
20    But she is now the head of the Chief Administrative
21    Office which is much like the Assistant Comptroller
22    General for Operations Office was when Joan Dodaro
23    occupied it.
24    Q.  I understand.  That's very clear.
25            All right.  Now, if we take what you've said
26    so far, is that a pretty good and substantial summation
```

19

1    of the way the chain of command was during the whole

2    time you were there?

3                MR. HARWOOD:  Objection.

4                BY MR. CHARLTON:

5        Q.  In your judgment.

6        A.  The chain of command to me.

7        Q.  For you.

8        A.  Yes.

9        Q.  Yeah, which one -- I should have said, "for

10   you."  Nothing left out.

11               MR. HARWOOD:  Objection.

12               THE WITNESS:  I think that's reasonable.

13               BY MR. CHARLTON:

14       Q.  All right.  Now, in your prior testimony you

15   talked about the building of the database system, the

16   Bob Mowbray database system.  And my recollection is

17   that you did it retroactively kind of starting in '89

18   or thereabouts and went back and built the files for

19   '86, '87, '88 and forward; is that roughly correct?

20               MR. HARWOOD:  I'm going to object to the term

21   "system".

22               MR. CHARLTON:  Excuse me.  Hold that question

23   for a minute.

24               THE WITNESS: Okay.

25               MR. CHARLTON:  We have an objection from Mr.

26   Harwood here and he objects to my term "system".

20

1          BY MR. CHARLTON:

2          Q.   I would like you to describe -- do you

3     understand what I'm talking about?  Do you understand

4     the question?

5          A.   I understand what you're talking about.

6          Q.   Then if I'm wrong in any way about a system, I

7     want you to define what it is we're talking about when

8     we talk about what Bob Mowbray does.

9          A.   What we're talking about is a collection of

10    files that I have simply held on -- built and held onto

11    over the course of my employment since the late 1980's

12    in this position.  It's certainly not a system.  Each

13    one -- each file was developed each year independent of

14    others.  They have different variable names, different

15    contents.  They merely are grouped together because

16    they represent certain types of processes.  That is, I

17    created a file in the course of doing my work on pay

18    for performance in 1989.  In 1990 I created a file for

19    -- that represented what went on in 1990.  I made no

20    attempt to have these files be linked, be consistent

21    with one another in terms of contents, in terms of the

22    variables, whatever the variable names are that I

23    created in 1990 may or may not have been consistent

24    with what was there in 1989.  And each year, each

25    succeeding year, when the process came around, I would

26    create a file and at the end of the process I saved

1    that file.  But each of these is an independent

2    creation in that year with different variable names,

3    different contents, and it's in no sense a system.

4    It's a conglomeration of files that are loosely grouped

5    together because they deal with pay for performance,

6    performance appraisals --

7         Q.  Pardon me.  Take this a little slower, will

8    you?

9         A.  They each -- they deal with pay for

10   performance which of course we call PFP.  Appraisals.

11        Q.  Is that performance appraisals?

12        A.  Performance appraisals which were either VARS

13   under that old system or CBPS under the new system.

14   Promotions, that is cycle promotions.  And that was the

15   old MSP system and staffing data, NFC data.

16             Each year I created SAS files as processes

17   took place.  I simply saved those SAS files.  They are

18   not part of a system.  Each requires some in-depth

19   knowledge of what exactly -- what each variable means

20   in each system because I named them and it was

21   developed only for my use.

22        Q.  Did you say that the use of the system

23   requires the knowledge of the variables?

24             MR. HARWOOD:  Objection to the word "system".

25             THE WITNESS:  Use of any of these files --

26             By MR. CHARLTON:

22

1        Q.  Any of these files.

2        A.  -- requires knowledge of the variables.

3        Q.  All right.  I want to stop you there or slow

4   down a bit so we don't get too far away from our

5   understanding of what's going on here.

6            Now, when you say "pay for performance" and

7   you used the term "pay for performance" and you used

8   the term "SAS" files; what is an SAS file?

9        A.  SAS is the statistical analysis system.  It's

10  a programming language and with SAS one can create what

11  are called SAS databases, SAS files, those are

12  synonymous, a SAS file and a SAS database.

13       Q.  So a SAS file is a SAS database?

14       A.  Exactly.  Which can be read using the SAS

15  language.

16       Q.  Now, when you say "pay for performance SAS

17  file" is that all -- I mean, is that one file in SAS

18  language for one year?

19       A.  There would be for 1989 one SAS file

20  representing pay for performance data.

21       Q.  All right.  Now, similarly, when you say

22  "appraisal" for 1989, there would be a SAS file with

23  appraisal data; is that correct?

24       A.  That's correct.

25       Q.  And there would be another SAS file for

26  promotion data?

23

1      A.   Except not in 1989, of course.

2      Q.   Why not?

3      A.   Because there was none created in 1989.  As

4   you know in the previous deposition they were created

5   for 1986, 1987 and then began again in 1990 when I --

6      Q.   So you just -- there was a lapse?

7      A.   That's correct.

8      Q.   So you have 1986, you have 1987, 1988, --

9      A.   No.  No, 1988.

10      Q.   No 1988.

11      A.   '88 and '89 were not collected.

12      Q.   1988 and 1989 were a lapse.  And then you go

13   to 1990; right?

14      A.   Correct.

15      Q.   And so they continue on.  Were there any

16   promotions in those years?

17      A.   In which years?

18      Q.   In 1988 and '89?

19      A.   I would assume so.  I wasn't in the office at

20   that point.  That was before I took the position in

21   November of 1989.

22      Q.   Okay.  So now, just the timing of it is when

23   you took the office you went back and retroactively

24   built these files; is that correct?

25      A.   No, that's not correct.  Not the '86 and '87.

26   Those were created while I was employed with IMTEC.  I

24

1    was detailed or did some work for, I didn't actually

2    change office.  I did some work for the -- for the

3    assistant -- office of the Assistant Comptroller

4    General for Operations specifically to create databases

5    for 1986 and 1987.

6         Q.  And when did you do that?

7         A.  I did that probably in 1988.

8         Q.  Before you came to work for GAO?

9         A.  No, I came to work for GAO in 1985.

10        Q.  1985.

11        A.  I came to work in ACGOPS in 1989.

12        Q.  Oh, I see.  I had those two dates -- that's

13    when you went to GAO in '85 and OPS in 1989.  Okay.

14            But you actually did build '86 and '87 files?

15        A.  That's correct.

16        Q.  Now, going back to the files you mentioned,

17    the NFC data, the staffing data, again, that is an SAS

18    database file?

19        A.  Yes.

20        Q.  All right.  Now, so when you say there is no

21    "system" do you -- do you mean that there is no cross

22    linking between these four types of files?

23            MR. HARWOOD:  Objection.

24            THE WITNESS:  No, that's not what I mean by

25    there's not a system.

26            BY MR. CHARLTON:

25

1         Q.  Here's what confuses me.  I know that you turn

2    out reports, I've seen some of your reports.  And I

3    know that these reports cross-link these files.  That

4    is correct; is it not?

5         A.  That is correct.  These files can be cross

6    linked through programs.

7         Q.  Yes.  And they all can be cross linked through

8    programming, can they not?

9         A.  Yes.

10        Q.  Now, so what lead me to misspeak, perhaps, and

11   use the word "system" is that I was speaking in viewing

12   the cross linking of these files and the reports that

13   flow from these files as quote, "a system" unquote.

14   And so we have a semantical problem here.  And so I

15   think I'm now starting to understand what you mean.

16             What you're saying is they really are

17   standalone and any report that flows from this I have

18   to program; is that correct?

19        A.  Precisely.  In fact, any report that flows

20   from any one of those I have to program.

21        Q.  All right.  And therefore you do not view it

22   as a system like an off-the-shelf database system that

23   any typist can sit down and do things with?

24             MR. HARWOOD:  Objection.  Do you understand

25   the question?

26             BY MR. CHARLTON:

26

1          Q.  Is that correct?

2          A.  It is -- it is not a system.

3          Q.  Okay.

4          A.  As most people would view a system.

5          Q.  I understand.

6               Now, in an overall sense, is this system the

7     same now as it was when you first built it --

8               MR. HARWOOD:  I'm going to object to the term

9     "system" again.

10              MR. CHARLTON:  -- in that sense.

11              All right.  All right.  I'm sorry.  I've got

12    that embedded in iron in my head and I have to get it

13    out.

14              BY MR. CHARLTON:

15         Q.  Are the programs and the files and the

16    methodology you use to produce reports consistent from

17    1986 to date?

18              MR. HARWOOD:  Object to methodology.  But if

19    you understand you may answer.

20              BY MR. CHARLTON:

21         Q.  And if you want to rephrase that, what I'm

22    trying to find out is, when you first started working

23    on it, you had to do things because the bosses wanted

24    certain reports.  Now the bosses still want reports and

25    you have to do things.  Is there a consistency in your

26    efforts over the flow of time from '86 files through

27

1    2007 files?  Is it all the same or did you put in a

2    whole new system halfway through?

3                MR. HARWOOD:  Objection to "system".

4                MR. CHARLTON:  And my system is -- I mean,

5    did you put in any other methodology all the way

6    through?

7                MR. HARWOOD:  Objection.  I don't understand

8    the question.  I don't know if you understand --

9                MR. CHARLTON:  I don't really want to make a

10   speech here.  I'm just -- we're having trouble

11   conveying this.

12               MR. HARWOOD:  Are you asking him whether the

13   files are available?  The files that were available

14   then?

15               MR. CHARLTON:  No.  I'm not asking him that

16   question.

17               BY MR. CHARLTON:

18      Q.  Are your duties in maintaining these files

19   consistent throughout the time frame?

20               MR. HARWOOD:  Objection.

21               MR. CHARLTON:

22      Q.  Time frame '86 to date.

23               MR. HARWOOD:  Objection to the extent that he

24   has a duty to maintain the files.  I don't think you've

25   made that foundation yet.

26               BY MR. CHARLTON:

28

1       Q.  Do you understand the question?

2       A.  No, I don't.

3       Q.  All right.  When the boss calls for a chart of

4   some kind based upon the data from 1986 in 1987, you

5   had to write a program; right?

6       A.  A SAS program; correct.

7       Q.  If the same boss were here today and asking

8   for the same program in the year 2007, would you still

9   have to write a SAS program?

10      A.  I would still have to write a new SAS program;

11  correct.

12      Q.  Is there any material variation or difference

13  in the level of effort required for you to do that from

14  one year to the next starting in '86 to date or is it

15  roughly the same job?

16      A.  It's difficult to compare years because the

17  level of effort depends on the complexity of what I'm

18  being asked to do.

19      Q.  Assume the task is the same.

20      A.  If the task were the same and the data were

21  the same, then there shouldn't be because SAS is still

22  SAS.  It's the same programming language that it has

23  been since the '80s.

24      Q.  Okay.  Now, if something were to happen to Bob

25  Mowbray, you get run over by a truck tonight –

26      A.  Uh-huh.

1      Q.  -- who would step into your shoes over there?

2          MR. HARWOOD:  Objection.

3          BY MR. CHARLTON:

4      Q.  -- and do that the next time the boss asks the

5  question?

6          MR. HARWOOD:  Objection to the extent you

7  would know.

8          MR. CHARLTON:  Well, there are several

9  answers.  Nobody is one answer.

10         THE WITNESS:  Well, that may well be.

11         MR. CHARLTON:  Is that right?

12         MR. HARWOOD:  Objection.

13         MR. CHARLTON:  What is the objection?

14         MR. HARWOOD:  You didn't ask a question.

15         MR. CHARLTON:  Yes, I did.

16         BY MR. CHARLTON:

17     Q.  Okay.  I think we've gotten to the point where

18  maybe we all understand about the "nonsystem" concept.

19         Now, the data for each one of these years is

20  maintained.  When you crank out the SAS file where is

21  it stored?

22     A.  The data and programs are at the -- on the

23  mainframe computer at the Austin automation center in

24  Austin, Texas.

25     Q.  They're still at Austin.  And are those data

26  and programs still in tact for all of the years here

30

1   involved '86 through 2007?

2           MR. HARWOOD:  Objection.  He said that there

3   is no data for some of those years.

4           MR. CHARLTON:  I understand that.  But that's

5   not my question.

6           THE WITNESS:  To the extent that I created

7   them, the data is in tact.  Certainly the program --

8   programs have come and gone over the years and have

9   been overwritten and eliminated when I no longer need

10  programs.  Programs are just a means to get to the

11  data.  The data has remained and has been saved.

12      Q.  Okay.

13          [Pause.]

14          BY MR. CHARLTON:

15      Q.  All right.  I want to go over these.  I want

16  to show you what is now --

17          MR. CHARLTON:  We don't have an exhibit

18  number on this, do we?  Here is the package I have

19  gotten for Mr. Harwood.  And I'm going to just make

20  this Exhibit No. 4.  The whole package at the moment.

21  Perhaps we will put subheadings on it as we need.

22                          [Mowbray Deposition

23                          Exhibit No. 4 was marked

24                          for identification and

25                          made a part of the

26                          record.]

1          MR. HARWOOD:  Mr. Mowbray, Walter didn't

2     mention at the beginning of the deposition, but if at

3     any point you need a break just let me know.  If at any

4     point you have a question you don't understand, you can

5     ask him to rephrase it.

6          THE WITNESS:  Okay.

7          MR. CHARLTON:  Now, we have just put a

8     sticker with Exhibit No. 4 on the brown file folder

9     that these items came in.  And I have removed the

10     papers that were in there and I'm going to put them in

11     front of you.  I have not --

12          MR. HARWOOD:  This is not exactly how it was

13     sent to you because Exhibit -- at least I can see that

14     Exhibit A was not in front of my response.

15          MR. CHARLTON:  Well, I don't mean to say that

16     they're untouched by human hands.  So if we can -- what

17     I would like you to do is to put them -- I guess this

18     is perhaps in the proper order now.

19          MR. HARWOOD:  I haven't reviewed it, but

20     counsel has represented --

21          BY MR. CHARLTON:

22     Q.  Have you seen what is now before you as

23     Exhibit A?

24          MR. HARWOOD:  Take a moment to look through

25     this.  It's about a six-inch stack of documents.

26          MR. CHARLTON:  Let's go off the record a

32

1    minute.

2              [Discussion held off the record.]

3              BY MR. CHARLTON:

4        Q.  I'll repeat the last question.  Do you

5    recognize Exhibit A?

6        A.  Yes.

7        Q.  And is it -- are Exhibit A materials that you

8    in fact prepared?

9              MR. HARWOOD:  Walter, we just have to be

10   clear for the record, you've marked everything Exhibit

11   4 and it's probably not going to be very clear what

12   this is.

13             MR. CHARLTON:  All right.  We're talking

14   about Exhibit A part of Exhibit 4.

15             THE WITNESS:  Now, actually, I provided only

16   a part of Exhibit -- well, there's an Exhibit A and an

17   Exhibit B here.

18             BY MR. CHARLTON:

19       Q.  We are only talking about Exhibit A at the

20   moment.

21       A.  Okay.  Got it.

22             THE WITNESS: [Examines the document.]

23             Okay.  Yes, Exhibit A out of the box.

24             BY MR. CHARLTON:

25       Q.  And we'll come back to Exhibit A in a minute.

26   Now, Exhibit B, did you provide Exhibit B?

33

1      A.  No, I did not.

2      Q.  You had nothing to do with Exhibit B?

3      A.  No.

4      Q.  All right.

5      A.  Let me make sure what's in here.  Just one

6  second.

7          MR. HARWOOD:  Walter, are you asking specific

8  questions about documents in Exhibit A?

9          MR. CHARLTON:  Not yet.  I'm going to --

10         MR. HARWOOD:  When you do, I would like you

11  to provide copies for us.

12         MR. CHARLTON:  Well, I don't have copies.

13  This is all I have and we'll just have to do the best

14  we can with it.  This came from you, so I presumed you

15  had a copy.  I have not changed any pages or added any

16  pages, subtracted any pages.  So, it's what I got from

17  you.  We'll just have to do the best we can.  I don't

18  know whether I'll be asking detailed questions about it

19  yet or not.

20         BY MR. CHARLTON:

21     Q.  But right now my question is, or the last

22  question was, did you have anything to do with

23  preparation of Exhibit B?

24     A.  And I did supply, I believe, the very last

25  clip, the small clip, this one, of Exhibit B.

26     Q.  All right.  Let's remove that from Exhibit B

34

1    then and take a look at it.

2              MR. HARWOOD:  Walter, I think you should mark

3    some of these exhibits specifically otherwise we're

4    going to have no idea what --

5              MR. CHARLTON:  I will do that at the proper

6    time.  And I guess the proper time is now.

7              Let's mark this one B(1); 4B(1).  It should

8    be 4B(1).

9              MR. HARWOOD:  4B(1) would make more sense.

10                            [Mowbray Deposition

11                            Exhibit No. 4A(1) was

12                            marked for identification

13                            and made a part of the

14                            record.]

15             BY MR. CHARLTON:

16        Q.  Okay.  I show you what's been marked as

17   Exhibit 4B(1) which would appear to be the final 15 or

18   20 pages of the response to production of documents

19   which is marked as Exhibit B, and ask you if you can

20   identify that document?

21        A.  Yes, this is a data dictionary for the MATS

22   system which is the Mission Assignment and Tracking

23   System.  It's a system to which many people in GAO have

24   access.  It's where information is stored on job

25   assignments, hours charged to jobs, risk level of jobs

26   and timing of jobs, dates, who the requesters are, just

35

1    all information in tracking of jobs in GAO.

2            MR. HARWOOD:  I would just note for the

3    record that Exhibit -- what has been marked as Exhibit

4    4B(1) was actually produced in response as part of

5    Exhibit A to Defendant's response to document requests

6    contained in Plaintiff's notice of deposition of

7    William R. Mowbray.  So Walter, this was actually

8    attached to Exhibit A.

9            MR. CHARLTON:  Is a part of Exhibit A.

10           MR. HARWOOD:  Yes.

11           MR. CHARLTON:  Okay.  Well then let's --

12   right now, let's just change the designation because I

13   thought it was part of Exhibit B.  So let's change the

14   table on that.

15           MR. HARWOOD:  Why don't we make it 4A(1).

16           MR. CHARLTON:  4A(1).  Thank you for catching

17   that.

18           MR. HARWOOD:  Let's go off the record for one

19   second.  I'm going to get my set of these.

20           MR. CHARLTON:  Okay.

21           [Discussion held off the record.]

22           BY MR. CHARLTON:

23       Q.   All right.  I am now showing you revised

24   Exhibit tab number 4A(1).  And as we now understand

25   that was a part of the submission on Exhibit A.  And

26   did you actually physically prepare that document?

36

1      A.  No, I did not.

2      Q.  Who did?

3      A.  I obtained that from a man by the name of

4  Mario Petrucelli in the office of QCI which is Quality

5  and Continuous Improvement.

6      Q.  And he gave it to you.  Why did he give it to

7  you?

8      A.  I asked him for it.

9      Q.  And why did you ask him for it?  Did you see

10  that that was in response to one of our requests?

11     A.  Yes, because this is a JAOI database to which

12  I have access.

13     Q.  Okay.  So what we're looking at here is a

14  database?

15     A.  This is indeed a database.

16     Q.  And that's in a database system?

17         MR. HARWOOD:  Objection.

18         THE WITNESS:  I don't know if I would call it

19  a database system.  MATS is the mission assignment and

20  tracking system, as far as I know.

21         BY MR. CHARLTON:

22     Q.  Okay.  You have access to it.  Do you use it

23  at all?

24     A.  Very seldom.  It's a very large system and I

25  have very little use for the data.

26     Q.  All right.  A glance at that page appears to

37

1   be -- appears to contain -- the pages appear to contain

2   some kind of a code for various fields and field

3   descriptions; is that correct?

4        A.  That's correct.

5        Q.  Are those field descriptions the same,

6   different, or mixed in comparison to your field

7   descriptions?

8             MR. HARWOOD:  Objection.

9             THE WITNESS:  I have no field descriptions

10  for my files.

11            BY MR. CHARLTON:

12       Q.  That is, there's no resemblance, whatever, to

13  these?

14            MR. HARWOOD:  Objection.

15            BY MR. CHARLTON:

16       Q.  Since you have none and there's something

17  here.

18            MR. HARWOOD:  Same objection.

19            THE WITNESS:  This is a data dictionary.  I

20  have no data dictionary for any of my files.  My files

21  are not part of a system.

22            BY MR. CHARLTON:

23       Q.  They're just files.

24       A.  They're just files.

25       Q.  All right.  Now, if we were to take -- jumping

26  now away from this item here back to A --

```
 1              [Pause.]

 2              BY MR. CHARLTON:

 3         Q.  One of those Exhibit A pages, MSP promotion

 4    data, would you go to that --

 5         A.  I have it.

 6         Q.  -- page.  What are the variables in that --

 7              MR. HARWOOD:  Do you want to mark that?

 8              BY MR. CHARLTON:

 9         Q.  -- file?

10              MR. CHARLTON:  Pardon?

11              MR. HARWOOD:  Do you want to mark that?

12              THE WITNESS:  Just the first one?

13              MR. CHARLTON:  No, I don't think we need to

14    mark it.  Do we have page numbers or anything on this?

15              THE WITNESS:  The first one doesn't appear

16    to, but I think the rest do.  Maybe Xeroxed off.

17              MR. HARWOOD:  I think you should mark it,

18    Walter.

19              MR. CHARLTON:  Well, let's mark that page --

20    just mark it page 1 and then we don't need to mark it.

21    It's just -- where are we anyway?  This is part of --

22    let's call that Exhibit 4A(2).

23              MR. HARWOOD:  4A(2).

24              MR. CHARLTON:  Right.  That's a good idea.

25    This whole package.

26                              [Mowbray Deposition
```

39

1                        Exhibit No. 4A(2) was

2                        marked for identification

3                        and made a part of the

4                        record.]

5          MR. CHARLTON:  All right.  Let's start over.

6    I'm going to put a -- with the agreement of counsel I'm

7    going to put a "page 1" on page 1 is that all right?

8          MR. HARWOOD:  That's fine.

9          MR. CHARLTON:  All right.

10         BY MR. CHARLTON:

11    Q.  I am showing you what has been marked Exhibit

12    4A(2), pages 1 through 14.  And I ask you, what is

13    that?  What are those 14 pages?

14    A.  These are the 14 pages that represents one of

15    the MSP files starting with '86 and '87 and then

16    picking up with 1990 and running up through 2001.  So

17    each represents the file that I saved representing the

18    promotion processes for those years.

19    Q.  And so there's 14 pages representing 14 files

20    in 14 different years?

21    A.  That's correct.

22    Q.  Now, can you take -- I am not asking you to do

23    this, but I'm asking you, is this possible.  Can you

24    take each one of those 14 pages and describe what each

25    field on those 14 pages consists of, a description of

26    it?  Are you able to do that?

40

1         A.  I'm not able to do it without actually looking

2    at the data.  I can look because I'm the creator of

3    these files.  I can look at these variable names and

4    make a pretty good guess as to what many of them stand

5    for.  In other cases I don't know and one way to find

6    out if I have to do an analysis on an old data set, I

7    have to go in the data set and maybe do a frequency

8    distribution or something on the data that's in there.

9    And then the light may come on and I'll say, oh, yes, I

10   remember why I named that a certain thing.  These are

11   just the variable names that I attached to the data in

12   the year in which I created these files.

13        Q.  For the purposes you were working with at that

14   time?

15        A.  Exactly.

16        Q.  Okay.  So what you're saying is, the data is

17   there for each one of these data fields, but the system

18   description is not there it's only in your head and it

19   isn't even in your head until you put it there by

20   looking at data which allows you to recall what it

21   really is?

22             MR. HARWOOD:  Objection.

23             MR. CHARLTON:  Is that roughly correct?

24             MR. HARWOOD:  I'm not sure that's answerable.

25             MR. CHARLTON:  No?

26             MR. HARWOOD:  But if you can put it in your

41

1  own words, then maybe you could answer.

2          BY MR. CHARLTON:

3      Q.  Then, please, would you describe?  What I'm

4  trying to do is avoid asking this question.  Here's the

5  question then.  Can you provide a description of the

6  format and the usage for each of the variables listed

7  on each of the pages?

8          MR. HARWOOD:  Could you repeat the question?

9          BY MR. CHARLTON:

10     Q.  Provide a description of the format and usage

11 for each of the variables listed on each of the pages.

12         MR. HARWOOD:  I'm going to object to "usage."

13 I don't understand the question, but if you can answer,

14 you can answer.

15         MR. CHARLTON:  Well, usage or meaning.

16         MR. HARWOOD:  I still would object.

17         THE WITNESS: I could -- I, with a great deal

18 of work, could do that for a larger number of the

19 variables.  I certainly couldn't guarantee that

20 everything that exists in there I recall what it means.

21         BY MR. CHARLTON:

22     Q.  Okay.  And how many fields are in each one of

23 those products?

24     A.  They vary.  As we can see they vary.  I'm not

25 counting, I'm only looking.  I see two and a half lines

26 of data for the first file.  Only two lines by the time

42

1    I get to page 5.  Four lines by the time I get to six.

2    So there are different numbers of variables in each --

3    in each one.

4         Q.  In different years.

5         A.  And they vary.

6         Q.  In each year; correct?

7         A.  Right.

8         Q.  And this situation applies to the promotion

9    data, the pay for performance data, the pay for

10   performance appraisal data and the MSP pay for NFC

11   data; is that right?

12        A.  For what situation?

13        Q.  The same.  That is, the only way to pull out

14   the meaning of the variables is for you to go through

15   with a great deal of work and find out what they are.

16             MR. HARWOOD:  Objection.  That's now what he

17   said.

18             THE WITNESS:  No.

19             BY MR. CHARLTON:

20        Q.  Well, would you clarify what you said?

21        A.  What I said are -- is that in some cases

22   that's what would be necessary if it's something I

23   don't recognize.  Obviously if I were to look at

24   something like "EL name" that is clearly the employee's

25   last name.  I don't need to go in and look at the

26   database to know that.  "Eseries" is the employee's

43

1    series.  I don't need the database for that.  "Rating"

2    is either BQ or Q.  I don't need to go in and look at

3    that.  But if I look at something like "ANNCAT" I'm not

4    sure what I meant by that, that year.  I'd have to go

5    in and look at that and all the data in that field and

6    find out just what is "ANNCAT" telling me in that year

7    in order to figure that out.

8         Q.  Okay.  I want to ask you some questions about

9    the data variables to see whether you can identify them

10   or not.

11            MR. HARWOOD:  And are these questions

12   specific to the MSP exhibit?

13            MR. CHARLTON:  Maybe.  Maybe not.  I don't

14   know where he's got them.  That's one of the problems.

15   That's a good question you're asking.  I don't know the

16   answer to it.

17            MR. HARWOOD:  I just want to make sure if he

18   has to refer to another exhibit --

19            MR. CHARLTON:  I don't know.

20            MR. HARWOOD:  -- to make sure that you let

21   him.

22            MR. CHARLTON:  Let's forget about the

23   exhibits for a minute and just ask.

24            BY MR. CHARLTON:

25        Q.  In all of the files that you maintain, do you

26   have a field somewhere or another that does these

44

1   things that I'm getting ready to ask you.  You can say

2   yes or no or I don't know.

3        A.  I think you may be overly broad there.  I

4   can't guarantee for any given variable that it exists

5   in all files that I maintained.

6        Q.  Okay.

7             MR. HARWOOD:  Walter, just before you ask the

8   question, can you -- you're using the word "field" he's

9   using the word "variable" can you just make sure that

10  you understand --

11            MR. CHARLTON:  That's synonymous.  I'm taking

12  about a field -- I presume they're a fixed-length

13  field.

14            THE WITNESS:  They are before they go into

15  SAS format; yes.

16            BY MR. CHARLTON:

17       Q.  And in SAS format they are not a fixed-length

18  field?

19       A.  No.  Well, they're in the SAS database.

20       Q.  The SAS database.  Okay.  So these fields

21  here, are they before they go into the SAS format or

22  after?

23       A.  These are SAS.

24       Q.  They are the output.  They're the SAS data

25  output.  Okay.

26       A.  They came from variables.

45

1    Q.  Whatever they are, they're a field?

2    A.  Correct.

3    Q.  Okay.  All right.  So, what we are talking

4    about here is, for each one of these files that you

5    maintained, you have them separated the way you've

6    explained they're separated.  And you have a field

7    within that file for data.  And now I'm going to ask

8    you about whether you have this specific data or not.

9    And when I say "or not" whether you have the data or

10   not, I mean, ever.  Ever in any one of the years.  Then

11   if -- and then the next question is going to be, if we

12   get that far, if the data is there sometimes is it

13   there all the time?  That's a different question.

14        I just want to know, do you have the data

15   sometimes?  Because I'm trying to get an understanding

16   of what's going on here.

17        Okay.  And here are the data fields.

18        MR. HARWOOD:  I'm going to object to the

19   question.

20        MR. CHARLTON:  Okay.

21        MR. HARWOOD:  I think that it's vague.  But

22   to the extent that you can answer, you can answer it.

23        THE WITNESS:  Well, I see you have a fairly

24   long list and there are only a handful of things that I

25   know I could say are going to be consistently in all 77

26   files that we're talking about here.

46

1            BY MR. CHARLTON:

2        Q.  All right.  Well, let's start with -- start

3    with -- tell me what you know is in there.

4        A.  Well, they all contain Social Security

5    Numbers.

6        Q.  Okay.  Next.

7        A.  Let me make sure I know the major --

8            MR. HARWOOD:  If he needs to look at the

9    documents, make sure you look at them.

10            THE WITNESS:  But the thing is, I can't

11    remember all 77.

12            MR. HARWOOD:  If you can't answer without

13    looking at all 77, then you can't answer without

14    looking at all 77.  Don't guess.

15            THE WITNESS:  Well, I think we may have

16    almost run out of what we know is in all of them.

17    Because I think perhaps race is in all of them and

18    gender.  And I believe that's probably it.  Because if

19    we look at NFC data from 1989, there are only one, two,

20    three, four, five, six, seven, eight, nine, ten, 11, 12

21    variables in the entire file.

22            BY MR. CHARLTON:

23        Q.  And what is NFC data?

24        A.  This is the staffing data from National

25    Finance Center.

26        Q.  All right.  Let's start with that one, can you

47

1    tell us what each one of those variables are?

2            MR. HARWOOD:  Why don't we mark that as an

3    exhibit?

4            MR. CHARLTON:  Now, let's mark this as

5    exhibit -- what is the next exhibit number?

6            MR. HARWOOD:  4A(3).

7            MR. CHARLTON:  Thank you.  4A(3), madam

8    reporter.

9                            [Mowbray Deposition

10                           Exhibit No. 4B was marked

11                           for identification and

12                           made a part of the

13                           record.]

14           THE WITNESS:  All right.  The data elements

15    are "DOB" which would be date of birth.

16           BY MR. CHARLTON:

17      Q.  Stop.  If you have the date of birth, how can

18    you say you don't have it?  You don't have age, I don't

19    get it.

20           MR. HARWOOD:  Objection.  That's not a

21    question.

22           MR. CHARLTON:  Huh?  Well, you confused me

23    with your previous answer.  You said, all files contain

24    the Social Security Number, the race, and the gender,

25    at least.

26           MR. HARWOOD:  He didn't say they all

48

1    contained the Social Security Number.  He said that he

2    believed they all contained the race and the gender.

3    He didn't say they definitely contained the race and

4    the gender.

5         MR. CHARLTON:  I think he did.  I don't want

6    to argue, that's for the witness, not us.

7         THE WITNESS:  No, I said, I can't absolutely

8    guarantee that something is in all 77 files.

9         BY MR. CHARLTON:

10   Q.  Well, if you --

11   A.  It's likely that date of birth is also in all

12   of them.

13   Q.  Okay.  That's okay.  That's fine.  Now I'm not

14   confused anymore.  Next.

15        MR. HARWOOD:  Do you want to go back to

16   reading off the variables from the NFC data?

17        MR. CHARLTON:  Yes.

18        THE WITNESS:  Okay.

19        MR. HARWOOD:  For the first year of the NFC

20   data?

21        MR. SCHROTH:  Just, I want to clarify, it's

22   Exhibit 4A(3) and we're only talking about I think it's

23   page 59 in the top right corner.  Is that the only page

24   we're discussing this morning?

25        MR. CHARLTON:  Correct.

26        THE WITNESS:  That's right.

49

```
 1              MR. HARWOOD:  And what year is that?

 2              THE WITNESS:  This is June of 1989.

 3              BY MR. CHARLTON:

 4         Q.  And it's 4A(3), what was that page number

 5    again?

 6              MR. HARWOOD:  Page 59.

 7              MR. CHARLTON:  Okay.

 8              MR. HARWOOD:  And the date is June 1989 --

 9    well, 1989 data.

10              BY MR. CHARLTON:

11         Q.  Now, you were going to tell us the data

12    elements that are in there.

13         A.  All right.  The second one is educational

14    level.  This is a two-digit code indicating level of

15    education.  A 13 means a bachelors degree, for example.

16         Q.  Okay.  I don't want you to go that far.

17    Educational level.  Now, again, so we understand each

18    other, are you saying that you have educational level

19    for everybody or not?

20              MR. HARWOOD:  Objection.

21              THE WITNESS:  I don't know.

22              BY MR. CHARLTON:

23         Q.  But that's what that field means?

24         A.  That's what it means in this database, yes, or

25    in this file, yes.  And I would have to go through 77

26    of these to confirm that it's indeed in all of them.
```

50

1     Q.   Okay.  And I understand what you're saying

2  about that one.  Now, where do you get the number 77

3  from?

4     A.   There are 77 pages in this, if we go from the

5  front to the back, this is the final one.  This is the

6  77 page --

7     Q.   All right.  Let me rephrase.  We're on the

8  wrong track here.  All right.  I need a minute.

9           MR. CHARLTON:  Let's go off the record just

10  for about 30 seconds.

11           [Discussion held off the record.]

12           BY MR. CHARLTON:

13     Q.   All right.  Cancel that discussion for a

14  minute.  Let's go back a minute.  As I understood your

15  prior testimony, you said I have four sets of files.

16     A.   Four groupings, yes.

17     Q.   Four groupings of files.  And you then said

18  that -- I was attempting to find out what information

19  you have for each person in these files.  And you said

20  roughly that the only thing I can guarantee is Social

21  Security, race, gender, and date of birth.

22           MR. HARWOOD:  Objection to the

23  characterization --

24           MR. CHARLTON:  Okay.  This is just

25  background.

26           BY MR. CHARLTON:

51

1         Q.  Now, the next thing that confuses me is this,

2    you have, as I understand your testimony, 77 pages for

3    each year; is that right?

4              MR. HARWOOD:  Objection.

5              THE WITNESS:  No.

6              BY MR. CHARLTON:

7         Q.  No, excuse me.  You have -- is it four pages

8    for each year then?  Four groupings?

9              MR. HARWOOD:  Objection.

10             BY MR. CHARLTON:

11        Q.  Four sets of files.  For each year how many

12   sets of files do you have?

13             MR. HARWOOD:  Objection.  He hasn't looked

14   through for each year.  You have to look through each

15   year --

16             MR. CHARLTON:  Chris, please, don't

17   interrupt.  You can object, but I'm asking him, not

18   you.

19             THE WITNESS:  For most years that we're

20   talking about, obviously not for '86 and '87.  But for

21   the years since 1990 we're talking roughly in almost

22   all cases four per year.  One for pay for performance,

23   one for appraisals, one for MSP promotions, and one for

24   NFC data.

25             BY MR. CHARLTON:

26        Q.  Okay.  Now, in each one of these sets of files

52

1   you have a person identifier, i.e., the Social Security

2   Number --

3       A.  Correct.

4       Q.  -- is that correct?

5       A.  That's correct.

6       Q.  Now, I'm not attempting to ask you whether you

7   have the education level in each one of those four sets

8   of data.  What I want to know is, do you have the

9   education level in one of the sets of data, any one of

10  the sets of data?

11      A.  Again, without reviewing each of the four sets

12  for all the years, I can't categorically say yes or no.

13      Q.  I understand.  I understand that that is true.

14  But for this year -- now we're talking about for the

15  year, what is it, '86, that you have in front of you?

16      A.  You don't want to do '89 because there isn't

17  an MSP for '89.

18      Q.  All right.  Well, pick out a year that's got

19  an MSP for '89.

20      A.  All right.   Let's go to --

21      Q.  I mean --

22      A.  Let's go to 1990 in all cases.

23      Q.  That's what we want to do.

24      A.  There's a 1990 in every case.

25          MR. CHARLTON:  Let's mark that -- get the

26  1990s.

53

 1          MR. HARWOOD:  Why don't you finish marking

 2     each of the four categories?

 3          MR. CHARLTON:  No, I don't want to do that.

 4     We probably should, but let's just mark this.  Let's

 5     get 1990 together and mark it as the next -- have you

 6     got 1990 together?

 7          MR. HARWOOD:  You're going to have to pull

 8     pages out of current exhibits.

 9          THE WITNESS:  Yeah, I just turned to the page

10     and laid them out.

11          MR. CHARLTON:  All right.  I would like you

12     -- let me ask you to do something different.  Pull 1990

13     out of the four sets and put them all together.

14          I guarantee you we are not going through all

15     77 pages.  So I don't even care if it gets scrambled at

16     this point.

17          THE WITNESS:  Okay.  Got it.

18          BY MR. CHARLTON:

19     Q.  Okay.  Now, I think -- let's start over with

20     1990.  Going back to my first question, my first

21     logical question on this thing.  Each set or I'd prefer

22     to call them a set.  What did you call them?  Group?

23     Each grouping of files, that is the four groupings for

24     1990, have in each of the files a Social Security

25     Number; is that correct?

26     A.  That's correct.

54

1      Q.  Now, for 1990 I want to ask you whether you

2  have files in there for -- somewhere for race.  I think

3  you said, yes.

4      A.  Well, let me look.

5          MR. HARWOOD:  And you're asking him if this

6  appears in any one of the four?

7          MR. CHARLTON:  Any one of the four sets.

8          THE WITNESS:  In any one of the four.  All

9  right.  That's easier.  Yes.

10          BY MR. CHARLTON:

11      Q.  The answer is yes?

12      A.  Yes.

13      Q.  Okay.  Race, gender.

14      A.  Yes.

15      Q.  Date of birth?

16      A.  Yes.

17      Q.  Education level?

18      A.  Yes.

19      Q.  I'm going to ask you some more questions.

20  Whether or not applied for a promotion?

21      A.  There's not a field for whether applied for a

22  promotion.  The -- yeah, there's no field in any of

23  these for applied for a promotion.  However, existence

24  in this data set MSP 90 means applied for a promotion.

25      Q.  So that can be -- that's a yes assumed; right?

26          MR. HARWOOD:  Objection.

55

1          BY MR. CHARLTON:

2          Q.  Is that correct, Mr. Mowbray?  By its

3     existence there it means either applied or was

4     automatically eligible?

5          A.  Yes.

6          Q.  Next.  Whether or not a person made the best

7     qualified list?

8          A.  Yes.

9          Q.  Whether or not a person was promoted or not?

10         A.  Yes, it indicates whether they were promoted

11    in the cycle of promotion.  There are no --

12         Q.  Now, what I --

13         A.  -- cycle.

14         Q.  Okay.  So it's a yes with a question mark.

15    And I want to stop and talk about this one a little

16    bit.  Because we got -- and we have to mathematically

17    define what we are talking about here so we're clear.

18    And I'm relying on you to straighten it out.

19              You have a cycle and when does the cycle

20    begin and end each year at GAO -- the promotion cycle.

21         A.  They ended -- the cycles changed and I'm

22    trying to remember when.  Right now the cycles run from

23    the appraisal cycles, the rating cycles run from

24    October to October.

25         Q.  All right.  Now, I don't want to hold you to

26    this, but for purposes of this discussion and

56

1    understanding it, I want to make the assumption that

2    all the cycles for all the years are the same and

3    they're October to October.  That's okay.  Because when

4    there are variations, if we ever get into the

5    intricacies of this we'll fix that.

6              MR. HARWOOD:  I'm going to object to that.

7    You have to answer the question --

8              [Simultaneous conversation.]

9              MR. CHARLTON:  Is that -- so that you and I

10   communicate, I want to make that assumption; is that a

11   fair assumption.

12             MR. HARWOOD:  I'm going to make my objection

13   for the record.  I object to that to the extent that

14   you're asking him to assume something that's not true.

15   He's here to answer your questions to the best of his

16   ability and he's going to answer them to the best of

17   his ability.  He's not going to assume something that

18   he knows is not true or that he doesn't know.

19             MR. CHARLTON:  Your objection is on the

20   record.

21             BY MR. CHARLTON:

22        Q.  Now, do you understand where I'm trying to get

23   to with this?

24        A.  Not yet.

25        Q.  All right.  I want you to assume that the

26   promotion cycle is October to October.

57

1          MR. HARWOOD:  I'm going to object to that.

2          BY MR. CHARLTON:

3     Q.  I then am asking you this question:  I'm

4  looking at a database, I don't care which year it is,

5  where the promotion cycle is October to October.  And

6  I'm asking you the question, in this promotion cycle

7  was this Social Security Number guy promoted or not?

8  Now, we've got a problem because the promotion cycle

9  might be here and the promotion might come into the

10 next year.  Now, I don't know how you record that.  And

11 I'm asking you this question, how do you handle that

12 problem in your database?

13         MR. HARWOOD:  Objection.  You can answer.

14         MR. CHARLTON:  Or is it a problem that

15 doesn't exist?

16         MR. HARWOOD:  If you don't understand, make

17 him rephrase it.

18         THE WITNESS:  Could you rephrase?

19         BY MR. CHARLTON:

20    Q.  I'll try.  Let me start with a different

21 question.  The question -- we're starting with the

22 question, does your data contain whether a person was

23 promoted or not?  And you said, yes, with a caveat of

24 some kind.  And I would like you to explain the caveat.

25 Explain why you say yes.

26    A.  It's whether the person was promoted in the

58

1    annual assessment and promotion cycle.  There are

2    occasionally out-of-cycle promotions.  I don't capture

3    those.  I capture only the cycle that takes place when

4    vacancies are announced, people apply, panels meet,

5    they BQ people and then eventually people are selected.

6    Those are the cycle appraisals and that's what I've

7    captured.

8         Q.  That's very clear.  Fine, thank you.  I have

9    this question.  If we are talking about a cycle, a big

10   cycle, October to October, February to February, I

11   don't care when it is, does the promotion occur within

12   that cycle that you record or in the first of the next

13   one?

14        A.  No, it does not.

15        Q.  When does it occur?

16        A.  Well, think of the current time which is

17   easier to think of rather than back when I don't know

18   what the cycle times were.  Right now the ratings cycle

19   is from October to October.

20        Q.  Yes.

21        A.  So at the beginning of October each person

22   gets a rating, an appraisal.  Then some period of time

23   passes during which -- during which they can apply for

24   a promotion and so forth.  So the people who got their

25   ratings last October in '07 would have applied over the

26   course of the winter and the promotions were just

59

1    effective in either February or March of that is year.

2         Q.  So there's --

3         A.  So the promotions are effective well after the

4    appraisal period.

5         Q.  Okay.  Thank you.  That's very clear.

6             So your answer is whether or not a person is

7    promoted or not is captured in your data?

8             MR. HARWOOD:  Objection.  The answer is what

9    it is.

10            BY MR. CHARLTON:

11       Q.  Yes?  And that is your –

12       A.  It is one of those variables in that cycle.

13       Q.  And which variable is that?

14       A.  In this particular one it's called select, S-

15   E-L-E-C-T.

16       Q.  Okay.

17            MR. HARWOOD:  Why don't you identify which

18   particular one you were pointing to.

19            THE WITNESS:  Well, for the 1990 MSP --

20            BY MR. CHARLTON:

21       Q.  Database.

22       A.  MSP 90.

23       Q.  It's select, quote "S-E-L-E-C-T"?

24       A.  Correct.  And that may have values depending

25   on year ranging from Y and N for yes and no S and N for

26   yes and no.  It may have W for withdrawal.

60

1        Q.  Okay.

2        A.  It may have --

3        Q.  I understand.

4        A.  -- D for declined.

5        Q.  Understood.  Okay.  Next I want to go to the

6   next item.  Performance rating.

7        A.  And we're still operating under the question,

8   does it occur in any of these four --

9        Q.  Yes.

10        A.  -- databases?

11            The 1990 VARS rating is in one of the

12   databases.

13        Q.  The answer is yes; right?

14        A.  Correct.

15        Q.  We've already handled age.  We've handled

16   race.  We've handled gender.  The next one is

17   specialist or not.

18        A.  For this particular year do you mean the

19   position as a specialist position or the employee who

20   is applying is a specialist?

21        Q.  No.  No.  No, I'm not asking that question.

22   Let me -- it has gotten untracked here.  I am asking

23   about an individual whose Social Security Number

24   appears and the question is, is this guy a specialist

25   or not?

26        A.  That is, it's not a field in there.  The field

61

1    is series and whether the person is -- if the person is

2    in series 0347, then they are not a specialist, and

3    everything else is considered --

4         Q.  All right.  So information is in there?

5         A.  Yeah.

6         Q.  Is determinable?  Yes.  Okay.

7             Disabled?

8         A.  There is a disability code, a two-digit code

9    in there.  Yes.

10        Q.  Veteran?

11        A.  No.

12        Q.  Not in there?

13        A.  Not in any one of them.

14        Q.  Disabled veteran?

15        A.  Well, clearly not.

16        Q.  Okay.  Now, as to veterans, do you have access

17   to veteran information anywhere?

18        A.  I do now.

19        Q.  And when did you become -- you say "now" when

20   did it start?  Are you implying that you didn't before?

21             MR. HARWOOD:  Objection.

22             THE WITNESS:  At the time in the 1990s

23   whenever the database was created, that was not one of

24   the fields that I was receiving when I received my

25   information from the NFC system.  I get it downloaded

26   from the Human Capital Office and given to me.  I was

62

1    not at that time receiving veterans preference as one

2    of the fields.  It was a field that was available.  It

3    simply wasn't one I was receiving at that time.

4              BY MR. CHARLTON:

5        Q.  That you didn't capture?

6        A.  Somewhere in the '90s we started capturing it.

7        Q.  Do you know from collateral knowledge whether

8    or not GAO has records anywhere of the status of folks

9    -- veterans, non-veterans, disabled veterans?

10             MR. HARWOOD:  Objection.

11             BY MR. CHARLTON:

12       Q.  They must.

13       A.  At what time?

14             MR. HARWOOD:  Objection.

15             BY MR. CHARLTON:

16       Q.  Ever.  I mean, for the whole period.  I'm

17   talking about for the period '86 to 2007.

18             MR. HARWOOD:  Objection.

19             BY MR. CHARLTON:

20       Q.  If you know.  I mean, if you don't know, you

21   don't know.

22       A.  I don't -- I only know as far back as the mid-

23   90s when I started receiving it.  I still received

24   veterans preference as one of the job elements that is

25   in my regular download from NFC.

26       Q.  But you don't capture it?

63

1       A.  Oh, yes, I did -- I started receiving it and

2  capturing it on a regular basis in the mid-90s.  This

3  is in 1990 itself.  This was before veterans preference

4  was captured.

5       Q.  Okay.  I understand.  Now, let's see if we can

6  put this so everybody else will understand in the

7  record.

8          Okay.  The first question is, for the whole

9  period of time of the existence of the Bob Mowbray

10  fields, was there -- was veterans and disabled veterans

11  information captured?

12      A.  Not for the entire time.

13      Q.  All right.  Did there come a time when this

14  started being captured?

15      A.  Yes.

16      Q.  And when was that?

17      A.  I can't say for sure.

18      Q.  Well, just the closest five years.

19      A.  Well, somewhere --

20      Q.  We'll figure it out later.

21      A.  -- in the mid-90s.

22      Q.  All right.  So if you looked at your 76 pages

23  here and you got to the right field in the mid-90s

24  somewhere you would start to find it; right?

25      A.  Correct.

26      Q.  Okay.  Now, hold it while I make a note of

64

1    that.

2              MR. HARWOOD:  Walter, I see here where you

3    have not yet marked these couple pages.

4              MR. CHARLTON:  Yes, well, we better do that.

5    Where are they?  All right.  Let's mark those four

6    pages as -- what is the next exhibit?

7              MR. HARWOOD:  Why don't we make a copy of

8    these so we have a full set of the exhibits and then

9    we'll make this Exhibit 5.

10             MR. CHARLTON:  You just confused me with your

11   statement.

12                            [Mowbray Deposition

13                            Exhibit No. 5 was marked

14                            for identification and

15                            made a part of the

16                            record.]

17             BY MR. CHARLTON:

18        Q.  All right.  Now, for the year we are talking

19   about, I would like you to -- if you are able to, go

20   through each one of the four sets of -- four groupings

21   of files and take them in any sequence you want and

22   take each one of the fields and tell me if you can

23   identify them or not, and if you can identify them what

24   they are.

25        A.  Okay.

26        Q.  Out of the top of your head.  If you can't,

65

1    just say, "I can't identify them."

2        A.  All right.

3        Q.  First tell us what page you're on?

4        A.  All right.  I'm on page 3.  I'll put them in

5    order.

6        Q.  First of all let me identify the document.  We

7    are talking about Exhibit 5, pages -- what are the page

8    numbers?  3 is the first one, the lowest number.  Put

9    them in number sequence first of all.

10       A.  All right.

11       Q.  We put the sticker on the wrong page, but

12   okay.  But in describing them we'll put them in number

13   sequence.  So we're talking about page 3, what is that

14   16 --

15       A.  Correct.

16       Q.  -- 40 and 60?

17       A.  Uh-huh.

18       Q.  All right.  Now we're talking about page 3 of

19   Exhibit 5.  And tell us the names of the fields and

20   what they mean.

21       A.   The first one "_FREQ_" which has an underline

22   in the front and an underline in the back looks like

23   the output from a SAS PROFREQ and it really probably

24   has no meaning in here.  It just means that at some

25   point in creating it, I ran a frequency distribution

26   and read it out.  And the same is true of the second

66

1    one "_TYPE_" which has an underscore in the front and

2    an underscore in the back.  We look in the file and we

3    find nothing of use in those fields.

4              "ANNBAND" is the announcement band.  That is,

5    whether it's saying for instance, band 2, band 3.

6              "ANNOUNCE" would be the announcement number,

7    specific announcement number.  It also has "ANNUM"

8    which is a variable I also used for announcement

9    number.  How those two compare to each, I don't know.

10    I would have to look.

11              "ANNUNIT" is the announcing unit.

12              "ANSERIES" is the announcement series.

13              "AVG" is the average which would, I think,

14    represent the panel score, the average score from the

15    panel.

16              "BAND", I think, is the employee's band since

17    "ANNBAND" would have been the announcement band.

18              "BQCUT" would be the cut score for

19    determining BQ or Q.

20              "DOB" date of birth.

21              "DUPE" I'm not sure what that means.  It

22    probably means a duplicate of some kind, but I'm not

23    sure why or what it's for.  If I looked at it, I could.

24              "EDUCLVL" educational level we talked about

25    is the educational level.

26              "EXT" I can only guess at this point might

67

1    mean it's an external applicant.  Because I don't see

2    APPLSTAT which is a variable I use in other ones which

3    is the internal or external.

4            Next is federal service comp date which is

5    the date of the federal hire.

6            "FNAME" first name.

7            GAO service comp date is self explanatory.

8            "GENDER" is self explanatory.

9            "HCCODE" is the two-digit disability code.

10            "LNAME" is last name.

11            "NEWPROM" would be the date of last

12    promotion.

13            "PANEL" would be panel name.

14            "RACE" would be, of course, race.

15            "RATING" has a value of either BQ or Q.

16            "REG" no idea.

17            "SALARY" is salary, of course.

18            "SELECT" is whether the person was selected.

19            "SERIES" is the person's job series.

20            "SSN" is, of course, Social Security Number.

21            "STAT" don't know.

22            "UNIT" would be the employee's unit.

23            That's the first one.

24        Q.  That's the first page.  Okay.  Go to the next

25    page which is page number what?

26        A.  Page number 16.

68

1          Q.  Okay.  PFP Data.

2              Now, "ACSCORE" let me think a minute, in 1990

3     the appraisals and -- oh, there was an appraisal and a

4     contribution component in pay for performance in 1990.

5     That's 18 years ago, that's a lot of remembering here.

6              "ACSCORE" is, I'm not sure.

7              "ARANK" would be the appraisal rank.

8              "ASCORE" would be the appraisal score.

9              "AUTOLOAD" don't know, something that just

10    came in from the software.

11             "BAND" would be the employee's band.

12             "BGROUP" don't know.

13             "BONCAT" appears to be some kind of a bonus

14    category.  But there's also a "BONCATS" and I'm not

15    sure which of those two is most meaningful.  I would

16    have to look at the data.

17             "BONUS" is the actual bonus amount.

18             "CRANK" would be contributions rank.

19             "DOB" is date of birth.

20             "EDUCLVL" educational level, same as before.

21             Eligible "ELIG" probably means eligible for

22    assessment for PFP.

23             "EMPLTYPE" is is employee type.  For instance

24    A is a full-time permanent and so forth.

25             "EMPSALRY" must be the employee's salary.

26             "FEDSCD" federal service comp date we know.

69

1              "FNAME" first name.

2              "GAOSCD" GAO service comp date is GAO hire

3    date.

4              "GENDER" is, of course, self explanatory.

5              "GRADE" is the employee's grade.

6              "GROUP", I'm not sure what that means in this

7    year.

8              "HCCODE" is the disability code.

9              "JUL90SAL" is the July '90 salary of this

10    person.

11              "LASTPROM" is the last date of the last

12    promotion.

13              "LASTWGI" is the date of the last within

14    grade increase.

15              Last name is "LNAME".

16              "METHOD" I'm not sure of that.

17              "MNAME" is middle name.

18              "NEWBAND" I'm not sure why there is a new

19    band in there.

20              "NEWPROM" again is the date of last

21    promotion.

22              "OCTBAND" would be the October band.

23              "OCTGRADE" would be the October grade.

24              "OCTLSTPR" probably means something like

25    October last promotion.

26              "OCTSALRY" would be October salary.

70

1          "ORGCODE" seven-digit org code tells where

2     the person is assigned.

3          "PANEL" would be the panel name.

4          "PAYCAT" whatever pay category a person was

5     placed in.

6          "PAYPLAN" is probably PE because these people

7     were all pay plan PE, their pay for performance.

8          "PNLID" is a panel ID.

9          "PPSAL" is pay protection salary.  There was

10    pay protection in those days.

11         "PROFCAT" is a professional category which

12    is, for instance, 1 for SES, 2 for analyst and related.

13    I think all these people had the same PROFCAT.

14         "PROM89" is the -- I'm not sure.  It's either

15    -- I don't think it's the grade in '89.  It might be

16    what their last promotion date was when they were

17    converted in '89.  I'm not sure of that.

18         "PSALAMT" I know is the final salary that

19    came out of the process.

20         "RACE" of course is race.

21         "RANGE" I'm not sure.

22         "RANK" probably their overall rank.

23         "REWARD" not sure what reward meant that

24    year.  Have to look at the book.

25         "SALINC" Salary increase, the total amount

26    that the person's salary increased.

71

1          "SALSFLAG" is salary set flag.  The method by

2     which the salary was increased.

3          "SEPACCTP" I think is some code that

4     identifies people who are either recently hired into

5     the system or being processed out of the system.

6          "SERIES" is, of course, the person's job

7     series.

8          "SSN" is SSN.

9          "STEP" is the person's step.

10          "TCSCORE" would be total contribution score.

11          "TDAYS" I don't know.  Total days, but I

12     don't know what total days represents.

13          "TIE" might be a flag in case people are

14     tied.

15          "TITLE" is the person's job title.

16          "TSCORE" is the total score.

17          "TYPEEMPL" is something like empl type, but I

18     don't know what it means.

19          And "UNIT" is the employee's unit.

20          And that completes page 16.

21     Q.  Okay.  Go to the next page.

22     A.  The next page is the Appraisal Data, page 40.

23          All right.   First we have "ASCORE" and,

24     again, I'm not sure what that means.

25          "AVGBARS" average bars.  That would be the

26     average of the ratings on the bars dimensions.

72

1            "BDATE" is the beginning date of the
2    appraisal.

3            "DAYS" would represent the days that the
4    appraisal covered.

5            That must be a typo there.  Let's see, I have
6    "DDIM5" which probably means nothing because I have
7    "DIM1, DIM2, DIM3, DIM4, DIM5, DIM6, DIM7, DIM8," all
8    the way up through "DIM12" are the actual rating scores
9    on each of the 12 dimensions.

10           "EDATE" is the ending date.

11           "FNAME" first name.

12           "LNAME" is last name.

13           "ORGCODE" is the seven-digit org code.

14           "PANEL" is -- I'm not sure what panel is in
15    that.

16           It has "RSSN" which would be the, I guess,
17    the rater's SSN.

18           And then "SSN" which is the person's SSN.

19           That completes page 40.

20           Now, to page 60 which is NFC data from
21    October of 1990.

22           We have "BAND" which is the employee's band.

23           "DOB" is date of birth.

24           Educational Level "EDUCLVL" we've mentioned
25    before.

26           "EMPLTYPE" we've mentioned before.

1          Federal Service comp date we've mentioned

2    before.

3          First name as before.

4          GAO service comp date as before.

5          "GENDER" as before.

6          "GRADE" is, of course, the person's grade.

7          "GRADE89" is probably the grade the person

8    was before they were converted to bands.

9          "HCCODE" is disability code as before.

10         "LASTPROM" is the date of last promotion.

11         "LASTWGI" date of last within grade increase.

12         "LNAME" is last name.

13         "MNAME" is middle name.

14         "NEWPROM" date of last promotion.

15         "ORGCODE" seven-digit org code.

16         "PAYPLAN" is PE for all these people.  Oh,

17   no, maybe not.  Payplan tells what pay plan a person is

18   in.  It could be GS.

19         "PROFCAT" is the professional category.

20         "PROM89" again we're not exactly sure.  If I

21   looked at it, I could tell.  It has something to do

22   with what their promotion date is at the time of

23   conversion.

24         "RACE" is race.

25         "SALARY" salary.

26         "SEPACCTP" is an indicator of whether the

74

1    person is just leaving the organization or just

2    gaining.

3            "SERIES" job series.

4            "SSN" is the person's SSN.

5            "STEP" their step.

6            "STEP89" their step at conversion.

7            "TITLE" job title.

8            Once again, "TYPEEMPL" I'm not sure how that

9    differs from "EMPLTYPE" but it's there.

10           And "UNIT" is the person's unit.

11   Q.   Okay.  Give me a minute I'm reviewing some

12   questions here.

13           [Pause.]

14           BY MR. CHARLTON:

15   Q.   Does GAO have any plans now to upgrade or

16   modernize the system?

17   A.   There is no system.  I just collect --

18           MR. HARWOOD:  Objection.

19           BY MR. CHARLTON:

20   Q.   Modernize the --

21           [Simultaneous conversation.]

22           BY MR. CHARLTON:

23   Q.   Well, collect the data and turn it into an

24   off-the-shelf type database system?

25   A.   I don't know of any.

26   Q.   You don't know of any.  Okay.

75

1          MR. CHARLTON:  All right.  I think we're

2     making quite good progress here.  But I want to take a

3     short break, if we can.  And I would prefer to go

4     through and not have lunch and get out of here.

5          MR. HARWOOD:  Okay by me.

6          MR. CHARLTON:  But I do need a break right

7     now.  So let's take a ten-minute or so --

8          MR. HARWOOD:  How far do you think you're

9     going to go?

10          MR. CHARLTON:  I don't know.

11          [Brief recess taken at 12:12 p.m.]

12          [Record resumes at 12:30 p.m.]

13          MR. CHARLTON:  Okay.  Thank you.  Are we back

14     on the record?

15          BY MR. CHARLTON:

16     Q.  All right.  Thank you, Mr. Mowbray.  That was

17     difficult, but more difficult for you than us, I guess.

18          All right.  Now, I have a couple of general

19     questions I want to ask about your workload and stuff.

20     When you work -- I mean, I presume you work hard and

21     you have demands on your time.  Who asks you to do

22     jobs?

23     A.  Any number of people.  The Human Capital

24     Office might ask.  My supervisor might ask.

25     Q.  How about the legal division?

26     A.  They might ask.

76

```
 1        Q.  Anyone else?

 2        A.  It could be --

 3        Q.  The Comptroller General?

 4        A.  No.  We don't even have a Comptroller General.

 5        Q.  I mean before.  I'm talking 20 years here.

 6        A.  No.

 7        Q.  Huh?

 8        A.  No.

 9        Q.  Never been asked by the Comptroller General to

10   do anything?

11        A.  Not specifically that I can recall.

12        Q.  How about SallyAnne Harper?

13        A.  She could have, but I don't -- a request that

14   she was going to ask would probably come through Cher.

15        Q.  From who?

16        A.  Cher Whitaker.  Cheryl Whitaker.

17        Q.  Whitaker.  Who was your direct supervisor?

18        A.  Exactly.

19        Q.  So whoever wanted it.  All right.  Have you

20   ever made or processed a request from a promotion

21   panel?

22        A.  From a promotion panel.  No.

23        Q.  Not ever?  How about the Kansas City promotion

24   panel?

25        A.  That wasn't a promotion panel

26        Q.  Oh, well, okay.  So you're being specific.  I
```

1    don't know a promotion panel from a big red dog in

2    terms of definitions.  When somebody is rating people

3    for performance appraisals and when they were closing

4    the Kansas City Office and all of that stuff, where who

5    is doing their job right is important, what do you call

6    it, those kind of panels and organizations?

7              MR. HARWOOD:  I'm going to object.  I don't

8    understand the question.  But if you do, you --

9              THE WITNESS:  No, I don't.

10             BY MR. CHARLTON:

11    Q.  Okay.

12             MR. HARWOOD:  And does the question have to

13    do with this litigation?

14             MR. CHARLTON:  Yes.  Let me rephrase.  Strike

15    all that and we'll rephrase.

16             BY MR. CHARLTON:

17    Q.  Do you get requests that are used by people

18    determining promotions and ratings?

19             MR. HARWOOD: Objection.

20             BY MR. CHARLTON:

21    Q.  At GAO?

22             MR. HARWOOD:  Objection; to the extent you

23    know.

24             THE WITNESS:  I don't understand the

25    question.  Could you run that by again?

26             BY MR. CHARLTON:

78

1    Q.  I'll try.  Your reports contain a lot of
2  information regarding a person's performance and work
3  history; do they not?
4    A.  Past performance, yes.
5    Q.  Past performance.  Who is -- what is the
6  function of a typical user of your data fields?
7         MR. HARWOOD:  Objection.
8         BY MR. CHARLTON:
9    Q.  Or the data information.  Your reports, your
10  printout reports.
11         MR. HARWOOD:  Objection to "typical".
12         THE WITNESS:  Yeah, what's "typical"?
13         BY MR. CHARLTON:
14    Q.  It means from day-to-day who is using this
15  stuff you crank out?
16         MR. HARWOOD:  Objection.  To the extent you
17  know.
18         BY MR. CHARLTON:
19    Q.  If you know.
20    A.  Human Capital Office might want to know --
21  might need data for process of retention allowance.
22  Somebody may be eligible for a retention allowance or
23  their supervisor has applied for one.  They --
24    Q.  What is a "retention allowance"?
25    A.  A retention allowance is pay above and beyond
26  your normal pay from someone who has received an offer

1    or whoever they think is likely to leave the agency.

2    And, of course, they would want to know the performance

3    of those people.  And so the Human Capital Office would

4    ask me for information on that individual and I would

5    use the files that I have to give them PFP information

6    and performance information and ratings information on

7    those people from those history files.

8        Q.  Have you ever had a request from the General

9    Accounting Office or Government Accountability Office,

10   Personnel Appeals Board for information?

11       A.  I'm sure years ago there have been some.

12       Q.  Do you recall a specific event?

13           MR. HARWOOD:  Objection.

14           THE WITNESS:  For information or for --

15           BY MR. CHARLTON:

16       Q.  A request for information from your files by

17   anyone at the Personnel Appeal Board?

18       A.  Actually that may not --the way you just

19   characterized it strikes me a little differently.  I

20   have been asked to provide information for the

21   Personnel Appeals Board, but I don't get the request

22   from the Personnel Appeals Board.

23       Q.  Who do you get it from?

24       A.  I get it through legal services, through the

25   General Counsel's office.

26       Q.  So you -- okay.  To put it differently,

80

1    there's no direct contact with you, it all gets -- it

2    comes in through your supervisors and other folks.  The

3    Personnel Appals Board would not contact you directly?

4        A.  Correct.

5        Q.  Okay.  Do you have any knowledge as to whether

6    the Personnel Appeals Board even knows of your

7    existence or not?

8            MR. HARWOOD:  Objection.

9            THE WITNESS:  I have no way --

10            MR. HARWOOD:  Before you answer -- before you

11    answer.  Objection.  But I also want to note that you

12    are not to testify to anything -- any communications

13    that you have had with the Office of General Counsel,

14    things that you've learned from lawyers in this case,

15    that's privileged.

16            MR. CHARLTON:  That's I don't think accurate.

17    I don't think it's privileged.  But you're not

18    representing him as an individual here.

19            MR. HARWOOD:  I'm representing him as an

20    employee of that GAO.

21            MR. CHARLTON:  All right.  But whether his

22    conversation is privileged or not is a who different

23    matter.

24            MR. HARWOOD:  Well, I 'm instructing you, if

25    you are being asked to testify about anything that you

26    learned from counsel, then you are to discuss with me

81

1   so we can determine whether the communication is
2   privileged or not.  It may or may not be.  But --
3           MR. CHARLTON:  That I do not object to.
4           MR. HARWOOD:  Okay.
5           BY MR. CHARLTON:
6       Q.  Okay.  Now, back to the question.  Have you
7   ever received a request for information where yo know
8   that the destination of it was the Personnel Appeals
9   Board?  That is, the output from your data files.
10      A.  I received requests that I was told that it
11  was data for the PAB; yes.
12      Q.  And what was the nature of those requests?
13      A.  Well, in some cases it may be as simple as
14  tell me all the people who were in a given unit in a
15  given year or in several given years.
16          In other cases it may be, tell me -- tell me
17  with regard to a specific individual all of the ratings
18  of the people who were in the same pay plan and band
19  and unit as that person.  Things could vary.
20          MR. HARWOOD:  It sounds like you are
21  hypothesizing.  Could Walter agree that we want you to
22  testify as to what you remember.
23          MR. CHARLTON:  Is that an objection?
24          MR. HARWOOD:  That's not an objection.
25          MR. CHARLTON:  I just don't want any comments
26  to influence the witness on this point, please.  If

82

1    you're going to make an objection, make an objection.

2              BY MR. CHARLTON:

3    Q.  All right.  So is it fair to say that -- okay,

4    over what period of time have such requests occurred as

5    you just described; requests where the data was

6    ultimately destined to go to the PAB?

7              MR. HARWOOD:  Objection.

8              BY MR. CHARLTON:

9    Q.  Are we talking recently?  Are we talking the

10   whole time frame from '86 on, or are what?

11   A.  I couldn't characterize it as either as simply

12   recently or as the entire period.  Just some time in

13   the past.

14   Q.  It has happened?  You're saying it has

15   happened?

16   A. [Nods affirmatively.]

17   Q.  So is it fair to say that you know -- is it

18   fair to say of your own knowledge that the PAB knows of

19   the existence of Bob Mowbray's data files?

20             MR. HARWOOD:  Objection.

21             THE WITNESS: I don't know.  I don't know what

22   they know, that they know what they know.

23             BY MR. CHARLTON:

24   Q.  Well, if you've given them information and

25   they know where they got it from, don't they?

26   A.  No.

83

1          MR. HARWOOD:  Objection.

2          THE WITNESS:  If I give information to legal

3    services and they give information to PAB, the PAB

4    doesn't know where legal services got it.

5          BY MR. CHARLTON:

6      Q.  I see.  So you -- All right.  Have you or have

7    you not had direct contact with any PAB employee,

8    officer or judge?

9          MR. HARWOOD:  Objection, as to what the

10   contact was for.

11         MR. CHARLTON:  Pardon?

12         MR. HARWOOD:  You asked him if he had any

13   contact at all.  You didn't specify with respect to

14   what.

15         MR. CHARLTON:  That's what I mean, any

16   contact at all, personnel, email, letter, or otherwise.

17         MR. HARWOOD:  Objection.  You can answer.

18         THE WITNESS:  Okay.  Can we talk?

19         MR. HARWOOD:  Is it a privilege issue?

20         THE WITNESS:  No.

21         MR. HARWOOD:  Then you have to answer the

22   question.  If it doesn't raise a matter of privilege

23   then you have to answer the question.

24         THE WITNESS:  The only contact that I can

25   recall is a deposition with PAB.

26         BY MR. CHARLTON:

84

1     Q.  Your deposition was taken?

2     A.  Yes.

3     Q.  By who and when?

4     A.  By Anne Wagner.  And I don't recall when.  It

5  was within the past two years, but I don't know when.

6     Q.  Was it in conjunction with the Band II split?

7     A.  I don't know that that was the topic.  I don't

8  really recall.  Yeah, I know it had to do with SRS.

9     Q.  What is "SRS"?

10    A.  Standard rating score used in performance-

11 based compensation which is now which is what the PFP

12 evolved into.  PFP is performance -- pay for

13 performance evolved into performance-based

14 compensation.

15    Q.  And is that concept or the numbers, recording

16 that score is that part of your data fields?

17    A.  It's part of the data field since the 2004 PFP

18 cycle or PPC cycle.

19    Q.  But not before?

20    A.  Correct.

21    Q.  Is that the only instance you can think of?

22    A.  Yes.

23    Q.  Was that a deposition in a PAB case?

24    A.  I can't even remember.  I honestly don't know.

25    Q.  Okay.  Well, we can get that, that's not a

26 problem.  Okay.

85

1              All right.  How many runs or reports do you

2      run in a typical month?

3           A.  I don't think there is a typical month.

4           Q.  What do you -- you mean each month is entirely

5      different?  You don't have a routine?

6           A.  The things I do range from very small to very

7      large.  They are not counted.  I don't log them.  I

8      couldn't say.

9           Q.  Is there any record of who you distribute you

10     reports to?

11          A.  No.

12          Q.  So a report is printed from a computer where,

13     in Austin?

14          A.  No, right outside my office.

15          Q.  So they fire it over the wire from Austin to

16     you --

17          A.  Right.

18          Q.  -- and it's printed out and you hand it out to

19     somebody?

20          A.  Correct.

21          Q.  And there is no record made of who you hand it

22     to?

23          A.  No.  There's no log or record.

24          Q.  Do they keep a log of what they do in Austin?

25          A.  No, those computer logs are deleted weekly.

26          Q.  Are the -- is there any security designation

86

1   on these?  Are these secret files or anything like

2   that?

3        A.  No.

4        Q.  Why is there no record kept of what you do?

5            MR. HARWOOD:  Objection.

6            BY MR. CHARLTON:

7        Q.  If you know.

8        A.  I don't.

9        Q.  You don't know why there's no record?

10           MR. HARWOOD:  Objection.

11           BY MR. CHARLTON:

12       Q.  Or you just were never asked to keep one or

13   what?

14       A.  Well, certainly I was never asked to keep one,

15   that's for certain.

16       Q.  Or you would be doing it.

17           MR. HARWOOD:  Objection.

18           BY MR. CHARLTON:

19       Q.  Do you know who Ron Stroman is?

20       A.  Yes.

21       Q.  Have you ever furnished reports to Ron

22   Stroman?

23       A.  Yes, I've given data to him.

24       Q.  Day-to-day?

25       A.  No, data.

26       Q.  You've furnished him data?

87

1       A.   Yes.

2       Q.   How frequent is your contact with him?

3       A.   Very infrequent.

4       Q.   And before in the Office of Civil Rights did

5    you ever furnish them information?

6       A.   Yes, occasionally.

7       Q.   Okay.  Now, in your prior testimony I asked

8    you a question about if you received a request from the

9    Comptroller General to prepare a report for him with 20

10   variables in it and approximately how long would it

11   take you.  And as I recall your answer, it was, I can

12   usually turn everything around within two days; is that

13   still accurate or have I got that straight and I would

14   like you to comment on that.

15          MR. HARWOOD:  Objection.  Do you want him to

16   review his testimony?

17          MR. CHARLTON:  No, I just want to ask him a

18   new question on that subject.

19          THE WITNESS:  Okay.  What's the question?

20          BY MR. CHARLTON:

21      Q.   If I was the Comptroller General and I said, I

22   want you to prepare me a report combining all four of

23   these files for five years, and analyze 20 variables in

24   the following format, about how long would it take you

25   to do it?

26          MR. HARWOOD:  Objection.

1          THE WITNESS:  There would be no way to answer

2     that question.  There's no way to tell how much

3     complexity is involved once you start merging data.

4     Some files have multiple records per Social Security

5     Number, files don't, some files don't.  And we haven't

6     even talked about what the complexity is of the

7     analysis that you want done.

8          BY MR. CHARLTON:

9     Q.  So it would depend on the complexity of the

10    job entirely?

11         MR. HARWOOD:  Objection.

12         THE WITNESS:  In part.  Also on the

13    complexity are the data sets involved and whether there

14    are any mismatches in merging.  Just because they both

15    contain SSN doesn't mean that they merge up completely.

16    There will be some SSNs in one that don't exist in the

17    other, vice versa, and potential multiple occurrences

18    of SSNs and it can get very complicated.

19         To do a thorough job it takes time.

20         BY MR. CHARLTON:

21    Q.  And here, as I understand your prior

22    testimony, some of the -- I mean, the files aren't even

23    in the same format from year to year; correct?

24    A.  Correct.

25    Q.  So you would have that complexity also.

26         Okay.  Can your files be combined, combining

89

1    all the variables for all persons into a --

2              Let me rephrase that.

3              If you were asked to combine four sets of

4    files, four groups of files that you call them, into

5    one master file for the people for one year, would you

6    be able to do that?

7        A.  I don't know that it would be -- I'm trying to

8    picture how I would do that.  Because you're talking

9    about one file.  Some of these files, like the NFC data

10   files, the staffing files, have literally one record

11   per individual, one record per individual.  The pay for

12   performance or PPC files have one record per

13   individual.  But promotion files have some individuals

14   may apply eight, nine times.  So there are eight or

15   nine records per individual in those.

16             So the question would become, how would you

17   combine them into a file.  Do you count to still have

18   one record per individual or do you have nine times as

19   many records because they were, when you merged in the

20   data from the MSP you had nine.  It's better to do

21   analysis by doing the individual analyses drawing from

22   the individual data sets rather than attempting to

23   combine them all into one very, very large file unless

24   we were willing to spend a lot of money and have

25   professional developers do it.

26       Q.  Okay.  Now, next question.  Are you able to --

90

1    would you be able to analyze and extract data from each

2    one of the files and merge it into a predetermined

3    format master file, one such for each person for each

4    year?

5            MR. HARWOOD:  Objection.

6            BY MR. CHARLTON:

7        Q.  In a fixed format.  Let's assume it's a fixed

8    format.

9        A.  That, again, I think would be a very difficult

10    way to do it because we're talking here about merging

11    four files that have to be merged by SSN.  The question

12    becomes, what happens when I have one person here from

13    the NFC data, I could merge that person's PFP data in

14    because there was only one record in the PFP file.  But

15    when I try to merge by Social Security Number the

16    promotion data there may be seven records for that

17    person.  When I do the merge I now have seven records

18    for that person, not one.  So it would be very

19    difficult to do in fixed file format.

20        Q.  All right.  Is there any other way to do it?

21    What would you suggest --

22            MR. HARWOOD:  Objection.

23            BY MR. CHARLTON:

24        Q.  -- as an alternative to get -- say that was a

25    requirement, how would you go about doing it?

26            MR. HARWOOD:  Objection.

91

```
 1              THE WITNESS:  I would talk someone out of
 2    that requirement is what I would do.  Because it would
 3    be better to do analyses of pay for performance from
 4    the pay for performance database; to do analyses of
 5    promotions from the promotion database and so forth.
 6    And if pieces of data were needed from other files,
 7    simply bring them in, in the course of the analysis.
 8    But to attempt to make them into one big megafile would
 9    be very, very difficult.  It would be a lot of details.
10              BY MR. CHARLTON:
11        Q.  But with the information all there, then the
12    methodology you just talked about could accomplish
13    perhaps the result you are looking for.
14              MR. HARWOOD:  Objection.
15              THE WITNESS:  What result is that?
16              BY MR. CHARLTON:
17        Q.  Well, a result of cross comparing and linking
18    data from your four groups of data.
19              MR. HARWOOD:  Objection.
20              THE WITNESS:  That can now be done in the
21    course of an analysis; yes.
22              BY MR. CHARLTON:
23        Q.  And you do that -- and you do that all the
24    time; do you not in these reports you run for various
25    folks?
26              MR. HARWOOD:  Objection.
```

92

```
1              THE WITNESS:  No, I do it sometimes.
2              BY MR. CHARLTON:
3      Q.  Sometimes.  Well, okay.  So you do it.
4      A.  It can be done.
5      Q.  Okay.  All right.  And if you had to do a job
6   like that for a particular year, how long would it
7   take?  Is that a difficult job?
8              MR. HARWOOD:  Can you just define the "job
9   like that"?
10              MR. CHARLTON:  Like that is what he just said
11   in his words.  I don't want to recast them.
12              THE WITNESS:  I didn't define any level of
13   complexity or magnitude of job in what I was talking
14   about.
15              MR. HARWOOD:  The conversation was very
16   general, I think you need to be more specific.
17              BY MR. CHARLTON:
18      Q.  Okay.  Well, let's go to something else.  If I
19   wanted to compare promotion or not by age and race and
20   grade, band, et cetera, can you generate such a report?
21              MR. HARWOOD:  Objection to "et cetera".
22              MR. CHARLTON:  Well, strike, "et cetera".
23              MR. HARWOOD:  Do you have the question?
24              THE WITNESS:  Yes, the question is, can I
25   generate for, I suppose, a given year, a report
26   summarizing promotions by age or gender or band; was
```

93

1    that it?

2              BY MR. CHARLTON:

3        Q.  Yes.  Age, race, gender, band.

4        A.  Yes.  Because those variables all exist in the

5    MSP databases.  By the way, I can do that only through

6    the year 2001.

7        Q.  Only through 2001.  Why is that?

8        A.  The collection of data for the promotion cycle

9    was moved to the human capital office starting in 2002

10   and they have retained the data, but not in SAS format

11   and not in any format I can access since then.  It's in

12   Excel spreadsheets.

13       Q.  So they have a system.  Okay.

14       A.  They have spreadsheets.

15       Q.  They have spreadsheets.  Okay.

16              Can your files be analyzed by band, age

17   range, race of the person promoted by year, band and

18   grade?

19       A.  Is that what you just asked?

20       Q.  No.

21       A.  Promotion you just asked, didn't you?

22       Q.  I put in age range in this one.

23              MR. HARWOOD:  Why don't you just reask the

24   question.

25              BY MR. CHARLTON:

26       Q.  Can your files be analyzed by band, the age

94

1    range and race of the person promoted by year band and

2    grade?

3        A.  By year, band, and grade; yes.

4        Q.  Can your files for each year compare the

5    performance rating and promotions by age, race, year,

6    and grade, and band?

7            MR. HARWOOD:  Objection to "for each year."

8            THE WITNESS:  The answer is, yes, but the

9    farther back we go the worse the rating data is.  The

10   rating data is not always complete as we get farther

11   back and we go back into the '90s.  And when we attempt

12   to bring in rating data we are not always guaranteed.

13   Remember rating data does not exist in the promotion

14   data files in the MSP files.  The rating data is in the

15   appraisal file.  So we would have to merge in three

16   years of rating data because the MSP folders contain

17   the last three years ratings.  We would have to bring

18   in three years of ratings for each applicant.  And it's

19   not guaranteed that all the data is going to be there

20   for all of those -- for all of those applicants.

21           BY MR. CHARLTON:

22       Q.  I understand.

23       A.  I did the best I could in putting together the

24   rating file.

25       Q.  So you've got data problems with that --

26       A.  Perhaps.

95

1     Q.  -- for that particular calculation.  Okay.

2          You mentioned in your -- when you were going

3     through the sheets you said in conjunction with page

4     16, "I have to look at the book" because you couldn't,

5     what does that -- what book?

6     A.  It's the -- each year in pay for performance

7     GAO issues what they call the PFP handbook and it's

8     issued and it's available to all the staff.  And it

9     merely lays out the parameters for the process that

10    year including things like what are the bonus

11    categories, or how much -- what percent of people are

12    allowed to be put into a certain category.  And it's

13    publicly available.  I have copies of almost all, if

14    not all of them historically.

15         MR. CHARLTON:  All right.  Just a moment I

16    may be done.

17         [Discussion held off the record.]

18         BY MR. CHARLTON:

19    Q.  Do you have a list of computer programs or do

20    you have a book of computer programs?  I mean, how do

21    you store your programs?

22    A.  They're stored at the mainframe down there.

23    Q.  So they're in Austin?

24    A.  They're in Austin.

25    Q.  And are they written by the folks in Austin?

26    A.  No, they're written by me.

96

1      Q.  They're written by you.  You don't keep copies

2  of them?

3      A.  Do you mean paper copies?

4      Q.  Any kind of copies.

5      A.  No, I don't keep paper copies, no.

6      Q.  But you have each one of your programs on your

7  computer, I presume?

8      A.  Each of the recent ones, yes.

9      Q.  Yeah, okay.

10     MR. HARWOOD:  These are the SAS programs

11  you're talking about?

12     THE WITNESS:  Correct.  The SAS programs.

13     MR. CHARLTON:  Okay.  That's all I've got.

14     MR. HARWOOD:  I don't have anything.

15     [Whereupon, at 1:02 p.m., the deposition of

16  William R. Mowbray was concluded.]

CERTIFICATE OF REPORTER

I, Cynthia D. Thomas, a Notary Reporter, in and for the District of Columbia, do hereby certify that the foregoing proceeding was transcribed by me and is a true and accurate record of the testimony given to the best of my ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

_____
Cynthia D. Thomas, CVR
Court Reporter

Notary for the District of Columbia
My Commission expires:  December 14, 2009

98

ACKNOWLEDGEMENT OF DEPONENT

```
_____)
VENKAREDDY CHENNAREDDY, et al.,  )
                                 )
            Plaintiff,           )   CA: 87-3538 (EGS)
                                 )
        vs.                      )
                                 )
DAVID M. WALKER,                 )
                                 )
            Defendant.           )
_____)
```

        I, William R. Mowbray, hereby acknowledge

that I have read and examined pages 1 through 113,

inclusive, of the transcript of my deposition, and that

except for the changes noted in the attached Errata

Sheet, the same is an accurate and complete

transcription of the answers given by me to the

questions therein recorded.

_____     _____
    Date                         Signature

    Subscribed and sworn to before me this _____

day of _____, _____.

                        _____

                            Notary Public

My commission expires:

**E-R-R-A-T-A   S-H-E-E-T**

In re:  Venkareddy Chennareddy vs. David M. Walker

Deposition of:  William R. Mowbray

Taken on:  Friday, May 16, 2008

    At the time the above-named deponent read and
signed the deposition, the deponent desired to make the
following corrections:

PAGE:   LINE:   AS TRANSCRIBED:     CHANGE TO:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

DATED: _____SIGNED:_____